020108 Schuessler

1

```
 1    IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
 2
      ----------------------X
 3    In Re:                   Case No. 07-35608
                               Chapter 7
 4
      CHRISTOPHER SCHEUSSLER
 5    & BOBBI ANN SCHEUSSLER,

 6              Debtor.     Poughkeepsie, NY
      ----------------------X February 1, 2008
 7

 8
                    TRANSCRIPT OF HEARING
 9
            BEFORE THE HONORABLE CECELIA G. MORRIS
10          UNITED STATES BANKRUPTCY COURT JUDGE

11

12    APPEARANCES:

13    For Debtors:        JOHN J. FALLON, ESQ.

14    For Chase Home      LILLIAN WEIGERT, ESQ.
      Finance:            Gellert & Klein PC
15
                          EDWARD LESNIAK, ESQ.
16                            Burke Warren

17
      Transcriptionist:   KAREN SCHMIEDER, CSR, RDR
18                        Schmieder & Meister, Inc.

19

20

21

22

23

24          Proceedings recorded by electronic sound
              recording; transcript produced by
25                   transcription service.
```

2

```
 1                   THE COURT:  This is case number
```

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

2    07-35608, Christopher and Bobbi Ann

3    Scheussler.  State your name and

4    affiliation.

5          MS. WEIGERT:  Good morning, Your

6    Honor.  Lillian Weigert, Gellert & Klein for

7    Chase Home Finance.

8          It is my pleasure to introduce

9    Edward Lesniak, who has been admitted pro

10   hac vice in this case.

11         MR. LESNIAK:  Good morning, Your

12   Honor.

13         MS. WEIGERT:  From the law firm of

14   Burke Warren in Chicago.  And also with us

15   are the two Chase witnesses Your Honor

16   requested, Miss Deborah Baker and Miss

17   Sophie Salinas.

18         THE COURT:  Very good.

19         MR. FALLON:  Good morning, Your

20   Honor.  John J. Fallon, McDonovan, Fallon

21   for the Scheusslers.

22         THE COURT:  Very good.

23         MS. WEIGERT:  One preliminary

24   matter.

25         THE COURT:  Yes, ma'am.

                        3

1          MS. WEIGERT:  Your Honor, Chase

2    submitted a response in aid of this hearing

3    and requested leave that it be accepted.  It

4    was filed online and served on our

5    adversary.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

6        THE COURT:  And this was the one

7    that I have?

8        MS. WEIGERT:  Correct, Your Honor.

9        THE COURT:  Very good.

10       This is the Court's motion, and I

11   want to emphasize today what this hearing is

12   about and what it's not about.  It is not

13   about excusing debtors from paying their

14   mortgage payments when they become due.  As

15   we all know, bankruptcy is not an

16   opportunity for debtors to shirk their

17   mortgage obligations.  Nor is bankruptcy an

18   opportunity for secured creditors to take

19   advantage of the situation by confusing the

20   record, contriving defaults or otherwise

21   attempting to obtain possession of debtor's

22   property solely because the debtor filed for

23   bankruptcy.

24       Moreover, a secured creditor cannot

25   deny certain services or privileges to a

                                              4


1    mortgagor solely because the mortgagor filed

2    a bankruptcy petition.  The automatic stay

3    is a fundamental right for bankruptcy

4    debtors.  An order granting relief from the

5    stay even in a Chapter 7 case is a serious

6    negative consequence for debtors.  Thus all

7    filings submitted to a federal court must be

8    taken seriously.  Where affidavits are

9    submitted to a Court under penalty of

Page 3

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

10    perjury, this Court has the right to assume

11    the facts sworn to in that affidavit have

12    been carefully researched and to the best of

13    the parties' knowledge are true and correct.

14              It goes without saying that

15    attorneys, as officers of the Court, are

16    held to an even higher standard.  The Court

17    must be certain that the party requesting

18    relief is taking the matter as seriously and

19    as carefully as the decision maker.  And I

20    will add here, I take my responsibilities

21    seriously and I make my decisions, I hope,

22    carefully.

23              We are not here today to punish a

24    secured creditor out of judicial activism or

25    because it has become fashionable today.  It

                                                    5


1    is my duty, this Court must ensure that if

2    debtors and any debtor that comes before

3    this Court do what is required of them, they

4    will have a shot at a fresh start and/or

5    reorganization, and all of the other rights

6    and benefits contained in the Bankruptcy

7    Code.  Where a creditor's policy or

8    practices interfere with those rights, this

9    Court has the authority -- and I might even

10   say I believe this Court has the duty to

11   investigate the conduct.

12             The Court's concern was raised by

13   the debtor's opposition to the lift-stay

Page 4

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

14    motion.  Chase's subsequent conduct has only

15    increased this Court's level of concern.

16            The Court has thoroughly reviewed

17    the January 25th, 2008 response from Chase,

18    and momentarily I will comment on Chase's

19    response line by line, and then I will give

20    Chase and debtor's counsel an opportunity to

21    reply.  Having said that, this Court will

22    take judicial notice of the spreadsheet and

23    payment history attached to the response and

24    will assume that Chase is absolutely

25    correct; that the debtors chronically made

6

1    delinquent mortgage payments; Chase misses

2    the entire point of the order to show cause.

3            Candidly, upon reading Chase's

4    response, the Court had the impression that

5    no one actually read the order to show

6    cause.  The order to show cause was

7    carefully worded and drafted, and a thorough

8    response was expected.  Chase's response

9    does not address any of the major concerns

10   addressed in the order to show cause.

11   Chase's response makes no effort to address

12   its policy as described in Deborah Baker's

13   affidavit, that mortgagors who are current

14   with their mortgage obligation are permitted

15   to make payments at local branches and by

16   telephone.  But on the other hand, Chase

17   informs debtors that their mortgage will be

Page 5

020108 Schuessler

18    monitored in the bankruptcy department even
19    if your loan is current.  And this
20    apparently means, according to Miss Baker's
21    affidavit, that debtors, even debtors that
22    are current, are not permitted to make
23    payments at Chase branches.
24          The emphasis basically expressed in
25    the affidavit all along has been the word

7

1    "current."  To emphasize, Chase claims that
2    the privilege of making payments at a local
3    branch is provided to mortgagors who are
4    current with their mortgage obligations, but
5    not on loans under Chapter 7 bankruptcy
6    protection.  When the Court expressed
7    concern in the order to show cause that the
8    current debtors would be denied this
9    privilege just because they filed for
10    bankruptcy, Chase's response is that these
11    debtors are delinquent, but does not explain
12    why delinquent mortgagors are granted the
13    privilege of paying at local branch, but the
14    same delinquent mortgagors may not pay at
15    branch if they file for bankruptcy.  This
16    would seem to increase the appearance of a
17    bankruptcy bias not alleviated.
18          In the response Chase abandons the
19    grounds it relied upon in the lift stay
20    motion by claiming that the debtor had been
21    paying late for years.  Although the debtors

Page 6

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

22   have been paying late for years, they have

23   been paying regularly for years.  Every

24   month.  And when a month is missed, two

25   payments were made the following month.

8

1   Again, I take judicial notice of what's been

2   put in Chase's response in the affidavit.

3        When the debtors pay late, they pay

4   late charges.  Paid late, i.e., paid, but

5   late is not the same as not current, which

6   means hasn't paid.  And delinquent is not a

7   big deal where the debtor paid the late

8   charges and have substantial equity; two

9   facts completely glossed over or ignored by

10   Chase.  It's not just the response that

11   makes the Court think that the order to show

12   cause has been ignored.

13        And by the way, I will take

14   judicial notice of the order to show cause.

15   It's in the record, and the parties are

16   presumed to be familiar with it.

17        Chase's entire course of conduct in

18   this case has been troubling, as noted in

19   the order to show cause.  First, after the

20   debtor filed opposition to the lift stay

21   motion; two, after the Court stated that

22   that if Chase has been doing what the debtor

23   says -- and by the way Chase has not

24   disputed one word of the debtor's

25   opposition; in fact, their subsequent

Page 7

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

9

1        filings have confirmed the debtors'
2        allegation.  And three, at that time this
3        Court said I want a hearing on this, and I
4        was clear.  We have listened to the
5        records -- that's what I said.  Three, after
6        the Court scheduled an evidentiary hearing
7        on the motion, and four, after requesting
8        multiple adjournments, an attempt was made
9        to withdraw the lift stay motion by a one
10       sentence letter filed on the docket from a
11       "legal assistant" acting on behalf of an
12       unknown entity called "Pillar Processing"
13       that had not previously appeared in this
14       case and no explanation of the relationship
15       to the case or on whose behalf Pillar
16       Processing was acting.
17              Just to add to that, on November
18       28, 2007, a letter was filed on the Court's
19       docket in this case, addressed to the Clerk
20       of the Court from a legal assistant acting
21       on behalf of Pillar Processing, LLC, an
22       entity unknown to the Court, and appeared to
23       have no connection with this case or these
24       debtors.  The letter stated, and I quote:
25       "Respecting captioned bankruptcy matter,

10

1        please be advised that the 362 motion
2        scheduled for December 7, 2007 at 10:30 a.m.

Page 8

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

3   has been withdrawn."  Therefore, though no
4   relationship was identified or explained in
5   the body or letterhead, Pillar Processing
6   and Chase's former bankruptcy counsel,
7   Steven Baum, P.C., share the same address
8   and phone number.  And the ECF reflects the
9   letter was filed by Dennis Jose, a Steven
10  Baum P.C. attorney on behalf of Chase Home
11  Financing, LLC.  Neither Chase nor its prior
12  bankruptcy counsel have made any effort to
13  address this act or the propriety of this
14  action on the record.
15          The Court's order to show cause was
16  met with a barrage of adjournment requests
17  from Chase and its counsel.  Some were
18  meritorious and some were not.  To give one
19  example, a request for adjournment was made
20  by Chase's former counsel because one of the
21  witnesses ordered to be here had to be at a
22  deposition.  But the attorney requesting did
23  not know whether she was taking the
24  deposition, being deposed or defending the
25  deposition or did not indicate whether any

                                              11


1   effort had been made to adjourn the
2   deposition.
3           It does not speak well of Chase if
4   even a federal judge cannot get Chase to
5   take orders seriously or get its officers or
6   its counsel to appear without meeting
                Page 9

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 7        resistance, evasive action or delay tactics.
 8        This is not directed at present counsel, but
 9        you must understand that today is the first
10        time Chase has physically appeared in this
11        Court, except by local counsel.
12                This Court is not a consumer debtor
13        that can be shrugged off or ignored.  And
14        that brings us to the point of today's
15        hearing.  Not only is it unacceptable for
16        Chase to conduct itself this way in a
17        federal court, and that should have been
18        obvious this was an order -- it is equally
19        unacceptable for Chase to treat consumers
20        that way.  When this conduct comes to the
21        attention of the Court, the Court has a duty
22        to address it.  One of the most difficult
23        things for a Judge is to know whether it is
24        correct to bring matters before the Court on
25        its own motion.  It is my understanding, an
```

12

```
 1        understanding I share with most judges that
 2        I know, that my job is to ensure the
 3        fairness and integrity of the bankruptcy
 4        system.  It is my responsibility, as I see
 5        it, to try to assist the bankruptcy system's
 6        dual goal of payment to the creditors and
 7        discharge of the debtors are met and fairly
 8        balanced.  That system is undermined when
 9        the debtors are treated unfairly.  And it
10        appears that the debtors have been treated
```

Page 10

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

11          unfairly in this case.  They have property
12          with equity.  Their payments were refused by
13          the creditors post-petition, putting them in
14          arrears.  And the secured creditor then
15          sought relief from this Court so it could
16          commence foreclosure sales based upon those
17          forced arrears.  And the payment it refused
18          because the debtor filed for bankruptcy.
19                  Those are the big picture concerns
20          as the Court sees them.  And they were not
21          addressed in Chase's response.  So I am
22          going to be very slow, and I am going to let
23          you write down the objectives of today's
24          hearing.
25                  The first one.  Whether Chase's

                                                        13


1           conduct violated Federal Bankruptcy Law
2           Section 9011.
3                   Two.  Whether sanctions or
4           otherwise warranted against Chase for moving
5           for relief from the stay in this case or for
6           violating the automatic stay.
7                   Three.  Whether Chase's conduct is
8           an abuse of the Bankruptcy Code.  And if so,
9           whether the Court should enjoin that conduct
10          by issuing an order pursuant to 11 U.S.C.
11          105.  And I might add here that I think I
12          made it very clear in the order to show
13          cause by referring to the Noseck decision
14          out of Massachusetts.

                        Page 11

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

15        This Court will be interested in
16   the decision-making and research that went
17   into this lift stay motion, and certain
18   policies that appear to bar all bankruptcy
19   debtors from paying at the branch.
20        I will now give you my analysis of
21   Chase's response.  The application to the
22   lift stay motion sought relief from the stay
23   because the note and mortgage provided that
24   the debtor will be in default if they do not
25   make full monthly payments on each date due.

14

1    As of the 29th day of June 2007, the debtors
2    have failed to make two payments in the
3    amount of $2,079.12, which represents the
4    payments due the 20th day of May 2007,
5    through June 2007 and have not cured said
6    defaults.  And I quoted from the lift stay
7    motion, and those were post-petition months.
8    The lift stay application, and I also have
9    that in the Salinas affidavit, and that's at
10   paragraph 5, as the debtor filed their
11   bankruptcy petition on April 30th, 2007, the
12   application appears to allege that they have
13   not made either of the two post-petition
14   payments that have come due as of the date
15   of the lift stay motion.  The debtors
16   responded with proof that they have made a
17   post-petition payment in May of 2007 and
18   have attempted to make another payment in

Page 12

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

19   June 2007, which had been refused at the
20   Chase branch.  Thus, the debtors claim and
21   Chase does not dispute that the debtors in
22   fact made or attempted to make both
23   post-petition payments.  In response to the
24   order to show cause, Chase picks up the word
25   delinquent, which the Court used in the

15

1   order and suggests that its lift stay motion
2   was warranted because the debtors were
3   delinquent prior to and at the time they
4   filed their petition.  And that the payment
5   history shows that they were continually one
6   or two months delinquent up to and including
7   the filing date.  That's the response at
8   page three.
9          In the response Chase acknowledges
10   that the debtor made a payment on May 25,
11   2007, which, quote, was promptly processed
12   and applied by Chase to the then next
13   payment, which was for April 20th,
14   pre-petition date, not May the 20th.  This
15   fact was not advertised, not even mentioned
16   by Chase in the lift stay application, the
17   Salinas affidavit or the memorandum of law.
18   As Chase notes in its response, the facts
19   could only be discovered by reviewing a
20   spreadsheet annexed to the Salinas
21   affidavit.
22          Chase stresses in the response that

Page 13

020108 Schuessler

23      the debtors were continually one or two

24      months delinquent and the attempt to justify

25      moving for the relief from stay.  The

                                                16


 1      problem is that Chase did not move on the

 2      grounds that the debtors were delinquent,

 3      pre-petition anyway.  Chase moved for the

 4      relief based upon the claim that the debtors

 5      have failed to make two payments.  Of

 6      course, one of the two payments the debtors

 7      allegedly failed to make was the

 8      post-petition payment that Chase refused to

 9      accept at its local branch.  Leaving this

10      aside for a moment, for Chase to focus on

11      the fact that one payment was delinquent,

12      even if technically correct, is misleading

13      for the many facts Chase leaves out.

14              In the lift stay motion Chase

15      alleges, and I'm quoting from the lift stay

16      motion:  The debtors failed to make two

17      payments in the amount of $2,079.12, which

18      represents the payments due the 20th day of

19      May 2007 through June 2007 and have not

20      cured said defaults.  Salinas affidavit.

21      The estimated amount owing to Chase under

22      the note and mortgage, including late

23      charges in the amount of $63.74, was

24      $165,394.14.  Chase claims interest on the

25      unpaid principal balance will continue to

                                                17

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1      accrue and to protect its security in the
2      mortgage premises secured creditor may be
3      required to make further advances for
4      property taxes, insurance and related
5      matters.
6              Continuing with Chase:  Chase is
7      suffering immediate and irreparable harm and
8      loss in that insufficient income is being
9      received by it on the note secured by the
10     mortgage to pay real estate taxes and hazard
11     insurance.  And as each installment payment
12     period passes and as advances are made,
13     secured creditor is further exposed in the
14     equity securing its interest in the
15     mortgaged premises is further diminished to
16     the point where it does not now nor will it
17     have adequate protection for that security
18     interest.  Again, that's in the lift stay
19     application.
20             In the memo Chase also argues, as
21     aforementioned, the value of the mortgaged
22     premises is $299,900; as such, no equity
23     exists.  Do the math.  Therefore, the stay
24     must be lifted pursuant to 362(d)(1) and
25     (2).  In its memo in support of the lift

18

1      stay motion, Chase cites case law for the
2      proposition that a debtor's failure to make

Page 15

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

3  regular mortgage payments as they become due
4  constitutes sufficient cause to lift the
5  automatic stay, 11 U.S.C. 362(d)(1).  The
6  reality is quite different.  Debtors made or
7  attempted to make all post-petition payments
8  as of the date Chase filed the lift stay
9  motion.
10        The debtors indicate in Schedule A
11  to their petition that the value of the
12  collateral subject to Chase's mortgage is
13  $299,900, which means that there was
14  significant equity in the property, and that
15  Chase was over secured by at least $120,000.
16  Chase agrees with the debtor's valuation.
17        Lift stay motion.  The debtors pay
18  late, but they pay regularly.  The
19  spreadsheet attached to the Salinas
20  affidavits show that the debtor has made
21  payments every month, and in the few months
22  where this is not so, double payments the
23  following month since originating the loan
24  in April of 2003.  When the debtors pay
25  late, Chase assesses late charges.  They pay

19

1  the penalty to pay late.  The debtors paid
2  all but $63.74 of these late charges, as
3  Miss Salinas acknowledges in her affidavit.
4        In requesting relief from the stay
5  Chase represented that the debtors failed to
6  make two main payments causing immediate and

Page 16

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

7   irreparable harm and loss because no equity

8   exists and Chase might have to make further

9   advances.  In reality, the debtors made

10  regular payments and paid late charges, made

11  or at least attempted to make payments in

12  both post-petition months and have

13  substantial equity.  The details omitted

14  from or misrepresented in Chase's motion are

15  the difference in a meritorious motion and

16  an unmeritorious motion.

17          The question arises as to why Chase

18  would move for relief from stay when the

19  debtors appear to have done what they have

20  been doing and Chase has been permitting

21  since February 2005, according to Chase's

22  records.  Notwithstanding the fact that

23  debtors attempted to make regular

24  post-petition payments, Chase moved for

25  relief from the stay.  It is troubling to

                                              20


1   the Court that Chase has apparently seized

2   the opportunity of this bankruptcy filing to

3   take steps to foreclose on debtors'

4   property.  There is no indication in Chase's

5   lift stay motion or in the debtors'

6   statement of financial affairs that Chase

7   commenced a foreclosure action pre-petition.

8          Getting back to the response.  One

9   other assertion does not ring true.  Chase's

10  main defense in the response is that the

Page 17

020108 Schuessler

11    debtor's were consistently one or two months

12    behind for more than a year prior to the

13    filing date.  That's in response, page four.

14    The debtors made a post-petition payment at

15    a Chase branch in May 2007.  In June 2007

16    the payment was refused.  It appears, though

17    it is not explicit in the debtors'

18    opposition to the lift stay motion, that the

19    debtors routinely made their pre-petition

20    mortgage payments to Chase at a local

21    branch.  If this is true, then Chase

22    accepted these "delinquent payments" at the

23    branch pre-petition for more than a year.

24    Chase accepting one post-petition payment in

25    May 2007 and then refused a payment in June

                                        21

1     2007.  What changed between May 2007 and

2     June 2007?  Delinquency is not a

3     satisfactory answer.

4              I am ready to question the

5     witnesses.  This is my motion.  If you'll

6     stand and raise your right hands.  Do you

7     solemnly swear the testimony you're about to

8     give is the truth, the whole truth and

9     nothing but the truth so help you God?

10             MS. BAKER: Yes, Your Honor.

11             THE COURT:  State your full name.

12             MS. BAKER:  Deborah Karen Baker.

13             THE COURT:  And your address,

14    please, Miss Baker.

                    Page 18

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

15              MS. BAKER:  My business address or
16      home address?
17              THE COURT:  Give me your business
18      address.
19              MS. BAKER:  3450 New Mission Drive,
20      Columbus, Ohio 41511.
21              THE COURT:  Very good.  Miss
22      Salinas.
23              MS. SALINAS:  My name is Sophia C.
24      Salinas, and I live at 1721 (indiscernible)
25      Avenue in (indiscernible) California.

                                            22
                    COURT - SALINAS


1               THE COURT:  Very good.  Miss
2       Salinas, if you'll take the witness box.
3
4               (SOPHIA C. SALINAS, sworn by the
5       Court.)
6
7    EXAMINATION
8    BY THE COURT:
9    Q.   Miss Salinas, I've had you now sworn in.  Can
10        you tell me what your role is at Chase?
11   A.   I am the bankruptcy supervisor there.
12   Q.   And when you say "there", what do you mean
13        there?
14   A.   At Chase Home Finance in San Diego.
15   Q.   What is your venue, jurisdiction; do you deal
16        with all bankruptcy for Chase nationwide or just
17        in your area?
18   A.   For subprime bankruptcy.

                    Page 19

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

19   Q.   For subprime bankruptcy?

20   A.   Correct.

21   Q.   How long have you worked at Chase in this

22        capacity?

23   A.   Two and a half years.

24   Q.   Approximately how many consumer mortgages do you

25        monitor?

                                                    23
                    COURT - SALINAS


 1   A.   Each person has about 500 loans, 450 to 500.

 2   Q.   And you are the person monitoring the

 3        Scheussler's loan?

 4   A.   No, I am not.

 5   Q.   Well, that's another question.  We'll get there

 6        in a minute.  How many affidavits of the type

 7        you filed in this case do you execute in the

 8        course of a day?

 9   A.   I would say maybe 15 to 20 a day, on average.

10   Q.   And you don't monitor the Scheussler's loan?

11   A.   Not me specifically.  We have about 17 people in

12        the bankruptcy department, and each person has

13        450 to 500 loans.  So there is one specific

14        person who handles the Scheussler account.

15   Q.   And that's not you?

16   A.   Correct.  I supervise that person.

17   Q.   Oh, you supervise that person?

18   A.   Yes.

19   Q.   So in your capacity as a supervisor is why you

20        signed the affidavit?

21   A.   Yes, ma'am.

22   Q.   So how many approximately a week of these type

                        Page 20

020108 Schuessler
```
23        of affidavits do you execute?
24   A.   Well, daily it's about 15, so times five
25        business days.
```
                                                            24
                         COURT - SALINAS

```
 1   Q.   And in a year.
 2   A.   About the same, 15 a day for the whole year.
 3   Q.   Practically speaking, how are these affidavits
 4        executed?
 5   A.   Well, the analyst gets them from our attorney,
 6        and what they do is they put the loan number on
 7        it, and they put it in a folder and they put the
 8        folder on my desk.  And then what I do is I go
 9        into that loan or the case -- I can search by
10        either the case or the loan number, and I verify
11        whatever is on that affidavit as far as what the
12        debtor is due for and the payment amounts.  If
13        there's any late charges on there I verify that
14        amount as well.
15   Q.   And you verified the information on this one?
16   A.   That's correct.
17   Q.   What information did you consult in compiling
18        this affidavit?
19   A.   I didn't -- I didn't make the affidavit myself.
20        Is that what you're asking?
21   Q.   That's a good -- that's an interesting answer,
22        but that wasn't what I was asking.  You're
23        signing an affidavit?
24   A.   Correct.
25   Q.   It's your word?
```
                                                            25
                         COURT - SALINAS

                         Page 21

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1   A.   Correct.

2   Q.   How do you verify that information for your

3        word?

4   A.   I check our systems.

5   Q.   And so you just check the system?

6   A.   Correct, we --

7   Q.   And you checked the system on this loan?

8   A.   I did.

9   Q.   Did you see that there was a payment made in May

10       2007?

11  A.   Correct, I did.

12  Q.   And yet you signed it as being in arrears?

13  A.   Yes, because the affidavit stated that the loan

14       was two months behind, and at the time I checked

15       it, it was two months behind.

16  Q.   But it wasn't two months behind after filing of

17       bankruptcy, is that correct?

18  A.   It was due for May and June.

19  Q.   And you didn't see that the May payment had been

20       made?

21  A.   There was a payment made in May, however it paid

22       for April.

23  Q.   What process did you undertake to ascertain

24       whether or not they were really in arrears?

25  A.   I checked the payment history.

                                        26
                    COURT - SALINAS

1   Q.   Did you check when they filed for bankruptcy?

2   A.   Not when they filed for bankruptcy.  I checked

3        the payment history when I signed the affidavit.

                    Page 22

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 4   Q.   The name Sophie Salinas appears to be stamped on
 5        the affidavit.  Why?
 6   A.   Because I stamp it under my signature.
 7   Q.   You don't -- do you sign it first?  Or you just
 8        stamp it?
 9   A.   At the same time, I'm stamping it, and then I'll
10        sign it.
11   Q.   On ours, on the one that's filed here, it seems
12        to only be stamped.  Do you control that stamp?
13   A.   I do, it's my stamp.
14   Q.   Nobody else stamps it but you?
15   A.   I stamped that one.  I stamped them all.
16   Q.   But you do have a stamp?
17   A.   Yes, I do.
18   Q.   And you say you actually also sign them?
19   A.   I do sign it.
20   Q.   So you did not prepare the affidavit?
21   A.   The actual wording of it, no.  Our attorney does
22        that on our behalf.
23   Q.   And you only check the information on the
24        computer system?
25   A.   Correct.
```
                                                    27
                        COURT - SALINAS

```
 1   Q.   And you're in the bankruptcy department?
 2   A.   Yes, I am.
 3   Q.   So you know this case was in bankruptcy?
 4   A.   Yes, I did.
 5   Q.   So you did not check pre and post-petition
 6        bankruptcy; you just saw that it was arrears?
 7   A.   Through the payment history, yes.
```
                        Page 23

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

 8    Q.    Who makes the decision to move for relief from
 9          the stay?
10    A.    The analyst does.
11    Q.    The person that works under you?
12    A.    Yes.
13    Q.    And you keep referring to an attorney.  Who is
14          the attorney you refer to?
15    A.    Steven Baum, I believe it was Steven Baum's
16          office.
17    Q.    Excuse me, I must have phrased that wrong.  You
18          talked about I would assume an in-house attorney
19          that tells you these are in arrears?
20    A.    No.
21    Q.    Steven Baum tells you that?
22    A.    No.
23    Q.    Who tells you that this is in arrears?
24    A.    We monitor the loan.  The analyst monitors the
25          loan, and we check monthly payments on it, so

                                                    28
                         COURT - SALINAS


 1          the analyst sees that it's in arrears.
 2    Q.    But you said the affidavit was prepared by your
 3          attorney?
 4    A.    That's correct.
 5    Q.    Is that Steven Baum?
 6    A.    I believe it was Steven Baum.
 7    Q.    How do they verify the information?
 8    A.    What happens is the analyst requests for the
 9          motion for relief from stay via a code in the
10          system.  That code goes to our vendor.  Our
11          vendor sets up --
                         Page 24

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

12   Q.   You're going to have to explain to me who a
13        vendor is?
14   A.   A vendor is -- they are called First American.
15        They work in-house, and they handle our
16        referrals to the attorney, and they handle mail.
17        They have different duties that they do on
18        behalf for Chase.  So they refer out the motion
19        for relief in a system called VendorScape.
20        VendorScape is the communication system we have
21        with our attorney.  In that referral they
22        indicate the arrears.  So they'll put, you know,
23        post-petition payments due.  The attorney
24        indicates that they received that --
25   Q.   Who is the attorney?

                                                29
                    COURT - SALINAS


 1   A.   Steven Baum's office, I'm sorry.
 2   Q.   So it is an outsourced -- it is not a Chase
 3        attorney; it is an outsourced attorney?
 4   A.   Correct, correct.
 5   Q.   And then the outsourced attorney compiles the
 6        affidavit?
 7   A.   Yes, ma'am.
 8   Q.   And then you sign it?
 9   A.   Correct.
10   Q.   And you say you checked the information?
11   A.   Yes, I do.
12   Q.   So again tell me, so your analyst makes the
13        decision to file the lift stay motion?
14   A.   To refer it out to our attorney, yes, Steven
15        Baum's office.

                    Page 25

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

16  Q.  And what kind of information do they send to
17       Steven Baum's office?
18  A.  I know the case report in VendorScape has the
19       unpaid principal balance, the interest, the
20       payments that are due and the amounts.
21  Q.  The affidavit indicates that it was executed in
22       Ohio, but the notary is qualified in San Diego.
23       What are the circumstances surrounding the
24       notarization?
25  A.  They are located in San Diego.

30

COURT - SALINAS

1  Q.  Excuse me?
2  A.  They are in San Diego.
3  Q.  But the affidavit says it was executed in Ohio?
4  A.  I'm not sure.  We are located in San Diego.
5  Q.  So what were the circumstances surrounding
6       notarization?  Was the notary physically present
7       when you did it?
8  A.  They are there, yes.
9  Q.  Standing there when you do it with a stamp?
10      Remember this is a stamp on this one?
11  A.  Right.  No, what happens is I have to sign it,
12      and then I send it to notary in a folder.
13  Q.  So they don't see you sign it?
14  A.  Right, they have a way of verifying signatures.
15      I think they have like a form or something they
16      have to follow matching up the signatures.
17  Q.  So was this one of a batch of affidavits
18      executed at the same time?
19  A.  It could be.  I'm not sure.

Page 26

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

20   Q.   Do you execute these in batches yourself?

21   A.   Sometimes.

22   Q.   And how many at a time?

23   A.   Ranging from five, six a person.  They'll put

24        them all in one folder at a time.

25   Q.   The name of the person notarizing the affidavit

31

COURT - SALINAS

1         is Patricia Bonning, who is she?

2    A.   She works for First American.  That's the vendor

3         I was talking about earlier.  They also notarize

4         for Chase.

5    Q.   Are they physically present in your same office?

6    A.   They are.

7    Q.   Do you know her?

8    A.   I do.

9    Q.   And what is her role at First America?

10   A.   As far as I know, she only does notary.  She

11        only notarizes documents for both bankruptcy and

12        foreclosure documents.

13   Q.   I stand corrected, you did sign it.  You did not

14        stamp it.  Let the record reflect that.

15             In the exhibits to the lift stay

16        motion there is a letter dated June 3rd, 2007

17        from Diane Ford at Chase in San Diego to Steven

18        Baum, indicating that an affidavit of default is

19        enclosed.  Who is Diane Ford?

20   A.   She is the person who handles the Scheussler's

21        account.

22   Q.   And you are her supervisor?

23   A.   Yeah.

Page 27

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

24    Q.    So she reports to you?

25    A.    Correct.

                                                    32
                          COURT - SALINAS


1     Q.    How many people report to you?

2     A.    About eight people.  There is two supervisors.

3           About eight people each supervisor.

4     Q.    Does First American get paid by the motion or

5           how do they get paid?

6     A.    From what I know they get paid every time they

7           send a referral in VendorScape.  So they get

8           paid for each referral that goes out in

9           VendorScape.  And that includes proof of claim

10          referrals and motion for relief referrals.

11    Q.    How long have you worked with -- who is the

12          person that referred this to you, I'm sorry?

13    A.    Referred what to me, I'm sorry?

14    Q.    The motion to lift stay in this case, who is

15          your employee?

16    A.    Oh, Diana Ford.

17    Q.    Oh, yes, Diana Ford.  How long have you worked

18          with her?

19    A.    About a year, because she started about a year

20          after I did.  So about a year.

21    Q.    So just give me a little employment stepping

22          stone.  She's been employed for Chase about a

23          year --

24    A.    Correct.

25    Q.    -- so she's the lowest rung in your department?

                                                    33
                          COURT - SALINAS


                          Page 28

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 1   A.   Correct.
 2   Q.   And she monitors a body of these mortgages?
 3   A.   Correct.
 4   Q.   And you're in the subprime mortgage?
 5   A.   Correct.
 6   Q.   And she then sends it out to First American if
 7        she sees something that she thinks is in
 8        arrears?
 9   A.   Correct.
10   Q.   First American then refers to -- in this case it
11        was Steven Baum's office?
12   A.   Yes, ma'am.
13   Q.   And then Steven Baum sends it back to you for an
14        affidavit?
15   A.   Correct.
16   Q.   And you look on the computer system --
17   A.   Yes.
18   Q.   -- and verify what went on?
19   A.   Yes, ma'am.
20   Q.   So do you make the decisions to foreclose on the
21        loans you monitor?
22   A.   I do not, no.
23   Q.   And are you consulted?
24   A.   What do you mean --
25   Q.   Before someone like Diana Ford would refer it
```

                                                    34
                       COURT - SALINAS

```
 1        out, would she say anything to you?
 2   A.   No.
 3   Q.   Is she the one that makes the decision?
```

Page 29

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

 4   A.   Yes, she is.

 5   Q.   Have you previously commenced a foreclosure

 6        action yourself?

 7   A.   No, I have not.

 8   Q.   I read the same spreadsheet you read.  Why did

 9        you seek relief from the stay of foreclosure in

10        this case at this time?

11   A.   Because the debtors were two months behind at

12        the time.

13   Q.   Even though your records reflect that's not

14        true?

15   A.   Our payment history shows that they were two

16        months behind.

17   Q.   Ordinarily, would you recommend that Chase

18        commence a foreclosure action where mortgagors

19        are behind, a month behind but have been paying

20        regularly each month for several years,

21        including making the late payments, would you

22        make this recommendation?

23   A.   If I see that they are two months behind at the

24        time, yes, I would.

25   Q.   At the time of what?

                                              35
                     COURT - SALINAS


 1   A.   Of signing the affidavit.

 2   Q.   Would it matter to you if the mortgagors are in

 3        bankruptcy?

 4   A.   Not necessarily.  I mean I'm looking at the

 5        affidavit, because they are in bankruptcy.

 6   Q.   Would it matter to you that there is equity in

 7        the home?

                     Page 30

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

8   A.   No.  What we do is we leave that to our

9        attorney, to Steven Baum.

10  Q.   Were you aware at time you executed the

11       affidavit that the debtors asserted in their

12       petition equity of $120,000?

13  A.   I was unaware of that, no.

14  Q.   Did you take any steps to ascertain the value of

15       this collateral?

16  A.   I did not myself, no.

17  Q.   Would it matter to you?

18  A.   Umm, not really.  Only because the analyst will

19       provide that to the attorney.

20  Q.   So it could have easily been ascertained?

21  A.   Correct.

22  Q.   You said correct?

23  A.   I'm sorry, I don't understand what you're

24       saying.

25  Q.   You could easily find out how much the equity

36

COURT - SALINAS

1        is?

2   A.   Yes, ma'am.

3   Q.   But they didn't check?

4   A.   I don't know if our attorney checked.

5   Q.   In paragraph six of your affidavit you state

6        that Chase may be required to make further

7        advances for property taxes, insurance and

8        related matters.  In your affidavit or in your

9        payment history attached the Court couldn't find

10       a list of the advances that Chase had made to

11       that point.  Had they?

Page 31

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

12    A.    We could have provided it.

13    Q.    You could have, but you did not?

14    A.    I don't believe so.

15    Q.    Do you know if Chase had made any recent

16          advances?

17    A.    I do not know offhand, no.

18    Q.    And do you know what advances might have been

19          anticipated?

20    A.    Maybe taxes and insurance.

21    Q.    Do you know if Chase ever made any extensive

22          advances on this loan in the past that were not

23          covered by the payments?

24    A.    I don't know.

25    Q.    At the time you executed the affidavit, you

                                                    37
                        COURT - SALINAS


1          apparently were aware that there was a payment

2          of $2,110.99 that had been made by the debtors

3          post-petition on May 29th by the debtors and

4          accepted by Chase.  Why did you omit any

5          specific reference in your affidavit to the fact

6          that the debtors had made a recent post-petition

7          payment?

8    A.    I'm not sure.  Our attorney drafts that, so I'm

9          not sure why it was omitted.

10   Q.    So you didn't check.  What you're saying is you

11         didn't check.

12   A.    I check.  I checked the wording on the

13         affidavit.

14   Q.    Well, it's on the record.  I've seen your

15         spreadsheet; it was there?

                        Page 32

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

16   A.   Um-hmm.

17   Q.   So if you checked, did you just not see it?

18   A.   See the payment?

19   Q.   Yes.

20   A.   I did see it.  I see it when I refer to the

21        payment history.

22   Q.   So you saw it, but you chose to ignore it?

23        You're making the affidavit.  It's your name on

24        the line.  It's not Steven Baum's name on the

25        line.

                                                          38
COURT - SALINAS


1    A.   Right.  And what I check in the affidavit is

2         that the debtor was due for May and June and

3         that's why I signed it.

4    Q.   So without that information it's sort of -- it's

5         not potentially misleading.  It is misleading

6         when you say payments due the 20th day of May

7         2007 through June 2007 when you don't go on to

8         say oh, and by the way they've made a payment of

9         $2,110.99 on May 29th.  But we're not calling

10        that May's payment, we are calling that April,

11        pre-petition bankruptcy.  But you didn't say

12        that, nor did you bring it out.  Why did you not

13        tell the Court?  This is an affidavit going to

14        Court.

15   A.   Yeah, what we do is we tell our attorney all of

16        that information, and they draft the affidavit

17        on our behalf.

18   Q.   Can you tell by that spreadsheet whether or not

19        certain payments were made at a local branch?

Page 33

020108 Schuessler

20   A.   I cannot, no.

21   Q.   So you don't know if that May 29th -- you don't

22        know where that May 29th payment came from, do

23        you?

24   A.   That's correct.

25   Q.   Can you tell from your spreadsheet how many

39
COURT - SALINAS

1        other payments were made at that branch?

2    A.   No, I can't.

3    Q.   When you looked at that spreadsheet, does it

4        appear to you that the payments were correctly

5        processed?

6    A.   Yes, ma'am.

7    Q.   Do you ever know of an entity called Pillar

8        Processing?

9    A.   No, I don't.

10   Q.   When you looked at that spreadsheet, had Chase

11       accepted payments from the debtor up to this

12       point, even though as Chase now maintains they

13       were delinquent?

14   A.   Yes, the payments were accepted.

15   Q.   What correspondence between Chase and the debtor

16       are you aware of regarding debtors' delinquent

17       payments?

18   A.   None that I can think of right now off the top

19       of my head.

20   Q.   I need to ask for some clarification.

21            THE COURT: Attachment 1 to the

22       response, do you have that; do you have a

23       copy of your response to give to Miss

Page 34

020108 Schuessler

24   Salinas?

25               Would you please make sure she has

                                                40
                        COURT - SALINAS


1    it.

2                MR. LESNIAK:  Can I come up and

3    hand it to her, Judge?

4                THE COURT:  Please, thank you.  I

5    want particularly Schedule 1.  You can give

6    her everything, but that's what I want.

7    A.   Okay, thank you.

8     BY THE COURT:

9    Q.   I need you to explain something.  This is from

10        your affidavit, so this is what you've sworn to.

11        In attachment 1 to the response you note the

12        following late charges.

13   A.   I'm sorry?

14   Q.   You note the following late charges.

15   A.   Okay.

16   Q.   $124.47 in February 2005.  Are you with me?

17   A.   It was actually $31.81 -- and 87 cents, excuse

18        me, applied.  Is that the line you're on?

19   Q.   I'm looking at the late charges.

20   A.   Yeah, it was $31.87 applied to late charges, and

21        $124.47 left in suspense.

22   Q.   Okay, I need to look at the attachment too,

23        because I'm off.  I have Attachment 1 right here

24        as an exhibit.  Because I have $124.47, and you

25        say -- okay, if you look out in the fourth

                                                41
                        COURT - SALINAS


                        Page 35

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1      column, it says notes, late charges?

2   A.  Correct.

3   Q.  If you see it says $124.47 late charges?

4   A.  That would be the suspense balance.

5   Q.  So that's not a late charge, that's a suspense

6       balance?

7   A.  The late charge comment and the notes referring

8       to this $31.87 here, and then this $124.47 is

9       referring to the suspense column, and that's how

10      much is left in suspense.

11  Q.  So the late charges refers to $31.87?

12  A.  Correct.

13  Q.  So in February '04, it is $31.87 --

14  A.  '05, right.

15  Q.  Excuse me, yes.

16  A.  Yes.

17  Q.  And April of '05, it is $32.84?

18  A.  Correct.

19  Q.  And May -- what's that $1.97 applied to

20      principal?

21  A.  Yeah.

22  Q.  Okay.  It is $30.90 in May?

23  A.  Correct.

24  Q.  In August it is $31.87?

25  A.  Yes, ma'am.

                                                42
                 COURT - SALINAS


1   Q.  In November '05 $31.47?

2   A.  Um-hmm.

3   Q.  December $31.47?

4   A.  Correct.

                 Page 36

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

5   Q.   January '06, $63.74?

6   A.   Yes.

7   Q.   February '06, $31.87?

8   A.   Yes.

9   Q.   April '06, $31.87?

10   A.   Yes.

11   Q.   May '06, $71.49?

12   A.   Correct.

13   Q.   July '06, $31.87?

14   A.   Um-hmm.

15   Q.   Another one in July, $31.87?

16   A.   That's correct.

17   Q.   August $31.87?

18   A.   Yes.

19   Q.   September $31.87?

20   A.   Yes.

21   Q.   October $31.87?

22   A.   That's correct.

23   Q.   November $31.87?

24   A.   Correct.

25   Q.   So then January '07, $31.87?

                                                43
                    COURT - SALINAS


1   A.   Correct.

2   Q.   March '07, $20.88?

3   A.   Yes, ma'am.

4   Q.   Why did it change?

5   A.   It looks like that was what was left in

6        suspense, so they just applied the entire

7        suspense amount of $20.88 to late charges.

8   Q.   So that's not a late charge at that point.

                    Page 37

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

9  That's an application of it?

10 A. Correct.

11 Q. And then it jumps to $42.86 as a late charge?

12 A. Correct.

13 Q. And then $31.87, $31.87?

14 A. Yes.

15 Q. Okay, thank you.  You clarified that for me.

16 A. Okay.

17 Q. Now, you were a supervisor and yet you signed an
18  affidavit, and your name is on that, and yet I
19  have not heard you say that you're responsible
20  for it.  You're saying the person under you is
21  responsible for it; it goes to a lawyer that you
22  say is responsible for it, and you signed it and
23  it is filed with the Court, and you not at any
24  point are saying that you're responsible.
25  That's what I'm hearing.  Am I hearing you

44

COURT - SALINAS

1  correctly?

2 A. Well, I am responsible for verifying the
3  information on it and signing it.

4 Q. But even though it is wrong, you weren't
5  responsible for correcting and saying that there
6  was a payment made?

7 A. I don't understand how that's wrong.  I
8  understand that the information was not put on
9  there.

10 Q. Not only put on there, it's not correct.  There
11  was a post-petition bankruptcy payment made.

12 A. That paid for April, right.

Page 38

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

13  Q.  Which is pre-bankruptcy.  Is there any penalty,

14      beyond a late charge, when a debtor makes a late

15      payment?

16  A.  No, the late charge is the only thing assessed

17      to the account.

18  Q.  What was different about the payment history

19      immediately before and after the bankruptcy

20      filing that was different from the debtors'

21      course of conduct since 2005 that changed your

22      attitude with respect to this loan?

23  A.  Well, at the time I reviewed it it was

24      delinquent.

25  Q.  Do you file for foreclosure if it's delinquent

                                                    45
                    COURT - SALINAS


 1      two months?

 2  A.  I don't know the exact foreclosure process.

 3  Q.  So in this one, it was just the fact that they

 4      were in bankruptcy, is that correct?

 5  A.  They were in bankruptcy and two months

 6      delinquent, that's correct.

 7  Q.  But they hadn't changed their course of conduct?

 8  A.  As far as making payments?

 9  Q.  Yes.

10  A.  They had made payments up to that point.

11  Q.  But they had been two months behind before and

12      they made the payments and Chase had taken them,

13      and they paid their late fees, and Chase had

14      taken it, is that correct?

15  A.  That's correct.

16  Q.  So the only difference between their course of

                    Page 39

020108 Schuessler

17   conduct up until that moment in April of 2007

18   was the fact that they were in bankruptcy, is

19   that correct?

20   A.   Yes, that's correct.

21   Q.   Are you familiar with Chase's policies for

22   accepting or refusing mortgage payments at

23   branch locations?

24   A.   No, I'm not familiar with their procedures.

25   Q.   Are you involved in decision-making at any

                                           46
                    COURT - SALINAS

1   level?

2   A.   As a supervisor?

3   Q.   Yes.

4   A.   Yes, I am.

5   Q.   Were you at any point involved with or familiar

6   with the decision-making concerning this loan?

7   A.   No, other than signing the affidavit, no.

8   Q.   So it's a different department evaluating it

9   under different standards when there's a

10   bankruptcy filed?

11   A.   What do you mean by different department?

12   Q.   Well, you said right now you haven't evaluated

13   it at all.  You let other people do it.  All you

14   did was sign an affidavit that was put under

15   your nose?

16   A.   Correct.

17   Q.   And the only difference was they were in

18   bankruptcy, so you're not involved with or

19   familiar with the decision-making on this loan?

20   You didn't decide to file this relief from stay?

                    Page 40

020108 Schuessler

```
21   A.   That's correct.
22   Q.   And the only point you're testifying before this
23        Court today, even though you're supervisor, is
24        that you look on a computer screen and verify
25        one thing and sign an affidavit?
```

                                                        47
                        COURT - SALINAS


```
 1   A.   That's correct.
 2   Q.   And you didn't research it in any other way and
 3        didn't feel it necessary to let anyone know
 4        about that payment that had been made?
 5   A.   The attorneys were aware.  They are aware.  They
 6        are provided a payment history at the time of
 7        motion for relief referral.
 8   Q.   So you can't answer the question -- or maybe you
 9        can, whether payments were permitted and later
10        not permitted at the local branch?
11   A.   I'm not sure, no.
12   Q.   And can you or can you not explain why the
13        debtors, who were apparently delinquent, quote,
14        using your answer, your firm's answer, were
15        permitted to pay at a Chase branch up until the
16        time they filed for bankruptcy, but payments
17        were rejected thereafter?
18   A.   I'm not sure of the branch procedures.
19   Q.   Can you explain why Chase does not permit
20        bankruptcy debtors to make payments at the local
21        branch, even if they are current?
22   A.   Well, the only thing that I can think of is we
23        need to ensure that they get processed
24        appropriately.
```
                        Page 41

020108 Schuessler

25   Q.   For your benefit, and not for the debtor's

48
COURT - SALINAS


1    benefit.

2    A.   Not necessarily.

3    Q.   Well, that was my comment, and it didn't need an

4         answer.

5              Why is it not possible for the

6         payments to be accepted at the branch and

7         forwarded to the appropriate person; is there

8         any reason?  You've said it's not, as far as

9         you're concerned, it's not reflected in your

10        looking at the computer screen.  So do you see

11        any reason why that couldn't be done?

12   A.   Well, my thought is if the debtor were to go

13        into the branch, branch doesn't necessarily know

14        what's going on with the account, and there

15        could be a violation of the stay.  Maybe the

16        branch person could ask something about the

17        payments in violation of the stay.

18   Q.   So it protects Chase and not the debtor is what

19        you've just said.  Was the May 29, 2007 payment

20        that the debtors made at the Chase branch

21        correctly processed?

22   A.   Yes, it was.

23              THE COURT:  You may question your

24        witness.

25              MR. LESNIAK:  I just have a few

49
LESNIAK - DIRECT - SALINAS


Page 42

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1   questions, Your Honor.

2                THE COURT:  If you'll stay back by

3        the microphone.

4                MR. LESNIAK:  Oh, excuse me, Judge,

5        my apologies.

6

7   DIRECT EXAMINATION

8   BY MR. LESNIAK:

9   Q.   Now, Miss Salinas, you mentioned that an analyst

10       under your supervision makes the decision to

11       move for relief from stay, is that correct?

12  A.   Yes.

13  Q.   Okay, does that analyst have any criteria that

14       the analyst is told to follow in terms of making

15       that determination?

16  A.   Yes.

17  Q.   And what is that criteria?

18  A.   Two months delinquent, and it comes off of a

19       report that we instruct them to print on a

20       monthly basis.

21  Q.   And that report is sent to your recollection,

22       correct?

23  A.   I ask them to print it, and they do turn it back

24       into me.

25  Q.   Do they turn it back into you when you get the

                                              50
                 LESNIAK - DIRECT - SALINAS


1        affidavit?

2   A.   No, it's turned in before, once it's completed.

3   Q.   So you see the report before the decision to

4        move for relief is actually sent out to the

                        Page 43

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 5          attorney, is that correct?
 6    A.    Yes, that's correct.
 7    Q.    So you as supervisor have looked over that
 8          decision and determined that it complied with
 9          criteria and policies in place, is that correct?
10    A.    Yes, we are responsible for reviewing that
11          report.
12    Q.    And then what I would like to ask you to look at
13          is -- well, I'll do it from memory, the detailed
14          transaction history that you have in front of
15          you --
16    A.    Yes.
17    Q.    -- okay?
18    A.    Yes.
19    Q.    Now, in the bankruptcy department, in Chapter 7
20          cases does Chase draw a distinction between
21          pre-petition or post-petition payments?
22    A.    We don't.
23    Q.    So when a payment comes in, you'll just apply it
24          to the next due payment, is that correct?
25    A.    Contractually, yes.
```

                                        51
                    LESNIAK - DIRECT - SALINAS


```
 1    Q.    So when the payment was made on May 25 -- now,
 2          let's clarify that -- it is shown as being made
 3          on May 25.  Is that when it was received -- May
 4          25, 2007; is that when it was received by Chase?
 5    A.    No, the payment was posted on May 29th.
 6    Q.    Okay.  So why does it say May 25?
 7    A.    That's the effective date.
 8    Q.    So that was when the borrowers would have come
```

                            Page 44


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 9      in and made the payment at the teller window,
10      correct?
11   A. Correct.
12   Q. What happens to that payment?  Do you know where
13      it goes, how it gets processed so that it shows
14      up as being posted on May 29th?
15   A. The branch sends it out to a processing center,
16      and then it gets posted approximately three
17      business days later.
18   Q. Okay.  Now, the amount of the payment that was
19      sent in on May 25, 2007 was $2,110.99, correct?
20   A. What was that amount?  I'm sorry.
21   Q. It is May 25, 2007, the amount of money was
22      $2,110.99 that was sent in, is that correct?
23   A. That's correct.
24   Q. And what was the amount of the monthly principal
25      and interest and escrow payment?
```

52

LESNIAK - DIRECT - SALINAS

```
 1   A. The principal was $388.63 --
 2   Q. No, I'm sorry, let me rephrase that and ask it
 3      correctly.  The debtors' -- the borrowers'
 4      regular monthly payment that was due for April
 5      20, 2007 would be how much?
 6   A. $2,079.12.
 7   Q. Okay.  So is that the same monthly payment that
 8      would have been due for May 20th, 2007?
 9            THE COURT:  You can lead the
10      witness.  I did direct.
11   Q. The May payment was also $2,079.12, is that
12      correct?
```

Page 45

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

13   A.   That's correct.

14   Q.   Okay.  So when the borrowers made a payment that

15        was $31.87 more than the regular monthly

16        payment, and they made that on May 25, does that

17        tell you that they intended to pay the April

18        payment, which would have had a late charge or

19        the May payment which would not have had a late

20        charge at that point?

21   A.   They paid it with the late charge, so it would

22        be the April with the late charge.

23   Q.   Thank you.  So then when you looked at the

24        detailed transaction history when making your

25        affidavit, it showed at that point, June 29,

                                                          53
                    LESNIAK - DIRECT - SALINAS


 1        2007, that they were how many payments past due?

 2   A.   Two.

 3             THE COURT:  It's been asked and

 4        answered.  I don't mind the belabor, but

 5        I've heard this.  Do you have another point

 6        to make?

 7             MR. LESNIAK:  Not with this

 8        witness, Judge.  Thank you.

 9             THE COURT:  I have another

10        question.

11    BY THE COURT:

12   Q.   So the decision to file for relief from stay is

13        basically whether or not arrears show up on a

14        report, plain and simple?

15   A.   Yes, ma'am.

16             THE COURT:  Mr. Fallon, do you have


                        Page 46

020108 Schuessler
17       any questions of this witness?

18                    MR. FALLON:  Just a few, Your

19       Honor.

20                    THE COURT:  If you'll come to the

21       microphone, please.

22    CROSS-EXAMINATION

23    BY MR. FALLON:

24    Q.   Is it my understanding that the bankruptcy

25         department is in San Diego?
                                                54
                    FALLON - CROSS - SALINAS


 1    A.   Yes, sir.

 2    Q.   Is there any particular reason why the affidavit

 3         says it's in Ohio?

 4    A.   I'm not sure, no.

 5    Q.   Do you check that portion of the affidavit

 6         before you sign it?

 7    A.   Yeah, I usually do.

 8    Q.   And this affidavit was signed by you but not

 9         before the notary?

10    A.   Signed by me but not before --

11                    THE COURT:  She's testified to

12         that.

13    Q.   Now --

14                    THE COURT:  You understand you

15         testified to that.

16                    THE WITNESS:  Yeah.

17                    THE COURT:  That you send them over

18         in a batch.

19                    THE WITNESS:  Yeah, I was trying to

20         understand his question.  Sorry.

                    Page 47

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

21          THE COURT:  I just want to clarify,

22     Mr. Fallon, what I heard is she does not

23     sign that in front of a notary.  She puts it

24     in a folder and sends it to someone else on

25     the premises.

                                              55
              FALLON - CROSS - SALINAS


1    BY MR. FALLON:

2    Q.   Now, does the analyst, before making a decision

3         as to whether to try to lift the stay, get an

4         appraisal of the property?

5    A.   They do.  They provide it to the attorney.

6    Q.   And do you know whether that was done in this

7         case?

8    A.   I am not sure.  I would have to look through the

9         notes.

10   Q.   Well, would it --

11               THE COURT:  Do you have your notes?

12               THE WITNESS:  I don't think I have

13        them on me, no.

14   BY MR. FALLON:

15   Q.   Wouldn't that be an important aspect of your

16        decision-making or somebody's decision-making as

17        to whether or not to try to lift the stay?

18   A.   Yes, sir.

19   Q.   And as far as you can tell from your records,

20        there is no notation one way or another?

21   A.   Of the appraisal?

22   Q.   Of the appraisal.

23   A.   I don't know.

24   Q.   Well, I mean have you ever seen anything prior


                    Page 48

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler
25       to signing this affidavit that would lead you to

56
FALLON - CROSS - SALINAS

1       believe that the value of this property as set
2       forth by my clients in their bankruptcy petition
3       was overstated?
4    A. I can't answer that, only because I don't have
5       the notes to see if the appraisal was sent to
6       the attorney or not.
7    Q. But who -- the attorney is the one that makes
8       the decision and not Chase?
9    A. Decision for what, I'm sorry?
10   Q. Who makes that decision as to whether or not to
11      lift the stay?
12   A. Both.  The analyst makes a decision to refer it
13      to the attorney.
14   Q. Now, is that decision made based on what the
15      appraisal is?
16   A. For the analyst?
17   Q. Yes.
18   A. No, they don't look at the appraisal to make
19      that decision.
20   Q. So that has absolutely nothing to do with
21      whether they have a secured interest in it or
22      not?
23   A. As far as the analyst is concerned, right.
24   Q. And so the only one who does is the attorney?
25   A. Correct.

57
FALLON - CROSS - SALINAS

1    Q. And the attorney is authorized to order an
Page 49

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

2      appraisal of the property?

3   A.   They ask the analyst to order it, and the

4      analyst is authorized to get it requested, and

5      they would forward it to the attorney.

6   Q.   Okay, when the analyst gets it though, does she

7      make or he make any notations on the file to

8      show whether or not this property is

9      under-valued?

10  A.   What they do is they just notate that it was

11     sent to the attorney and they would send it out

12     to the attorney.  That's all they notate.

13  Q.   But you don't have any particular records of

14     what was in this particular case?

15  A.   Correct.

16  Q.   Now, with regard to the records that you have,

17     are these records produced by you --

18  A.   The payment?

19  Q.   Number one?

20         THE COURT:  Attachment 1.

21  Q.   Attachment 1, yes?

22  A.   The spreadsheet, yes.  Yes, they are.

23  Q.   Now, when you looked at that attachment back in

24     June of 2007, did it say that my clients had

25     filed bankruptcy?

58

FALLON - CROSS - SALINAS

1   A.   The document does not state that they filed

2      bankruptcy.

3   Q.   And that they filed April 30th?

4   A.   It does not state that.

5   Q.   It doesn't state that?

Page 50

020108 Schuessler

```
 6    A.    On the attachment, no.
 7    Q.    So but is there somewhere when you're looking at
 8          the computer screen when you can see when the
 9          person filed bankruptcy?
10    A.    Yes.
11    Q.    And did you note that the debtor when they filed
12          bankruptcy they made a post-petition payment on
13          May 1st?
14    A.    I saw that, yes, I did.
15    Q.    And that they made another post-petition payment
16          on May 25th?
17    A.    Yes.
18    Q.    And so now comes June 29th, it comes up on your
19          screen, is that correct?
20    A.    Yes.
21    Q.    Now, under the terms of the note, do the people
22          have a 15-day grace period?
23    A.    They do.
24    Q.    So that with regard to the June payment, that
25          payment is not actually due until fifteen days
```

                                                    59
                        FALLON - CROSS - SALINAS

```
 1          after June 20th, is that correct?
 2    A.    Right.
 3    Q.    So that at the time, at the worst-case
 4          situation, based on your records, my clients
 5          would have been one month behind?
 6    A.    Due for May and June.
 7    Q.    But June wasn't past due at that point?
 8    A.    We reviewed it I believe it was the 29th of
 9          June.
```

                        Page 51

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

10   Q.   But isn't one of the problems that some of your

11        records show that the payments are supposed to

12        be due on the first of the month?

13   A.   They are due on the 20th.

14   Q.   Right.  But so on June 29th, that's within the

15        15-day grace period?

16   A.   For the late charge, yes.

17   Q.   So if they paid it on June 29th, it's the same

18        as paying it on June 20th as far as Chase is

19        concerned?

20   A.   Right.

21   Q.   So it is not until basically the 4th of July

22        that the late charge would kick in, is that

23        correct?

24   A.   Right, if that's the 15-day mark.

25   Q.   Now, also in this particular case my client paid

                                       60

FALLON - CROSS - SALINAS

1        at a branch of Chase on May 25th, and it took

2        four days for it to be posted on your account?

3   A.   Right.  I believe there was a holiday in there

4        somewhere, wasn't there?

5   Q.   It's probably near Memorial Day.  But it isn't

6        done the same day?

7   A.   It is effective for the same day, but it takes

8        three business days to post, at least three

9        business days.

10   Q.   So is the late charge based on when it's posted

11        or when it is paid?

12   A.   The effective date.

13   Q.   So that the effective date would be -- how can

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

14      you tell from these records when the effective
15      date was?
16  A.  Through the contractual payment history.
17  Q.  Now, is it also true from your records currently
18      that you're holding $2,079 of my clients' money
19      that you haven't applied to anything?
20  A.  I don't have an updated payment history on me,
21      so I don't know the exact amount.
22  Q.  Okay, the one that you've submitted to the
23      Court?
24          THE COURT:  The one you've sworn
25      to.

                                            61
                FALLON - CROSS - SALINAS


1   A.  Okay, that's correct.
2   Q.  And how long have you been holding onto that
3       $2,079?
4   A.  I don't know if it's been posted since this
5       payment history.
6   Q.  Okay, but can you tell from the payment history
7       how long you had it?
8   A.  August.
9   Q.  So since --
10  A.  August 22nd, 2007.
11  Q.  So you had $2,079 of their money since August
12      22nd?
13          THE COURT:  Has it accrued
14      interest?
15          THE WITNESS:  That's just a credit.
16  Q.  Well, actually it was $2100, wasn't it, that
17      you've been holding and you've been deducting
                Page 53

020108 Schuessler

18       late charges from that, so now it is $2,079?

19   A.   That's correct.

20             THE COURT:  Read the spreadsheet.

21             MR. FALLON:  Yeah, I know.

22             THE COURT:  I'm just making a

23       comment.

24   Q.   So basically you've got $2100 of their money

25       since August 22nd that's just lying around

                                                      62
                    FALLON - CROSS - SALINAS


1        there.  You haven't given them a penny of

2        interest on that, right?

3    A.   On the credit?

4    Q.   Yeah.

5    A.   No, no.

6    Q.   I mean Chase wouldn't want something like that

7        to happen to themselves, right?

8    A.   Right, we don't do interest on credit.

9    Q.   Let me ask you another thing.  Your affidavit

10       says that you're a representative of Citibank?

11   A.   Right.

12   Q.   And are you representative of Citibank or of

13       Chase?

14   A.   I work for Chase, but we represent and we

15       service on behalf of Citibank.

16   Q.   So who is your employer?

17   A.   Chase Home Finance.

18   Q.   And they contract out to Citibank to do this?

19   A.   We service for Citibank.

20             THE COURT:  Would you answer the

21       question first, and then you can explain.

                    Page 54

020108 Schuessler

22          But answer his question.  You contract out
23          to Citibank?
24                     THE WITNESS:  I don't know if it
25          would be referred to as contract.  I just

                                                    63
                    FALLON - CROSS - SALINAS


1           know it's referred to as we service for
2           them.
3                      THE COURT:  Okay, that doesn't make
4           sense to our world.  You got to make it make
5           sense to our world.  What does Chase and
6           Citibank actually do?
7                      THE WITNESS:  It would be a
8           contract between Chase and Citibank.
9        BY MR. FALLON:
10       Q.   So Chase owns the mortgage, is that correct?
11       A.   Yes.
12       Q.   They contract with Citibank to service it, is
13            that correct?
14       A.   Maybe I'm just not understanding how to explain
15            it.  Cause the only way I know it is we see
16            Citibank as our investor and we service for
17            them.
18                     THE COURT:  Who owns this mortgage?
19            Who owns the mortgage we're talking about?
20                     THE WITNESS:  Well, Chase has the
21            mortgage.
22                     THE COURT:  Chase owns the
23            mortgage?
24                     THE WITNESS:  Chase Home Finance.
25                     THE COURT:  Chase Home Finance owns
                         Page 55

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

64

FALLON - CROSS - SALINAS

1      the mortgage and you work for Chase Home
2      Finance?
3                THE WITNESS:  Yes, ma'am.
4                THE COURT:  So why do you have
5      Citibank on your affidavit?
6                THE WITNESS:  Because we service
7      for them.
8                THE COURT:  But what have they to
9      do with this mortgage?
10               THE WITNESS:  With this affidavit
11     nothing.
12   BY MR. FALLON:
13   Q.   Now, do you know whether or not there was any
14        assignment of the original mortgage by JP Morgan
15        Chase to any other entity on the records of the
16        county clerk's office?
17   A.   I don't know if the assignments are there.  I
18        wouldn't know.
19   Q.   Do you know whether they were actually assigned
20        as opposed to just a servicing?
21   A.   I'm not sure.
22               MR. FALLON:  Okay, I have no
23     further questions, Your Honor.
24               THE COURT:  Very good.
25               Any clarification questions?

65

1                MR. LESNIAK:  Yes, Your Honor, if I

Page 56

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

2    may.  There was an issue about the status of

3    the account, and Miss Salinas only has a

4    payment history that goes back so far.  We

5    have printed out and brought with us a

6    current payment history, and she could

7    testify as to the current status of account,

8    so the Court can be assured that all

9    payments have been applied.  I would like to

10   do that, if I can.

11            THE COURT:  Mr. Fallon, do you have

12   any objection?  Have you given it to Mr.

13   Fallon?

14            MR. LESNIAK:  I have not, Your

15   Honor.

16            THE COURT:  Give it to Mr. Fallon

17   first.

18            MR. LESNIAK:  Yes, Your Honor.

19            THE COURT:  We'll take a quick

20   break.

21            THE CLERK:  All rise.

22

23            (Recess in the proceeding.)

24

25

                                              66


1            THE COURT:  Miss Salinas, I have

2    another question for you.  Can you tell me

3    your educational level, please?

4            THE WITNESS:  I currently go to the

5    University of Phoenix, trying to get my

                          Page 57

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

                        020108 Schuessler
     6      bachelor's in human service, which is like
     7      psychology.
     8                  THE COURT:  And your employee that
     9      is under you, whose name I -- the one that
    10      sent the Scheussler file to Steven Baum's
    11      office, what is her educational level?
    12                  THE WITNESS:  The employee?
    13                  THE COURT:  Yes, do you know?
    14                  THE WITNESS:  I don't know.  No, I
    15      don't.
    16                  THE COURT:  Okay.
    17                  Any further questions of this
    18      witness?
    19                  MR. LESNIAK:  Yes, Your Honor, we
    20      did want to clarify the status of the
    21      account.
    22                  THE COURT:  Okay, and you --
    23                  MR. LESNIAK:  I've shown Mr. Fallon
    24      the current payment history.
    25                  THE COURT:  Oh, if you'll hand it
                                                         67
                    LESNIAK - REDIRECT - SALINAS


     1      up to my law clerk.
     2                  Mr. Fallon, do you have any
     3      opposition?
     4                  MR. FALLON:  No, Your Honor.
     5                  THE COURT:  Very good.  Okay.
     6                  MR. LESNIAK:  Your Honor, may I
     7      hand this to the witness, please?
     8                  THE COURT:  Certainly.
     9                  THE WITNESS:  Thank you.

                            Page 58

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler
```
10            THE COURT:  It's not as clear as
11     the attachment, so you're going to have to
12     lead me through it.  So what is the
13     current -- where are we currently?
14            MR. LESNIAK:  Your Honor, I believe
15     if we go to the last page, it will show what
16     the current status of the account is.  I am
17     going to ask Miss Salinas to look at that
18     last page.
19
20  REDIRECT EXAMINATION
21   BY MR. LESNIAK:
22   Q.  Tell the Court what the current status is of the
23       account?
24   A.  Okay.  The next due date is December 2007 as the
25       next payment due.
```
                                             68
                  LESNIAK - REDIRECT - SALINAS

```
 1   Q.  And when is the most recent payment that was
 2       made?
 3   A.  On this payment history last payment made is
 4       December 31st, 2007, effective for December
 5       28th, 2007.
 6   Q.  I'm sorry, what was the date on the transaction
 7       history I gave you?
 8   A.  January 16th, 2008.
 9            MR. LESNIAK:  Your Honor, I
10     apologize, I handed up the wrong one --
11            MR. FALLON:  We have one --
12            THE COURT:  I was going to say, and
13     her testimony doesn't make sense to me.
```

Page 59

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

14          MR. LESNIAK:  It doesn't make sense

15     to me, Judge, but we have a current one.

16     I'm sorry, I had it marked as an exhibit.  I

17     grabbed the wrong one.

18          THE COURT:  So do you need this?

19          MS. WEIGERT:  Can we withdraw this?

20          MR. LESNIAK:  No, Your Honor, we do

21     not need that.  That was actually the one

22     that was attached to the report.

23          THE COURT:  It's in the garbage.

24          MR. FALLON:  This is the one I was

25     looking at.  I have no objection to that.

                                                69
          LESNIAK - REDIRECT - SALINAS


1          THE COURT:  Okay, so --

2          MR. LESNIAK:  Your Honor, I would

3     just like to take a moment, because I think

4     we did not staple all of these,

5     unfortunately.  I want to make sure I give

6     her -- yes, we did.  Thank you.

7          THE COURT:  And we're looking at

8     Chase Exhibit No. 1.

9          MR. LESNIAK:  I guess it would be

10     Exhibit No. 1, Your Honor.

11          THE COURT:  Okay, so what are we

12     showing?

13          MR. LESNIAK:  Cross-examination.

14  Q.  Miss Salinas, would you please take a look at

15      the last page of Chase Exhibit No. 1?

16  A.  Okay.

17  Q.  When was the most recent payment made?

                    Page 60

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

18   A.   Posted on January 29th, 2008, effective for

19        January 26, 2008.

20   Q.   And what months payment, contractual payment did

21        that make?

22   A.   December 2007 payment.

23   Q.   And so the borrowers are due for what payment

24        now?

25   A.   January 2008.

70

FALLON - RECROSS - SALINAS


1    Q.   In looking over into the suspense column, does

2         it show any money left in suspense?

3    A.   Yeah, $1.02.

4    Q.   Okay, so all of the monies, except for that

5         $1.02 that the borrowers have sent in have been

6         applied to their account, is that correct?

7    A.   Yes, sir.

8              MR. LESNIAK:  That's all I have,

9         Judge.

10             THE COURT:  Very good, you may step

11        down.

12             MR. FALLON:  Well, Judge, can I

13        just ask her a quick question?

14             THE COURT:  Yes, sir.

15    RECROSS-EXAMINATION

16    BY MR. FALLON:

17   Q.   However, when was the last substantial amount

18        taken out of suspense?

19   A.   There was an amount taken out of suspense

20        December 31st, 2007.

21   Q.   So from August 22nd through December 31st it was

Page 61

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

22  suspended?

23  A.   Correct, that's the only time I see something

24      coming out of suspense.

25  Q.   And since my clients filed a petition in

                                          71
                FALLON - RECROSS - SALINAS

1       bankruptcy, have they not sent at least one

2       payment every month post-petition to Chase?

3                THE COURT:  Can you prove that, Mr.

4       Fallon, do you have copies of the checks?

5                MR. FALLON:  Well, I have the

6       copies of the checks, but just on the

7       records it shows that.

8                THE COURT:  I would like to see the

9       record show that too.

10  A.   Okay.  Okay, I see a payment in May.

11  Q.   Aren't there two payments in May?

12               THE COURT:  You've already

13      testified to two payments in May.

14  A.   That's correct, May 1st and May 29th.  I don't

15      see a payment in June or July.

16  Q.   You see three payments in August.

17  A.   Correct, and I see payments in September,

18      October.

19               THE COURT:  Three, correct, for

20      three payments in August?  This is the in

21      the middle of the brouhaha, all this,

22      correct?

23               MR. FALLON:  Yes.

24  A.   October, November, December as well.

25  Q.   And January?

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

72

LESNIAK - REDIRECT - SALINAS

1   A.   Correct.

2   Q.   So every month there has been payments made?

3   A.   From what I can see, yes.

4            MR. FALLON:  No further questions.

5            THE COURT:  Very good.

6            MR. LESNIAK:  Your Honor, might I

7       just ask her about those payments in August,

8       so we can clarify for the Court?

9            THE COURT:  You can clarify for the

10      Court, but I'm aware of how that happened.

11      Go ahead.

12           MR. LESNIAK:  Okay, Judge.

13           THE COURT:  Remember, you got an

14      adjournment of this Court during that period

15      of time.

16           MR. LESNIAK:  Yes, Your Honor, I

17      understand.

18

19  REDIRECT EXAMINATION

20  BY MR. LESNIAK:

21  Q.   Miss Salinas, when a motion for relief is filed,

22      does it happen sometimes that borrowers make

23      payments sometimes after that motion is filed?

24           THE COURT:  Yes, it happens.

25  Q.   And what is the bankruptcy department's

73

LESNIAK - REDIRECT - SALINAS

1       procedure in how it handles those payments once

2       the motion for relief that has been filed?

Page 63

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

3   A.   We send them to our attorney for further
4        instruction.
5   Q.   Okay, and why do you do that?
6   A.   Because a lot of time if the motion is filed
7        it's our attorney's recommendation to not apply
8        them or to yes, apply them.  Everything is a
9        case by case practice, so it's best practice for
10       Chase is to forward everything to our attorney.
11       They could have a hearing coming up and they
12       could take them all to the hearing.  It just
13       depends on what's going on.
14  Q.   Do you know in this case if the checks were
15       received from the Scheusslers and sent to Mr.
16       Jose?
17  A.   They were.
18  Q.   And when were they applied?
19  A.   Those were the August payments that are posted
20       in the payment history.  Those are the payments
21       that our attorney had sent back to us to post.
22  Q.   And he gave you direction to post those
23       payments?
24  A.   That's correct.
25            MR. LESNIAK:  That's all I have,

74

1        Judge.
2             THE COURT:  So here's the question.
3        What payments did they not make?  They've
4        all been made.  What's not -- they say
5        there's one payment in arrears, is that just
6        the current payment that's coming up?

Page 64

020108 Schuessler

7           MR. FALLON:  It's our belief here,
8      Your Honor -- I realize, based on their
9      records and it looks like they are saying
10      there is some payment missed in '06 or '07.
11      Based on my the client's best knowledge is
12      that she has made every payment.
13           THE COURT:  Late though it be.
14           MR. FALLON:  Late though it be,
15      right.
16           MR. LESNIAK:  Your Honor, the
17      position of Chase is that at this point in
18      time the borrowers are one month behind.
19      They owe for January 20th.
20           THE COURT:  Of this year?
21           MR. LESNIAK:  Of this year, at this
22      point, yes, Judge.
23           THE COURT:  And today is February
24      1st.  So they owe for it.  But it is still
25      not in arrears yet.  It is not even late

                                              75


1      yet, because it is fifteen days after
2      January 20th.
3           MR. LESNIAK:  Well, it's due on the
4      20th, Your Honor, but the late charge does
5      not apply, as she testified, if they pay
6      within fifteen days.
7           THE COURT:  So let's be clear.  The
8      only payment that this debtor is in arrears
9      right now is the current payment due January
10      20th.

                    Page 65


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
11                    MR. LESNIAK:  At this point yes,
12         that is correct, Judge.
13                    THE COURT:  Very good.  You may
14         step down.
15                    Miss Baker, if you'll take the
16         witness stand.
17                    (DEBORAH KAREN BAKER, previously
18         sworn.)
19                    THE COURT:  Let me remind you
20         you're under oath.
21                    THE WITNESS:  Yes, Your Honor.
22                    THE COURT:  And if you'll tell
23         again for the record your full name.
24                    THE WITNESS:  Deborah Karen Baker.
25
```

                                                    76
                            COURT - BAKER


```
 1    BY THE COURT:
 2    Q.   And Miss Baker, what is your role at Chase?
 3    A.   I'm an assistant vice president of the loan
 4         support unit, the litigation support unit.
 5    Q.   And so your department is the litigation
 6         department or the litigation support department?
 7    A.   Litigation support department.
 8    Q.   And I know this is probably a loaded question
 9         for a banker, so I apologize in advance.  How
10         many VPs are there in that department?
11    A.   Well, I'm not a VP.  I'm an assistant vice
12         president.
13    Q.   Oh, okay.
14    A.   And there's only two.
```
                            Page 66

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
15   Q.   Okay, how many VPs?

16   A.   One.

17   Q.   Congratulations.

18   A.   Thank you.

19   Q.   How long have you been in this position?

20   A.   I've been an assistant vice president with Chase

21        since January 1st, 2005.

22   Q.   And were you in this kind of position before or

23        how long have you been with Chase?

24   A.   I've been with Chase since June 30th, 1997.  And

25        I have been an assistant vice president prior to
```

77

COURT - BAKER

```
 1        that.

 2   Q.   In Chase, but in a different department?

 3   A.   No, ma'am, at another company.

 4   Q.   What is your educational background?

 5   A.   High school.

 6   Q.   Are you generally familiar with bankruptcy?

 7   A.   Yes, ma'am, I am.

 8   Q.   And with bankruptcy process?

 9   A.   Yes, ma'am.

10   Q.   And with the Bankruptcy Code?

11   A.   Yes, ma'am.

12   Q.   What is Chase's role in the mortgage banking

13        industry?

14   A.   Are you asking about Chase Home Finance LLC?

15   Q.   If that's who owned this mortgage, that's who

16        I'm talking about?

17   A.   Chase Home Finance LLC does not own this

18        mortgage.
```

Page 67

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

19  Q.  Who owns this mortgage?

20  A.  JP Morgan Chase Bank originated the mortgage,

21      and then their mortgage was either assigned or

22      sold to Citibank, and then Citibank transferred

23      the mortgage to Chase for servicing.

24  Q.  And the records of the county will reflect that?

25  A.  They should reflect that, Your Honor.

                                              78
                    COURT - BAKER


1   Q.  So I want to go back then.  Who exactly is your

2       boss, I mean who do you work for?

3   A.  I work for Chase Home Finance LLC.

4   Q.  So what is Chase Home Finance LLC's role in the

5       mortgage banking industry?

6   A.  To service our own loans and to service loans

7       for other investors.

8   Q.  Can you give me an overview of your department?

9   A.  My department consists of approximately twelve

10      to fifteen people.  We all work with loans that

11      are only in litigation.  Anywhere from

12      bankruptcy, adversaries through what we call

13      true litigation.  It can be from underwriting

14      until after REO.

15  Q.  REO?

16  A.  Real estate owned, after we've sold the

17      property.

18  Q.  Okay.

19  A.  And we work with our in-house counsel and

20      outside counsel in order to research the loans,

21      the allegations that have been made against

22      Chase to determine if they are accurate, if they

                    Page 68

020108 Schuessler

23      are not accurate.  And then we provide that
24      information to our in-house counsel.
25  Q.  How many residential mortgages of this type does

                                                79
                    COURT - BAKER


1       Chase service?
2   A.  Over three million.
3   Q.  Of those, are they mostly originated by another
4       branch of Chase, or does Chase Home Finance
5       its -- or Chase just service them?
6   A.  It can be various.  There's brokers.  We do have
7       many branches; however, the branches are not
8       Chase Home Finance employees.  They are
9       separate.  It's under a separate entity.  So I
10      honestly don't know the answer to that question.
11  Q.  Well, is it fair to say that Chase, almost no
12      matter what, is in the business of servicing
13      loans; in other words, actively solicits
14      mortgages to service?
15  A.  Chase Home Finance, yes, Your Honor.
16  Q.  And do you know how Chase came to service this
17      particular mortgage?
18  A.  Well, Chase home -- well, back when Chase began
19      servicing this mortgage, it was Chase
20      Manhattan Mortgage Corporation.  Chase Manhattan
21      Mortgage Corporation acquired Advanta, which was
22      the entity in San Diego.  And at that time
23      that's how we obtained -- and actually, I
24      believe it was before this loan was even
25      originated.  It was -- or right about the same
                                                80

                    Page 69

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler
COURT - BAKER

```
 1        time, 2003, 2004.  And so then Chase Home
 2        Finance LLC is the successor to the merger of
 3        Chase Home Finance, Chase Manhattan Mortgage
 4        Corporation.
 5   Q.   Okay.  Is there any requirement that Chase be
 6        actually equipped to perform the necessary
 7        servicing?
 8   A.   I'm not sure I understand the question.
 9   Q.   Is there any requirement that Chase has to meet
10        before they can be a servicing agent?
11   A.   I honestly don't know.
12   Q.   But in your estimation is Chase well equipped to
13        perform mortgage servicing functions?
14   A.   Very well equipped, yes, ma'am.
15   Q.   Including those mortgages that are in
16        bankruptcy?
17   A.   Yes, ma'am.
18   Q.   Do you happen to know what Chase's share of the
19        servicing industry is?
20   A.   No, ma'am, I do not.
21   Q.   Are you familiar with Chase's policy for
22        accepting or refusing payment amounts, mortgage
23        payments at branch locations?
24   A.   I am.
25   Q.   Who is responsible for that policy?
```
                                               81
                        COURT - BAKER

```
 1   A.   For the writing of the policy?
 2   Q.   Yes.
```

Page 70

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

3  A.  You have to understand that the personnel at

4      branch does not work for Chase Home Finance LLC.

5      They work for Chase Bank, and it's a totally

6      different entity.  The policy is that whenever a

7      loan is in bankruptcy, foreclosure --

8  Q.  That wasn't my question.

9  A.  I'm sorry.

10  Q.  Who is responsible for the policy?

11  A.  Of servicing loans in bankruptcy?

12  Q.  Of whether or not Chase will accept or refuse a

13     mortgage payment at a branch location?

14  A.  Chase Home Finance.

15  Q.  Okay, Chase Home Finance.  So if a person is

16     current and not in bankruptcy, they can pay at a

17     Chase branch?

18  A.  Yes, ma'am.

19  Q.  So my question still is:  Who is responsible for

20     that policy?

21  A.  Chase Home Finance is.

22  Q.  And who at Chase Home Finance?

23  A.  I do not know the answer.

24  Q.  So even though you don't know who is responsible

25     for it, your description of the policy in your

                                          82
                   COURT - BAKER

1      affidavit and attachments is accurate, is that

2      correct?

3  A.  Yes.

4  Q.  Is that still the policy?

5  A.  It is, yes, ma'am.

6  Q.  Are you involved in the decision-making on any

                   Page 71

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 7        level?
 8   A.   Yes, ma'am.
 9   Q.   Were you at any point involved with the
10        decision-making concerning this loan?
11   A.   No, ma'am.
12   Q.   At what level are you on the decision-making
13        then?
14   A.   For loans in litigation, as far as settlements,
15        and if we go to trial, and I am frequently
16        deposed.
17   Q.   What are you deposed on?
18   A.   Loans in litigation.
19   Q.   So at what point did you become involved in this
20        loan?
21   A.   After I signed the affidavit, and I believe
22        there was a hearing.
23   Q.   Not here there wasn't.  So where was the
24        hearing?
25   A.   Or there was -- from what I understand you had
```

                                        83
                    COURT - BAKER

```
 1        ordered me to appear here.
 2   Q.   I did, because you signed an affidavit.
 3   A.   Correct.
 4   Q.   You signed an affidavit on a policy that you
 5        have no control over you say, and that you're
 6        only reflecting what you've been told.  Who made
 7        the policy that you signed and you swore that
 8        you did?  A human being has got to do it.
 9   A.   I know that.
10   Q.   Don't tell me a mortgage company does it.  A
```

Page 72

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
11        human being does it.  Who is the human being
12        that makes the policy?
13   A.   Well, I don't believe it is one particular human
14        being.
15   Q.   Okay, then who are the human beings that make
16        the policy?
17   A.   That would be our -- the way that I have seen it
18        work at Chase, since I've been there ten and a
19        half years, is that any time that there would be
20        a policy, it would go to a committee --
21   Q.   Committee of?
22   A.   Committee of senior vice presidents at Chase.
23   Q.   Okay.
24   A.   Then also our legal department would bless or
25        change the policy.  At that time it would become
```

                                                84
                    COURT - BAKER

```
 1        a policy.
 2   Q.   At what point did you become aware of the fact
 3        that the debtors attempted to make a payment at
 4        the Chase branch in June '07 and were refused?
 5   A.   Prior to the time that I signed the affidavit.
 6   Q.   And why were the debtors permitted and then
 7        later not permitted to make their payments at
 8        the local branch?
 9   A.   We don't know the answer to that question.
10   Q.   So you are saying that they shouldn't have been
11        permitted to begin with?
12   A.   Correct.  After the filing of the bankruptcy.
13   Q.   A-ha.  That's an a-ha moment.  That's called a
14        Perry Mason moment in the court, you all.
```

Page 73

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

15          So why were the debtors permitted and

16      later not permitted, and it's after the filing

17      of the bankruptcy is your answer?

18   A.  We don't know why they were permitted.

19   Q.  But you said the policy was on the filing of a

20      bankruptcy?

21   A.  Once a bankruptcy is filed, there are codes that

22      are either a bankruptcy foreclosure, it can be a

23      homeowner's assistance, which is our loss

24      mitigation department, it can be a loan that the

25      mortgagors are in the military.  There are

                                                    85
                    COURT - BAKER


1       various reasons why we put codes in the system

2       to stop payments be accepted in the branch.

3    Q.  And you said you knew about this policy.  What

4       source did you consult to confirm the policy?

5    A.  I consulted with our legal department, with our

6       attorneys.  I've been to two branch offices, and

7       I've received the same information from each

8       person.

9    Q.  Was it in a book?  Was it in a manual?

10   A.  I have seen manuals, yes, ma'am.

11   Q.  But did you consult it when you did your

12      affidavit?

13   A.  No, ma'am.  I had seen the manuals previously.

14   Q.  And is there a code in all of this for equity in

15      the home?

16   A.  Normally what I've seen in Chapter 7 bankruptcy

17      is that the trustee will decide if the, you

18      know, if the mortgagor has reaffirmed or not,

                    Page 74

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
19       and if they want to keep the house.  If they
20       don't want to keep the house, then normally the
21       trustee will decide if the house is to be sold
22       or what.  So I don't know what happened exactly
23       on the Scheussler's loan.
24   Q.  Well, I don't know either.  But that doesn't
25       make sense, given that the new level of
```
                                                       86
                        COURT - BAKER

```
1        exemptions, and of course in Florida that would
2        be a totally different story.  So see, you're
3        not talking to me on what I would consider an
4        honest level.  Because that's not correct.
5        Because there's a lot of equity in any home in
6        Florida, or there was at one time, in any home
7        in Texas, in any home anyplace else, and of
8        course New York State is up there in exemption.
9        So that there is a lot of equity in homes
10       nationwide.
11   A.  Right, yes, ma'am.
12   Q.  So I hear you, and I don't want to argue with
13       the witness.  I'll just say that doesn't ring
14       true.  Because there is equity.
15               So can you explain to me why debtors
16       are not permitted to make their payments at a
17       local branch after they file bankruptcy?
18   A.  Yes, ma'am.
19   Q.  Okay.
20   A.  The local branch does not know that a mortgagor
21       has filed bankruptcy or not.  And we don't want
22       them to know.  They are not our employees at
```

Page 75

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
23        all.  They are an affiliate.  Chase Home Finance
24        has specific departments, such as the bankruptcy
25        department, the foreclosure department, the
```
                                                        87
                         COURT - BAKER

```
 1        homeowner's assistance department, where any
 2        time that something out of the ordinary happens
 3        on a loan, we want to handle it with the best
 4        care possible.  We would not --
 5    Q.  But that's to protect Chase, not the debtor.
 6    A.  I believe it's a part of the Bankruptcy Code
 7        also.
 8    Q.  No, it's to protect Chase, not the debtor.  And
 9        it is not part of the Code.  But okay.
10    A.  Okay.  So when we instruct, when we put a code
11        on our system for the branch not to accept the
12        payment, the only thing that they say is
13        inactive.  And we don't want them saying
14        anything inappropriate to someone that may be in
15        bankruptcy or in foreclosure.  Because once the
16        loan -- just for instance, if it's in
17        foreclosure, we've accelerated that loan and we
18        don't want a payment coming in without our
19        knowledge.  And we want to ensure that the
20        payments are posted correctly.
21    Q.  So that's your explanation why these debtors who
22        were apparently quote, using another term
23        "delinquent", end quote, were permitted to pay
24        at a Chase branch up until the time they filed
25        for bankruptcy, but payments were rejected
```
                                                        88
                         COURT - BAKER

                         Page 76

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 1       thereafter?
 2  A.   They actually did pay at branch on May the 25th.
 3  Q.   That's right.  So I've heard Miss Salinas refer
 4       to Chapter 7, so Chase does not permit Chapter 7
 5       bankruptcy debtors to make payments at the local
 6       branch even if they are current?
 7  A.   That's correct.
 8  Q.   Is that also the policy with a Chapter 13
 9       debtor?
10  A.   Yes, ma'am.
11  Q.   Does it make any difference whether or not the
12       Chapter 13 debtors are current?
13  A.   Most Chapter 13 debtors are not current.  But it
14       would not make a difference.
15  Q.   I have a question to ask you that goes back to
16       what I asked about the codes on the equity.  So
17       if there are no codes, if Chase forecloses and
18       there are no other bidders, then the debtors
19       don't get their equity or their exemption, is
20       that right?
21  A.   Well normally, if there was equity in a property
22       and it went to a foreclosure sale, there would
23       be a lot of third-party bidders, so they would
24       receive anything over the total debt of the bid
25       of their loan amount that they owed Chase.
```

                                              89
                        COURT - BAKER

```
 1  Q.   But it probably would be a depressed bid anyway.
 2       So it would just be up to and a little over what
 3       the bank is owed.  And the debtor would lose
```
                        Page 77

020108 Schuessler

4       their equity portion of it, is that correct?

5   A.  From what I've seen, the bidding has not gone

6       down so much; they are still bidding, multiple

7       bidders at foreclosure sale.

8   Q.  But they would still -- I'm asking, still, the

9       debtors would lose their equity if it didn't

10      reach that level of bidding.  This case in

11      point, Chase was owed a hundred and something

12      thousand, the value was close to 300,000, maybe

13      120 in equity.  Had this gone into foreclosure,

14      Chase could have credit bid, if no one else did,

15      then someone could bid 167 whatever yours was

16      and 50 and get it and all their equity would be

17      foreclosed completely, is that correct?

18  A.  That's correct.

19  Q.  And potentially Chase could bid its debt and

20      take the property?

21  A.  Well, we rely on our --

22  Q.  Let's answer the question first.

23  A.  I'm sorry.

24  Q.  Potentially, Chase could bid its debt and take

25      the property?

                                        90
                    COURT - BAKER


1   A.  Yes, ma'am.

2   Q.  Okay, now then explain what you wanted to tell

3       me.

4   A.  Thank you.  We rely on our attorneys, who we

5       instruct to file a motion for relief from stay

6       to determine whether it should be appropriate or

7       not.

                    Page 78


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

8  Q.  How much do you pay these attorneys?

9  A.  There is a different schedule based on the type

10     of loan, and I believe the schedule for this

11     loan is $650 for a motion for relief from stay.

12  Q.  And they don't get that money unless they file

13     the motion.  If they review it, do they get

14     anything for just reviewing it?

15  A.  I honestly don't know.

16  Q.  And what about this Amer-- what was the name of

17     the company that was in-house out there in San

18     Diego?  I'm sorry, I can't recall it off the top

19     of my head.

20  A.  First American.

21  Q.  First American.

22  A.  Yes, ma'am.

23  Q.  How much do they get paid?

24  A.  I'm not sure.  I believe it's between $75 and

25     $150.

                                        91
                COURT - BAKER


1  Q.  And let me ask the same question.  Do they get

2     paid simply to review it, or do they get paid

3     only if a motion to lift stay is filed or a

4     proof of claim is filed?

5  A.  No, from what I understand, they are paid on --

6     they actually package the loan documents.  And

7     it's based on each package that's sent for

8     whatever, whether it is --

9  Q.  So if they packaged something, in this case, if

10    First American packaged something and they sent

11    it to Steven Baum, they got the $75 or $150?

                Page 79

020108 Schuessler

12   A.   Correct.

13   Q.   Was that then charged back to the debtor?

14   A.   No, ma'am.

15   Q.   In your experience, would the ability to make

16        payments at a local branch be regarded as a

17        convenience for most mortgagors?

18   A.   Well, in my experience I believe that the

19        mortgagors believe that it is.

20   Q.   Okay.

21   A.   But in reality, it's really not.

22   Q.   Well, okay, why is it not?

23   A.   Because it is and it's not.  It's a benefit if

24        they are paying on the last due date before a

25        late charge is going to be assessed, because

92

COURT - BAKER

1    they are assured that they will not incur that

2    late charge.  However, all the branches make a

3    batch every night and they send it to a

4    processing center.  That processing center then

5    determines where each check should go:

6    Bankruptcy, foreclosure, homeowner's assistance,

7    home equity, wherever.  Then they overnight that

8    to that appropriate department for decision.

9    And it normally takes three business days before

10   it will show up on their account.  In this case

11   it was four, because it was Friday, which was I

12   believe the Scheusslers paid at 5:39 on Friday

13   afternoon, and Monday was a holiday.

14   Q.   Right.

15   A.   And it was posted that very next Tuesday, but

Page 80

020108 Schuessler

16       effective dated as of the Friday.

17   Q.   Right.  So see, I don't understand why a

18        mortgagor would not think it is an asset.

19        Because if you put it in the mail, you don't

20        know it gets there.  You don't know if somebody

21        has held it up on the other end, you don't know

22        what that holiday would do.  But this mortgagor

23        can walk in, get a proof of payment and they are

24        done.

25   A.   No, that's incorrect.

                                                    93
                    COURT - BAKER


1    Q.   Okay.

2    A.   They get a receipt.  That does not ensure that

3         we will accept that payment.

4    Q.   But at least they have a receipt.

5    A.   They have a receipt.

6    Q.   And they know that it is -- at least they don't

7         have to wait for the check to be cashed, which

8         is what often, again, from my experience happens

9         in here, the check is just hanging out there and

10        nobody knows what's going on with it.  At least

11        on this one they've got a receipt.

12   A.   They've got a receipt.  However, again, they

13        don't have record that that payment may not be

14        denied once it reaches the appropriate

15        department.

16   Q.   In your affidavit you state:  It's Chase's

17        policy not to accept payments on loans under

18        Chapter 7 bankruptcy protection -- and you

19        called that a protected loan -- at local banking

                    Page 81

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

20      branches.  Said policy of not accepting payments
21      on protected loans at local banking branches is
22      to ensure that payment received on protected
23      loans are processed accurately within the
24      context of the requirements of the Bankruptcy
25      Code, established procedures and well within the

                                                94
                    COURT - BAKER


1      infrastructure for processing such payments. End
2      quote.
3              For mortgage and bankruptcy, why is it
4      not possible for those payments to be accepted
5      at the branch and forwarded, just like you said,
6      to the appropriate person and location P.O. box
7      for processing?
8   A.  Well, there's many different reasons.  In this
9      case, the Scheusslers, it was a Chapter 7
10     bankruptcy.  In Chapter 7s, there is no pre and
11     post.  They are due for whatever they are due
12     for.  They were due for the April 20th payment
13     when they made the payment on May 25th.  So
14     that's what the payment was applied to was April
15     20th.  So when Miss Salinas filed the -- or
16     signed the affidavit, she was signing it
17     correctly.  Now, if it had been in Chapter 13,
18     we would have had a totally different situation.
19  Q.  Let's go back a bit to giving it to a local
20     branch.  You compare with at least going in and
21     getting a receipt and putting it in the mail to
22     a Post Office box --
23  A.  No, ma'am, to a processing center.

                    Page 82

020108 Schuessler

24  Q.  Yeah, but it's got a Post Office box, doesn't
25      it?

                                                    95
                    COURT - BAKER


1   A.  For them to mail their payments in?
2   Q.  Right.
3   A.  Yes, ma'am, that's correct.
4   Q.  Right.  So you send it off in the mail, you
5       don't have a clue, then the money doesn't get
6       cashed, you don't know why.  How many days later
7       will you even find out?  Whereas at least you've
8       got your receipt.  I don't understand why this
9       couldn't be sorted out?
10  A.  We tried to withdraw the motion.  I don't know
11      if you're aware of --
12  Q.  I'm totally aware of it.  Pillar Processing had
13      no connection with Chase at all, but to withdraw
14      the motion after I had said I wanted a hearing
15      on it based on what I had heard.
16  A.  Right.
17  Q.  So yes.  And that's why Chase's behavior in this
18      has been unconscionable to me.
19              What is it about Chase's
20      infrastructure that would prevent them from just
21      going to the local branch, the local branch; why
22      could that not be done?
23  A.  Basically because we want to take every
24      precaution that that branch -- the branch
25      doesn't see our system at all.  Again, they only
                                                    96
                    COURT - BAKER


                    Page 83

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 1       will receive an inactive status when they try to
 2       process that.  The branch people do not work for
 3       Chase Home Finance.  They work for JP Morgan
 4       Chase Bank.  We do not want any inappropriate
 5       actions taken against the mortgagor at all.  And
 6       that's why it's sent directly to the appropriate
 7       department for decisioning.
 8    Q. So it's protecting Chase.  On your miscellaneous
 9       Attachment 1, have you looked at that
10       spreadsheet?
11    A. Yes, ma'am.
12    Q. Can you tell from that spreadsheet whether or
13       not a certain payment has been made at a local
14       branch?
15    A. No, ma'am.
16    Q. Do you know from that spreadsheet if the May
17       29th payment was made at a branch?
18    A. No, ma'am, not from a spreadsheet.
19    Q. Can you tell or do you know if many of the
20       debtors' other payments over the years were made
21       at that branch?
22    A. You cannot tell by looking at the spreadsheet,
23       no, ma'am.
24    Q. Does the May 29th payment that the debtors made
25       at the Chase branch appear to be correctly
```

                                                97
                        COURT - BAKER

```
 1       processed?
 2    A. Yes, ma'am.
 3    Q. So if payments at a Chase branch is a privilege
```

Page 84

020108 Schuessler

4       for those mortgagors who are current, and if

5       bankruptcy debtors are automatically not allowed

6       to pay at the branch, whether or not they are

7       current or whether or not they have equity,

8       isn't it fair to say that Chase's policy has the

9       effect of denying privileges to debtors in

10      bankruptcy just because they filed for

11      bankruptcy?

12  A.  I look at it differently.

13  Q.  Okay.

14  A.  I look at it as if we are trying to protect the

15      mortgagors.

16  Q.  You're protecting Chase, not the mortgagors.

17  A.  And that's where I see it differently.  I think

18      that if the mortgagors were allowed to go in and

19      make any payments at any time, no matter what

20      stage it's in, we could be basically violating

21      the Bankruptcy Code.  Because one of our tellers

22      could say something inappropriate.  There could

23      be payments that should have been accepted if

24      they were on an agreed order.  They may be

25      making payments that are less than what they

                                              98
                    COURT - BAKER


1       should have been.  And quite honestly, I don't

2       see it like we're protecting Chase.  I see it

3       like we're trying to protect both of us.

4   Q.  You've just testified to what I've said, so.

5                In your affidavit you state as per the

6       records of Chase on the 29th of June 2007 the

7       debtors were due for the monthly mortgage

                         Page 85

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

8      payments of May 2007 and June 2007 in the amount

9      of $2,110.99 each.  As of the fourth day of

10     December 2007, Chase's internal records indicate

11     that the debtors are delinquent for the monthly

12     mortgage payments of October of '07 and November

13     of '07, each in the amount of $2,362.38, with

14     the suspense balance of $2,079.70.  And a copy

15     was attached as Exhibit C.  Will you explain

16     that statement to me that I just read from your

17     affidavit?

18  A.  Yes, ma'am, which part are you --

19  Q.  Your affidavit, as per your records --

20          THE COURT:  Do you have a copy of

21     her affidavit?  Give it to her.

22  Q.  At paragraph ten:  As per the records of Chase

23     on the 29th day of June, 2007, the debtors were

24     due for the monthly mortgage payments for May

25     2007 and June 2007 in the amount of $2,110.99.

99

COURT - BAKER

1      As of the 4th day of December 2007, Chase's

2      internal records indicate that the debtors are

3      delinquent for the monthly mortgage payments of

4      October 2007 and November 2007, each in the

5      amount of $2,362.38, with a suspense balance of

6      $2,079.70.  A copy of the payment is attached.

7          I need you to explain, and I'll say

8      why.  Exhibit C reflects that since the debtors

9      filed on April 30th, six full post-petition

10     months they've appeared to make seven

11     post-petition payments for all but two of the

Page 86

020108 Schuessler

12      payments.  Three payments of $2100 were

13      received -- this has to do with what you then

14      finally put in suspense and then paid account?

15  A.  Correct.

16  Q.  But why didn't you feel it necessary to include

17      the suspense account in your affidavit?

18  A.  Because there were funds in it, the suspense

19      account.

20  Q.  But you didn't tell the Court, except on the

21      attachment you just said it.  So you give an

22      incomplete picture of the full situation, and

23      for every advantage to Chase.

24              The statement in the affidavit

25      suggests that the debtor failed to make payments

                                            100
                COURT - BAKER


1       for October and November of '07.  The amount in

2       the suspense account would have covered that,

3       short ten dollars?

4   A.  One of the payments, yes, ma'am.

5   Q.  I just think you would have been more accurate

6       if you had said the debtors made right at 16,800

7       in post-petition and about the same amount has

8       come due post-petition.  Simply put, they are

9       current.  They are ready for this last payment.

10      It is due.  I understand it's due.

11              Did you ever send a statement to them

12      saying X would catch you up?

13  A.  Yes, ma'am.  We sent monthly statements prior to

14      the filing of the bankruptcy, and then we send

15      for informational purposes only after the filing

                    Page 87

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

16    of the bankruptcy.

17            MR. LESNIAK:  We have those

18    available, Your Honor, if you'd like to see

19    them.

20            THE COURT:  Your questions.

21            But the affidavit did not include

22    the suspense fund amount.  It might have

23    been in an attachment that we had to find,

24    but it wasn't in the affidavit.  It simply

25    said they were behind.

                                          101


1            All right, your questions.

2            MR. LESNIAK:  Your Honor, what I've

3    handed up to the Court is a group exhibit,

4    which is a set of the monthly statements

5    that were sent by Chase to the borrower,

6    both pre and post bankruptcy petition.

7    These go back as far as November 4th of '05.

8    And Miss Baker will testify about that,

9    because that's as far back as they keep the

10    record.

11            THE COURT:  Mr. Fallon, is there

12    any contest in this?

13            MR. FALLON:  I've just seen this.

14    This is what I've just seen.

15            THE COURT:  Oh, just this moment.

16            MR. FALLON:  I haven't seen them

17    before.

18            THE COURT:  I'll let you ask any

19    kind of questions, you want, Mr. Lesniak,

                    Page 88

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

20    but I think we've all agreed there is one

21    payment due right now, and that's it.

22          MR. LESNIAK:  Your Honor, there is

23    one payment that was just made for December,

24    and there is a payment due in January, yes,

25    that is --

                                          102


1           THE COURT:  January 20th.

2           MR. LESNIAK:  That is correct, that

3     is correct.  I don't believe that this

4     hearing is about that particular payment,

5     Judge.

6           THE COURT:  It's not.  It's not.

7           MR. LESNIAK:  It's in terms of what

8     you said it's about.

9           THE COURT:  I think I was pretty

10    clear about that.

11          MR. LESNIAK:  Yes, you were.  But

12    it's not my intention to provide those

13    statements for that purpose.  Your Honor

14    asked about the statements, and she

15    mentioned what the statements show, and

16    we're going to be able to tell you exactly

17    what the statements show.  You had asked if

18    they show -- did the statements show how

19    much they have to pay to catch up.  And the

20    answer is in the statements, and I would

21    like to present that as our evidence,

22    because you've inquired about that.

23          THE COURT:  Okay.

Page 89

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler
24              MR. LESNIAK:  Okay?  So may I show
25      it to --

                                                103

1               THE COURT:  Oh, if Mr. Fallon has
2       no objection.  Give him a chance to look at
3       it.  I will accept it, but he needs to have
4       an opportunity to look at it.
5               MR. LESNIAK:  Fine, Judge.
6               Take as long as you need.
7               THE COURT:  Is there a letter in
8       here?
9               MR. LESNIAK:  There is a letter
10      that was attached to Miss Baker's affidavit,
11      and we will get to that, Your Honor.
12              THE COURT:  I've seen that.
13              Mr. Fallon, do you need a recess?
14              MR. FALLON:  Just like two minutes,
15      Judge.
16              THE COURT:  Certainly.  The Court
17      will take a recess.
18              THE CLERK:  All rise.
19
20              (Recess in the proceeding.)
21
22              MR. LESNIAK:  Your Honor, we were
23      at the point where Mr. Fallon was looking at
24      copies of the statements that Chase had.
25              THE COURT:  Mr. Fallon, do you have
                                                104
            LESNIAK - DIRECT - BAKER

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1    a comment on them?

2              MR. FALLON:  I have no objection,

3    Your Honor.

4              THE COURT:  Very good.  So you're

5    moving these into evidence?

6              MR. LESNIAK:  As Chase Exhibit 2.

7              THE COURT:  Okay.  And your point

8    on them will be?

9              MR. LESNIAK:  There's a number of

10   points on it, Your Honor.

11             THE COURT:  Okay.  I see you have

12   green tabs.

13             MR. LESNIAK:  Yes, I do, Your

14   Honor, to try to facilitate specific

15   references we will make -- however, we are

16   admitting the entire document into evidence.

17             (Chase Exhibit 2, monthly mortgage

18   billing statements.)

19

20  DIRECT EXAMINATION

21  MR. LESNIAK:

22  Q.   So I'd ask Miss Baker to please take a look at

23       it for a moment.  Miss Baker, with respect to

24       the entire group exhibit we have provided, what

25       are those?

                                                105
              LESNIAK - DIRECT - BAKER


1   A.   These are monthly mortgage billing statements

2        sent to Mr. and Mrs. Scheussler from Chase prior

3        to the bankruptcy and then informational

4        statements only after the bankruptcy was filed.

                    Page 91

020108 Schuessler

5   Q.   Okay.  Now even though they were admitted into

6        evidence, I want to make sure something that's

7        very clear.  These are copies of documents that

8        are retained by Chase, is that correct?

9   A.   That is correct.

10  Q.   And in what form are they retained?

11  A.   They are retained on our computer system.

12  Q.   Okay, and these are copies.  Is sending monthly

13       statements the manner in which Chase solicits

14       payment from borrowers for their next loan?

15  A.   Yes, sir.

16  Q.   Okay.  So these are copies of statements that

17       were actually sent out to the Scheusslers, is

18       that correct?

19  A.   That is correct.

20  Q.   Okay.  Now, I would like to refer you to the

21       statement dated May 1, which is the first green

22       tab.  Could you find that, please?

23  A.   Yes, sir.

24            THE COURT:  May 1 when?

25            MR. LESNIAK:  May 1, 2007, Your

                                              106
                 LESNIAK - DIRECT - BAKER


1        Honor.

2             THE COURT:  Okay.

3             MR. LESNIAK:  It should be the

4        first green tab, unless I made an error.

5        It's up on the right-hand corner, the

6        second -- below the loan number.

7             THE COURT:  I see it.

8             MR. LESNIAK:  Okay.

                 Page 92

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 9    BY MR. LESNIAK:

10    Q.   And Miss Baker, generally speaking, what

11         information is this statement intended to

12         provide to the borrower?

13    A.   It's intended to provide the current status of

14         their loan as of May 1st, 2007, when their next

15         monthly payment is due, and if there are any

16         past due payments that need to be paid.

17    Q.   Okay.  And does this statement do that?

18    A.   It does.

19    Q.   And could you point out where, please, in the

20         statement it would inform the borrower of the

21         status of the account, the most recent payment

22         and any past due payments?

23    A.   It's in -- there is a box area that says loan

24         status.  And to your left it says the current

25         payment is due by May the 20th.  Past -- and
```

107

LESNIAK - DIRECT - BAKER

```
 1         that payment is in the amount of $2,079.12.  In

 2         the middle it states the past due payment is in

 3         the amount of $2,079.12, and a late charge of

 4         $31.87, for a past due amount of $2,110.99.  And

 5         then it shows the total amount that's due as of

 6         May 1st, which is $4,190.11.

 7    Q.   Okay.  Is there someplace in the middle of the

 8         letter that informs the borrowers that they are

 9         past due?

10    A.   Yes, sir.

11    Q.   Okay, could you read that language, please?

12    A.   Yes, sir.  It says:  Our records indicate that
```

Page 93

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

13        your loan is past due.  Please remit the full
14        amount of the payment and charges due as
15        indicated on the payment coupon below.
16   Q.   All right.  Now, please go to the bottom of the
17        statement.  There again there is information
18        informing the borrowers that they are past due
19        and what amounts are currently due, is that
20        correct?
21   A.   Yes, sir.
22   Q.   Now, what's the purpose of that section at the
23        bottom?
24   A.   The section at the bottom again is to basically
25        reflect what's at the top.  It shows the amount

                                              108
                 LESNIAK - DIRECT - BAKER


1         that's due by May 20th, which is $4,190.11.  And
2         then the current payment due, if it's paid prior
3         to June 5th, '07 of $2,079.12, and the past due
4         payment of $2,110.99.
5    Q.   Now, on the actual statement that the borrower
6         gets, is that section perforated?
7    A.   It is.
8    Q.   Okay.  And what is the borrower supposed to do,
9         if anything, with that section when making
10        payment?
11   A.   Tear it off and mail it in.
12   Q.   Okay.
13   A.   Or --
14   Q.   Okay, now let's say the borrower comes to a
15        branch to make a payment.  What does the
16        borrower show, in addition to a check?

                      Page 94

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

17   A.   This monthly payment coupon.

18   Q.   So the person at the window who would take the

19        check that was brought in by the Scheusslers on

20        May 25 would probably have this detached

21        statement, correct?

22   A.   That's correct.

23   Q.   Is there any risk that that person at that

24        window could -- who is not a Chase employee,

25        could ask the borrowers about the past due

109

LESNIAK - DIRECT - BAKER

1        payments?

2    A.   There is.

3    Q.   Is that one of the reasons why Chase does not

4        want payments made at the teller windows in

5        bankruptcy, foreclosure and other circumstances

6        that you've described?

7    A.   It is.

8    Q.   In this particular case, do you recall what

9        amount of payment the Scheusslers made on May

10       25, 2007; was it the $2,079.12 or the 2,110.99?

11   A.   It was the $2,110.99.

12   Q.   Okay.  Now, I'd also like you to turn to -- and

13       please unclip it if you have to -- the second

14       page of the statement.  Is there any information

15       at the top of that statement that provides

16       contact information, so if the borrowers have a

17       question about whether or not a payment has been

18       received, is there a mechanism for them to find

19       that out easily?

20   A.   Yes, yes, sir.

Page 95

020108 Schuessler

21  Q.  And what is that mechanism?

22  A.  There is all kinds of information on here.

23      Customer care, what the hours are, the telephone

24      number, the fax number, where to send your

25      payments, if you want payoff.

                                                    110
                    LESNIAK - DIRECT - BAKER


 1  Q.  So if a customer does make a payment and it is

 2      by mail, and let me back up one step.  The

 3      payment that the Scheusslers tried to make at

 4      branch in June, that payment was not accepted at

 5      the branch, correct?

 6  A.  That's correct.

 7  Q.  But the payment itself was not refused?

 8  A.  That's correct.

 9  Q.  Okay.  It was later delivered to Chase and

10      ultimately processed and credited, is that

11      correct?

12  A.  That is correct.

13  Q.  Okay.  So a borrower who sends in a payment by

14      mail, will that borrower then -- well, how long

15      would a mail payment take, let's go through that

16      process.  If a party puts the payment in the

17      mail, generally speaking, do you know about how

18      long it is before it would get posted to the

19      account?

20  A.  Anywhere from -- depending on the mail and what

21      time of the year it is, anywhere from five to

22      seven business days.

23  Q.  And then would the customer have the ability to

24      call the customer service number and find out

                    Page 96

020108 Schuessler

25          whether or not that payment had been posted?

111

LESNIAK - DIRECT - BAKER

1    A.    Yes, sir, and there's also an automated service
2          where you can either input your loan number or
3          your Social Security number, and it will just
4          give you that information when your payments
5          were last processed, how much.
6    Q.    So even though the borrowers may be in a Chapter
7          7 bankruptcy, the customer service department
8          has access to those records to be able to answer
9          any inquiries that may be initiated by the
10         borrower, is that correct?
11   A.    Normally once a borrower -- that is correct.
12         That is correct.  If they have any further
13         questions, they are normally instructed to the
14         bankruptcy department.
15   Q.    Okay.  But the employee at the branch is not a
16         Chase employee, does not have access to the
17         account history information, is that correct?
18   A.    Not at all.
19   Q.    So if a payment had been made prior to May, and
20         the Scheusslers walked in in May and asked the
21         teller to find out if that prior payment had
22         been credited, could that teller find out that
23         information?
24   A.    No, the teller would instruct the mortgagor to
25         call the 800 number.

112

LESNIAK - DIRECT - BAKER

Page 97

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1  Q.  And calling the 800 number, that representative

2      could provide that information?

3  A.  That's correct.

4  Q.  Okay.  Now, after a Chapter 7 bankruptcy is

5      filed, I think it was mentioned that there is a

6      code put on the account?

7  A.  That's correct.

8  Q.  Does that code result --

9              THE COURT:  What is the code?

10             THE WITNESS:  The code is 70 --

11     it's a class -- first it's a class code that

12     shows that it is either not in collections

13     or not in foreclosure, but it's now in

14     bankruptcy.

15             THE COURT:  So your statement

16     earlier, that it wouldn't tell a teller

17     what's going on is untrue?

18             THE WITNESS:  No, ma'am.

19             THE COURT:  That code basically

20     tells them.

21             THE WITNESS:  No, ma'am, that's

22     only on the Chase Home Finance system.  Not

23     on the banking system.  They are two totally

24     separate systems.

25             THE COURT:  What does it do on the

                                113
              LESNIAK - DIRECT - BAKER


1      banking system?

2              THE WITNESS:  It shows inactive.

3              THE COURT:  So it basically says

4      you got trouble.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 5              THE WITNESS:  No, ma'am.  It can be
 6     for a variety of reasons.  It can be because
 7     an account has been closed --
 8              THE COURT:  On a mortgage?
 9              THE WITNESS:  No, ma'am, not a
10     mortgage, just on any account, a checking
11     account, savings account, anything, it will
12     show inactive.
13   BY MR. LESNIAK:
14   Q.  So the teller at the window does not know why
15       the payment cannot be accepted at the window, is
16       that correct?
17   A.  They have no idea.
18   Q.  Okay.  After the bankruptcy proceeding --
19              THE COURT:  That's incredulous to
20     me.  Of course they know.  They know
21     something is the matter with the account.
22              MR. LESNIAK:  Your Honor, they know
23     the payment can't be accepted --
24              THE COURT:  That's right.
25              MR. LESNIAK:  -- but I think she's
```

                                          114
                  LESNIAK - DIRECT - BAKER


```
 1     already testified that it could be
 2     because --
 3              THE COURT:  I've heard the
 4     testimony and it's unbelievable --
 5              MR. LESNIAK:  -- of foreclosure, a
 6     number of other reasons.
 7              THE COURT:  -- testimony.  Go right
 8     ahead.
```

                         Page 99

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

9    BY MR. LESNIAK:

10   Q.   Does Chase Home Finance train the tellers at

11        local banking branches?

12   A.   No, sir.

13   Q.   Are those local tellers employees of Chase Home

14        Finance?

15   A.   No, sir.

16   Q.   And they don't have access to the computer

17        system?

18   A.   No, sir.

19   Q.   So the payment at the branch is merely a

20        courtesy, isn't that correct?

21   A.   That's correct.

22   Q.   They get a receipt that says we got your check,

23        and then they forward it on the same way as if a

24        customer had sent it in by mail; it goes through

25        the same processing department before it is

115

LESNIAK – DIRECT – BAKER

1         separated out.  Isn't that what your testimony

2         was?

3    A.   Yes, sir.

4    Q.   Okay.  Now, after the Chapter 7 proceeding is

5         filed, do the borrowers, who are now bankruptcy

6         debtors, do they receive statements?

7    A.   No, sir.  They receive for informational

8         purposes only.

9    Q.   So they do receive statements, but the

10        statements, do they look a lot different?

11   A.   They do.

12   Q.   Okay.  Could you look at the second tab for a

Page 100

020108 Schuessler

13    moment please.  Could you read the bold language

14    on the first highlighted box?

15  A.  Account statement is for informational purposes

16    only.

17  Q.  Does it -- could you also read down into the

18    next box, important messages.  Is there anything

19    telling the borrower that this statement is not

20    requesting a payment?

21  A.  Yes, sir.  It says please note, this statement

22    is not a request for payment.  It is for

23    informational purposes only.  However, you may

24    use the attached coupon below to remit your next

25    payment to Chase.

116

LESNIAK - DIRECT - BAKER

1   Q.  Now, the coupon below, in this case it only

2     shows a current payment of $2,079.12.  The prior

3     statement showed a past due amount.  Does this

4     mean that the account was not past due?

5   A.  No, sir.

6   Q.  Okay, so are you saying that the statements that

7     are sent after bankruptcy will not show past due

8     amounts, is that correct?

9   A.  That's correct.

10  Q.  Okay.  And do you believe that if those

11    statements did show past due amounts, that that

12    might constitute a violation of either an

13    automatic stay or a discharge injunction?

14  A.  Yes, sir.

15  Q.  Now, Miss Baker, when a bankruptcy proceeding is

16    filed on a customer, that gets special

Page 101

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

17      treatment; I think you've testified to that.

18      There is a separate department to handle that,

19      is that correct?

20   A.   That's correct.

21   Q.   Okay.  And do you know, is a separate accounting

22       system set up to deal with let's say in Chapter

23       13 cases?

24   A.   There is.

25   Q.   So it distinguishes pre-petition and

117

LESNIAK - DIRECT - BAKER


1       post-petition payments, correct?

2    A.   That's correct.

3    Q.   Okay, so Chase has that system in place.  Now,

4        could you tell me, does Chase Home Finance

5        communicate with --

6             MR. LESNIAK:  Excuse me, Your

7        Honor.  I would like to withdraw that one.

8    Q.   I would ask Miss Baker to look at her affidavit.

9        And I would like you to please find the

10       promissory note, if you would?

11   A.   Yes, sir.

12   Q.   Okay.  Could you look down about the middle of

13       the page to find out; see paragraph three that

14       says payments?

15   A.   Yes, sir.

16   Q.   Could you read the language about six or seven

17       lines down that tells the borrowers where they

18       are supposed to make their payments?

19   A.   It says:  I will make my monthly payments to

20       P.O. Box 78828, Phoenix, Arizona 85062-- I

Page 102

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

21     believe it is a zero 828.

22  Q.  And then it goes on; there's a little bit more,

23      isn't there, or at a different place?

24  A.  Or at a different place, if required by the

25      (inaudible).

                                                     118
                    LESNIAK - DIRECT - BAKER


 1  Q.  Now, when customers go into bankruptcy, does

 2      Chase tell the customers, inform them as to

 3      where future payments are to be made in

 4      accordance with the note?

 5  A.  Yes, sir.

 6  Q.  Could you please look at your affidavit and then

 7      look at the Exhibit B; there's a letter dated

 8      May 3, 2007?

 9  A.  Yes, sir.

10  Q.  Is this the communication you're referring to?

11  A.  Yes, it is.

12  Q.  Okay.  And could you look through that.  And I

13      would like to know --

14              THE COURT:  Let me get to Exhibit

15      B, please.

16              MR. LESNIAK:  Sorry, Judge.  I

17      maybe have gone too far.

18              THE COURT:  Did I skip it?

19              MR. LESNIAK:  It is pretty much

20      near the end, Judge.

21              THE COURT:  Is it past the note?

22              MR. LESNIAK:  Yes, ma'am.

23              THE COURT:  Okay.

24    BY MR. LESNIAK:

                        Page 103

020108 Schuessler
25  Q.   Do you see at the top -- and this is the letter

119
LESNIAK - DIRECT - BAKER


1       that was sent to the Scheusslers, is that
2       correct?
3               THE COURT:  It was sent to Mr.
4       Christopher Scheussler.
5   Q.  Christopher Scheussler, is that correct?
6   A.  Yes.
7               THE COURT:  Let the record reflect
8       it says Christopher Scheussler.  It does not
9       say Mrs. Scheussler.  Okay.
10  BY MR. LESNIAK:
11  Q.  Okay.  This is not -- this is a copy of what was
12      actually sent, is that correct?
13  A.  Yes, sir.
14  Q.  Okay.  Could you please note at the top, it says
15      this is not an attempt to collect a debt, for
16      informational purposes only.  Do you know why
17      that language is on there?
18  A.  Because whenever a person is in bankruptcy we
19      don't try to collect a debt.
20  Q.  Okay.  And it also says that down at the end of
21      the first paragraph, is that correct?
22  A.  Yes, sir.
23  Q.  And doesn't it say in that same paragraph that
24      we're extending this letter to explain
25      procedures, is that correct?

120
LESNIAK - DIRECT - BAKER


1   A.  Yes, sir.

Page 104

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

2   Q.   And do those procedures include where to make

3        payments?

4   A.   Yes, sir.

5   Q.   Okay.  And do those procedures of where to make

6        payments include accepting payments at a

7        counter?

8   A.   I'm sorry?

9   Q.   Does that procedure set forth in that letter

10       include making payments at a local branch?

11   A.   No, sir, it does not.

12            THE COURT:  May I ask you, this is

13       Chase Home Finance.  When you say procedures

14       and policy, that's who you're referring to?

15            MR. LESNIAK:  Yes, Judge.

16            THE COURT:  Just let the record

17       reflect that.

18            MR. LESNIAK:  Just a moment, if I

19       may, Your Honor, to catch up.

20   Q.   One final question.  You mentioned earlier that

21       Chase Home Finance services or owns as many as 3

22       million mortgage accounts, is that correct?

23   A.   Yes, sir.

24   Q.   Where are those mortgage accounts located?

25   A.   All over the United States.

                                  121

COURT - BAKER

1   Q.   And is there a local Chase Bank near every one

2        of those borrowers?

3   A.   No, sir.

4            MR. LESNIAK:  That's all I have to

5       ask.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 6                    THE COURT:  I have a couple of
 7          questions, and then I'll let Mr. Fallon.
 8     BY THE COURT:
 9     Q.   I just was looking through this myself right
10          here, and if I look through it -- and I admit to
11          skimming.
12     A.   Sure.
13     Q.   -- but the overdue amounts and the past due
14          amount remain almost constant more or less for a
15          significant period of time pre-petition.  So my
16          question is, my thought is when I see it then is
17          that Chase reacted not to the fact that it was
18          overdue but to the fact they filed bankruptcy.
19          Because consistently they have been behind?
20     A.   They have been.
21     Q.   And that was my question on that.  Does anywhere
22          in that letter that you sent have a policy that
23          says don't do this anymore; don't file at your
24          branch bank anymore?
25     A.   No, ma'am, it does not.
```

                                                122
                      FALLON - CROSS - BAKER

```
 1                    THE COURT:  Mr. Fallon, the witness
 2          is with you.
 3                    MR. FALLON:  Thank you, Your Honor.
 4     CROSS-EXAMINATION
 5     BY MR. FALLON:
 6     Q.   Where does it advise the person to send their
 7          post-petition payments in your letter?
 8     A.   Where?
 9     Q.   Yes.
```

                        Page 106

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

10  A.  If I'll -- I can get back to it.  To P.O. Box
11      78828, Phoenix, Arizona, and it is 85062-8828.
12          THE COURT:  Tell me how to get to
13      that letter again?
14          MR. LESNIAK:  That would be the
15      letter of May 3rd, Your Honor.  It is
16      Exhibit B to Miss Baker's affidavit.
17          THE COURT:  Thank you.  I was
18      looking in the wrong place.  Go ahead.
19  BY MR. FALLON:
20  Q.  And yet with regard to the exhibits of these
21      notices that you've sent, it has a different
22      address, doesn't it?
23  A.  Yes, sir, it does.
24  Q.  Well, why is that?
25  A.  I don't know.

                                          123
                FALLON - CROSS - BAKER


 1  Q.  Isn't it the exact same address on these
 2      statements called account statement information
 3      purposes only, the same address as was listed on
 4      every monthly statement since 2003 that Chase
 5      sent to these people?
 6  A.  I think I may -- I'm not sure I understand your
 7      question.
 8  Q.  Well, you've submitted that the first document
 9      here is I guess November 4th, 2005?
10  A.  That's correct.
11  Q.  And it has a coupon to send to a particular
12      address?
13  A.  Yes, sir.
                    Page 107

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

14   Q.   And that's the same address post-petition,
15        notwithstanding the letter that you claim you
16        sent?
17                 THE COURT:  It's right after the
18        green tab, the first.
19   A.   Yes, it's the same -- well, actually it's the
20        same address.  But I was looking on the top of
21        the second page.
22   Q.   Top of the second page.  And the top of the
23        second page of?
24   A.   The account statement for informational
25        purposes.  There's where I -- actually it is the

                                              124
                 FALLON - CROSS - BAKER


1         same address.  I'm sorry.
2    Q.   Right.  So the letter confuses a person, gives
3         them an address that's completely different from
4         the monthly statement?
5    A.   It does, it does have a different address.
6    Q.   Now, going to the two items that were green
7         tabbed, all of the pre-petition statements, if
8         there is any past due payment it mentions it,
9         mentions a late charge, is that correct?
10   A.   Yes, sir.
11   Q.   Once the person files in bankruptcy, the form is
12        basically the same, but all of a sudden it never
13        lists late charges and it never lists any past
14        due amounts?
15   A.   That's correct.
16   Q.   So that come May 29th of 2007, when the first
17        statement that was sent to my clients, it lists

                         Page 108

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

18      the only amount due as $2,079.12?

19  A.  Yes, sir.

20  Q.  They wouldn't know there was any late charges

21      due from that?

22  A.  No, sir.

23  Q.  There is nothing on this statement, on the front

24      page of this statement that in any way says that

25      this statement has been changed because they

                                              125
                    FALLON - CROSS - BAKER


1       filed a petition in bankruptcy?

2   A.  No, sir, not on this.  We had previously sent

3       the letter, the May 3rd letter.

4   Q.  Right, which had the wrong address?

5   A.  Well, let's them know that we were aware that

6       they are in bankruptcy.

7   Q.  Okay, well, and I'm assuming they are aware they

8       are in bankruptcy too?

9   A.  Right, but --

10  Q.  But there is nothing on this form that would

11      lead me to believe if I have been receiving

12      monthly statements from Chase that this is

13      really any different from any prior forms, other

14      than the fact that now it says I don't owe any

15      money that's past due?

16  A.  Are you asking me if I believe that the forms

17      are the same?

18          THE COURT:  Why don't you restate

19      your question.

20  Q.  All right, do you think the average consumer is

21      going to know there's a difference between the

                    Page 109

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

22        forms pre-petition versus post-petition?

23   A.   I would.

24   Q.   You would, because you're in the bankruptcy

25        department.

126

FALLON - CROSS - BAKER

1    A.   No, sir, I'm not in the bankruptcy department.

2              THE COURT:  Litigation department.

3    Q.   Litigation department, okay.

4    A.   No, but I would, just because I would have known

5         what my bill looked like in the past and would

6         have noticed the change.

7    Q.   All right.  Well, if you thought on May 25th

8         that you paid the May 20th payment and you got

9         this statement May 29th, would you not assume

10        you're current?

11   A.   I would not assume that, and the reason I

12        wouldn't assume it is because of the May 1st

13        statement that tells me that I owe two payments.

14        And I know that I paid the past due payment.

15   Q.   All right, and if you believed that this

16        statement has now been corrected, you wouldn't

17        know whether or not what caused the statement to

18        change, is that correct, as a customer?

19   A.   You may or may not. I think that it would depend

20        on what your bankruptcy attorney would tell you,

21        whether to expect any changes.

22   Q.   Well, I mean it's Chase who is communicating,

23        not the bankruptcy attorney?

24   A.   Right, but.

25   Q.   But can't you tell your customer what happened?

Page 110

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

127

FALLON - CROSS - BAKER

```
 1              THE COURT:  What do you mean?
 2  Q.   Well, this is just a form.  It doesn't really
 3       explain anything to the person?
 4  A.   Well, it explains that we are not trying to
 5       collect the debt, and it's for informational
 6       purposes only.
 7  Q.   Well, the other forms, the pre-petition forms
 8       also in the small print on the second page say
 9       if you're in bankruptcy we are not trying to
10       collect this either.  So there's really nothing
11       much different between the forms.  Look on page
12       two of the pre-petition ones, near the bottom of
13       the page, it mentions important bankruptcy
14       information?
15              THE COURT:  This is the second
16       page?
17              MR. FALLON:  Second page, Your
18       Honor, of the pre-petition ones.
19              THE COURT:  Oh, I see.
20  Q.   And that's no different, other than its
21       location, to the important bankruptcy
22       information on the post-petition?
23  A.   Right, it's no different wording.
24  Q.   Now, when my client went to Chase on May 25th,
25       the check was taken and properly posted, is that
```

128

FALLON - CROSS - BAKER

```
 1       correct?
```

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

```
 2  A.  Yes, sir.

 3  Q.  Why wasn't it taken a month later?

 4  A.  Because at that time the classification of the

 5      loan had been changed in the Chase Home Finance

 6      system to reflect that the loan was in

 7      bankruptcy.

 8  Q.  And could they not make a code just simply to

 9      allow the teller to take that check?

10  A.  The only code that would change on the banking

11      side is one that would go from an inactive loan

12      to an active or active status to inactive.

13  Q.  Now, when my client went in June then she was

14      advised to mail it to Phoenix, is that correct,

15      or do you know?

16  A.  I don't know what she was advised.

17  Q.  Do you have any idea when the check for June was

18      received by Chase?

19  A.  On or about the day that we posted it.

20  Q.  Okay, so August 22nd, from your standpoint?

21  A.  No, actually -- I'm sorry, I take that back.  We

22      received the check.  We sent the check to our

23      attorney.

24  Q.  Okay.  And then the check for July, what

25      happened to that check?
```

                                        129
                    FALLON - CROSS - BAKER

```
 1  A.  The same thing.

 2  Q.  And then the check for August?

 3  A.  I believe at that time we were instructed, the

 4      attorney sent the checks back, and we were

 5      instructed to post the payments.
```

Page 112

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

 6    Q.   Now, at any time during this period of June,

 7         July and towards the end of August, did anybody

 8         on behalf of Chase communicate with my clients

 9         as to what was happening to their checks?

10    A.   On behalf of Chase?  I don't know if our

11         attorney did or not.

12    Q.   Okay, so you don't know what -- if the people

13         are sending payments that they are not getting

14         credit for at that point, is that correct?

15    A.   If the Scheusslers sent in a payment, we would

16         remit the payment to our attorney.  Our

17         attorney --

18              THE COURT:  Would you cash it or

19         would you just send the check?

20              THE WITNESS:  We would send the

21         check.  And we expect our attorney to --

22         because it's been referred for a motion, to

23         look at it, to advise us as to whether or

24         not he believes that we should take it based

25         on all of the information regarding the

                                                  130
                    FALLON - CROSS - BAKER


 1         loan.

 2    Q.   Well, even with the motion pending, is there

 3         anything that prevents Chase from taking the

 4         monthly payments?

 5    A.   Only the motion pending, and that's why we

 6         submit to our attorney for advisement.

 7    Q.   And the motion pending is to lift the stay?

 8    A.   Correct.

 9    Q.   But there's nothing that prevents Chase from

                    Page 113

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

10       keeping the monthly payment at that point?

11   A.   Well, it's our policy to send it to the attorney

12       for their advisement.

13   Q.   Okay, and in the meantime the customer is not

14       being advised about anything, is that correct?

15   A.   I do not know if the attorney advises the

16       customer or not.

17   Q.   Well, how is this supposed to benefit the

18       customer of Chase by no longer being able to pay

19       at the Chase branch?

20   A.   I'm sorry?  How --

21   Q.   I think you said that part of the reason for not

22       taking post-petition payments at branches is

23       because it's supposed to be a protection to the

24       customer?

25   A.   That's correct.

                                             131
                    FALLON - CROSS - BAKER


 1   Q.   And how does this sort of noncommunication when

 2       the customer sends it to the address that Chase

 3       has asked them to send it to, how does that help

 4       the customer?

 5   A.   Well, I believe from what I understand, after

 6       the motion for relief from stay is referred to

 7       the attorney, the attorney sends the -- you and

 8       Scheusslers a letter stating that we are filing

 9       a motion for relief from stay.  And from that

10       point it is communication between both

11       attorneys.

12   Q.   Okay.  Now, you I believe testified that when

13       you mail a payment to the Post Office box, it

                    Page 114

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

14         takes five to seven business days to be posted?

15   A.    Yes, sir.

16   Q.    Now, does the person get credit for the payment

17         the date it's received?

18   A.    Yes, sir.

19   Q.    Was it stamped someplace so that somebody knows

20         when it was actually received?

21   A.    If a loan is not in bankruptcy foreclosure, the

22         homeowner's assistance department or any other

23         special department, then it's posted at the lock

24         box, which is the P.O. box, which is all Chase

25         personnel.  If it's routed to an individual

                                              132
                    FALLON - CROSS - BAKER

1          department, then it's stamped as of the day that

2          it was received at that lock box, so that we

3          know that we need to effective date the check so

4          that there will be no disadvantage to the

5          customer.

6    Q.    So regardless of the day it's actually posted,

7          they will get credit for the date that it was

8          received?

9    A.    Correct.

10   Q.    Now, the advantage of going to a branch of

11         course is you get a receipt and you know it was

12         received that day.  You're not relying upon when

13         someone put a date stamp on it, is that correct?

14   A.    That it would be -- if the payment is accepted,

15         that it would be effective dated that day, yes,

16         sir.

17   Q.    And you have an immediate receipt from the

                    Page 115

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

18      teller at the Chase branch?

19  A.  That's correct.

20           MR. FALLON:  I have no further

21      questions.

22           THE COURT:  I have a couple.

23  BY THE COURT:

24  Q.  So this is not -- it's Chase Home Finance's

25      policy not to allow a Chase branch to do it, is

                                         133
                    COURT - BAKER


1       that correct?

2   A.  To accept the payments?

3   Q.  Right.

4   A.  Yes, Your Honor.

5   Q.  And apparently the branch would take it except

6       for Chase's home finance policy?

7   A.  The only reason why the branch would not accept

8       a payment is if the person had a Chase account

9       and the check that they were tendering -- say

10      they had $500 in their account and they were

11      tendering a check for $600, they would not

12      accept that check.

13  Q.  Is it a fair summary that payments from

14      bankruptcy debtors are not permitted at a branch

15      because the branch is not set up to handle it?

16  A.  That's correct.

17  Q.  And that's what the debtors are being protected

18      from?

19  A.  The debtors are being protected from any

20      improper communication regarding bankruptcy or

21      foreclosure or anything about their loan.


                    Page 116


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

22          THE COURT:  Any further questions?

23              MR. LESNIAK:  Just one or two, Your

24      Honor.

25

                                                            134
                    LESNIAK - REDIRECT - BAKER


1

2    REDIRECT EXAMINATION

3    BY MR. LESNIAK:

4    Q.   Miss Baker, Mr. Fallon pointed out that the

5         informational statements sent after the filing

6         of a case have a different P.O. box number than

7         what was in the May 3, 2007 letter, okay.  Does

8         it make any difference?

9    A.   No, sir, it's going to end up at the same place.

10   Q.   Is there any delay sending it to one box as

11        opposed to another?

12   A.   No, sir.

13              THE COURT:  Let's follow up with a

14        question.

15   BY THE COURT:

16   Q.   What about if it's given at the branch bank;

17        does it go to that P.O. box too?

18   A.   No, it goes to a processing center, and then the

19        processing center directs it specifically to the

20        correct department.

21   Q.   But that's an internal process, so it gets to

22        the processing center rather quickly?

23   A.   Yes, ma'am, overnight, ma'am.

24              THE COURT:  Overnight now.

25              Mr. Fallon, do you have any further

                        Page 117

020108 Schuessler

135

1    questions?
2              MR. FALLON:  No, Your Honor.
3              THE COURT:  You may step down.
4              THE WITNESS:  Thank you.  Should I
5    leave this here or take them?
6              THE COURT:  They belong to Mr.
7    Lesniak.
8              Mr. Lesniak, do you have anything
9    you wish to add?
10             MR. LESNIAK:  In terms of an oral
11   argument, Your Honor, or in terms of
12   witness?
13             THE COURT:  Well, in terms of
14   witness.
15             MR. LESNIAK:  In terms of
16   witnesses, no, I do not believe so, Judge.
17             THE COURT:  And I have to think
18   about oral argument.
19             Mr. Fallon.
20             MR. FALLON:  I don't think I need
21   to present any witnesses.
22             THE COURT:  Very good.  Before you
23   do oral argument, I want to give you the
24   legal standard, because I'm not trying to
25   blind side you in any way.

136

1              Bankruptcy Rule 9011(b) provides by
2    presenting to the Court, whether by signing,

Page 118

020108 Schuessler

3       filing, submitting or later advocating a
4       petition, pleading, written motion or other
5       paper an attorney or unrepresented party is
6       certifying that to the best of the person's
7       knowledge, information and belief formed
8       after an inquiry, reasonable under the
9       circumstances, that is not being presented
10      for an improper purpose such as to harass or
11      cause unnecessary delay or needlessly
12      increase the cost of litigation.  The
13      claims, defenses and other legal contentions
14      therein are warranted by existing law or by
15      nonfrivolous arguments for the extension,
16      modification, reversal or existing law or
17      the establishment of new law. The allegation
18      and other factual contentions have
19      evidentiary support if specifically so
20      identified are likely to have evidentiary
21      support after a reasonable opportunity for
22      further investigation or discovery, and the
23      denial of factual contentions are warranted
24      on the evidence or if specifically so
25      identified or recently based on a lack of

137

1       information or belief.  Where a pleading or
2       submission from a party violates one or more
3       of the provisions of Bankruptcy Rule
4       9011(b), Rule 9011(c) permits the Court,
5       after notice and a reasonable opportunity to
6       respond, to impose an appropriate sanction

Page 119

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

7        upon the attorneys, law firms or parties
8        that have violated Bankruptcy Rule 9011(b)
9        and are responsible for the violation.
10       Sanctions under Rule 9011(c)(2) may consist
11       of or include directives of a non-monetary
12       nature, an order to pay a penalty to Court
13       or if imposed on motion and warranted for
14       effect, deterrent, an order directing
15       payment to the movant of some or all of
16       reasonable attorneys' fees and other
17       expenses incurred as a direct result of the
18       violation.
19               Let me correct one thing.  I had
20       misinterpreted Miss Baker's affidavit.  And
21       it was on paragraph 10 of her affidavit,
22       where she does in fact talk about the
23       suspense account.  What happened was the
24       math was not done, so that I had to look
25       into the backup documentation to find out

                                              138


1        that there was at least one payment lacking
2        about ten dollars and some change to have
3        that current.
4                There are many troubling things
5        about this, and I'll listen to your
6        argument.  But now you've heard 9011, and
7        I'm looking at 9011 in the prospect that
8        this was filed for an improper purpose.  I
9        am also looking at a stay violation.  The
10       analysis of Rule 9011 is limited to the four
                         Page 120

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

11          corners of the filing that Chase submitted

12          to the Court.  This is not the case when

13          considering whether stay violation occurred,

14          whether the Court consider any post-petition

15          conduct by a creditor that would have the

16          effect of violating the automatic stay.  And

17          I point you to Bankruptcy Code Section

18          362(k), an individual injured by any willful

19          violation of the stay provided by this

20          section shall recover actual damages,

21          including costs and attorneys' fees, and in

22          appropriate circumstances may recover

23          punitive damages.  And I am also looking,

24          just so you know what law I'm looking at,

25          11-105.  And I pointed in my motion, my

                                                   139


1           order, order to show cause the Noseck

2           decision.  And basically in the Noseck

3           decision, a Massachusetts Bankruptcy Court

4           sanctioned a mortgage company, Ameriquest,

5           for failing to adjust its accounting

6           procedures just because the debtor filed

7           bankruptcy.  And those are the three areas

8           of law that I'm looking at.

9                   Now, how long -- I'm looking at the

10          clock too.  How long do you want to make

11          oral argument?

12                  MR. LESNIAK:  Maybe ten to fifteen

13          minutes, Judge.

14                  THE COURT:  Mr. Fallon, I'm sure

                          Page 121

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

15   you want some time too.  I think I'm going
16   to let you have lunch.
17         MR. LESNIAK:  Your Honor, if it
18   please the Court, we do have travel
19   arrangements today.
20         THE COURT:  I'm sure they are not
21   going to be flying.  Neither are you.  There
22   is ice out there.
23         MR. LESNIAK:  I understand, Judge,
24   I'm going to try to make it home.  I know it
25   may be late, but --

                                              140


1          THE COURT:  Where is your flight
2    out of?
3          MR. LESNIAK:  Albany.
4          THE COURT:  You probably cannot get
5    to Albany right now.  You might be able to
6    get someplace else, but you possibly will
7    not be getting to Albany today.  I'm just
8    being realistic here.  The storm is going
9    north.
10         MR. LESNIAK:  I understand, Your
11   Honor.  I was tracking it this morning the
12   whole time.  I fully understand.  I need to
13   get to Albany tonight and I will attempt to
14   do that.  But I'll take as long as you'd
15   like.
16         THE COURT:  Where are you two
17   ladies flying out of?
18         MS. BAKER:  I'm flying out of White
                      Page 122

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

19    Plains.
20              MS. SALINAS:  Stewart.
21              THE COURT:  White Plains may be
22    clear.  Stewart is going to be as iffy as
23    Albany.  Albany is going to be the most
24    iffy.  Stewart may fly; they've got longer
25    runways.

                                              141


1               We'll take a quick break.  You have
2    three areas you need to address.
3               THE CLERK:  All rise.
4
5               (Recess in the proceeding.)
6
7               THE COURT:  Mr. Lesniak, just so
8    you know, we tried to check and find out
9    about the Albany airport.  As far as we can
10   tell right now, the Albany airport is open.
11   LaGuardia is closed and Chicago is closed.
12              MR. LESNIAK:  Yes, I did check with
13   United, Your Honor.  My flight is still
14   scheduled on time, although expecting
15   delays.  But I'm expecting to go out
16   tonight.
17              THE COURT: And that's what it said,
18   that there will probably be departure
19   delays.  And we are going to try to find out
20   from the highway patrol.
21              MR. LESNIAK:  I greatly appreciate
22   your checking, Judge.  Thank you very much.

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

23          THE COURT:  And I'm sorry everybody
24     is hungry, but we have got a storm going on,
25     so let's hear.  Go ahead, sir.

                                        142


1          MR. LESNIAK:  Thank you, Judge.
2               Your Honor, I wanted to respond to
3     your opening comments, if I could.  The
4     response we filed was intended to address a
5     specific factual point, which we felt was
6     the underpinning of the Court's order.  It
7     was not intended to be a comprehensive
8     response.  It was not intended to provide in
9     writing all of the information and testimony
10    that Your Honor heard here today.  So I
11    apologize if we were not thorough.  It was
12    really only for very limited purpose and was
13    not intended to be comprehensive.  And we
14    tried to provide that information to you
15    today with the witnesses we've presented.
16               Before I move a little further, I
17    want to point out, Your Honor, that Chase in
18    this case, when payments did come in after
19    the motion for relief was filed did attempt
20    to withdraw this motion.  That's the reason
21    why the payments are sent when they are
22    received to the attorney, so the attorney
23    can handle it.  And if the attorney has the
24    payments that will cause the basis for the
25    motion to go away, the attorney will be

                                        143

                    Page 124

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1    instructed and would be advised certainly to
2    withdraw that motion.  I think there was an
3    attempt here to do that, particularly when
4    it was clear that Mr. Jose had enough
5    payments that at worst the account was only
6    one month in arrears.  So the trigger for
7    the motion for relief was no longer present
8    and he attempted to remove that.
9           As far as the motion goes itself,
10   Your Honor, I want to hit one point right up
11   front.  We did not prepare that motion.  We
12   will deal with the consequences of that
13   motion.  I am not going to defend to you the
14   fact that as far as one portion of the
15   motion, the 362(d)(2) there's clearly in the
16   breach, there is an admission that there is
17   equity in the property.  And I am not going
18   to stand here and argue with you that there
19   was no equity in the property.  362(d)(2) is
20   something that I can't support and justify
21   as I stand here before you.
22          But, there is another part of that
23   motion, that's 362(d)(1).  And 362(d)(1) is
24   based on a fairly broad standard for cause.
25   And typically when a borrower goes into

                                            144

1    default and is a couple of months behind so
2    that the interest payments are not being

                      Page 125

020108 Schuessler

3      made and interest is accruing on the

4      account, that is a justifiable basis to move

5      forward.

6              I just want to say that opening

7      about the motion, so you kind of have a

8      general feel of where we were.

9              Rule 9011.  What we are focusing on

10     there, Judge, is:  Is there evidentiary

11     support.  Did Miss Salinas lie when she made

12     her affidavit?  The answer is no.  She

13     looked at the account information.  And the

14     account information at Chase showed that

15     they were two months behind.

16              Now, I know there's been some issue

17     that I don't really understand between pre

18     and post-petition payments.  This is a

19     Chapter 7 case.  It's a Chapter 7 case that

20     the debtors filed a 521 statement of to

21     reaffirm.  And no reaffirmation has

22     occurred.  I think we need to understand

23     that background, because that really limits

24     what we can say to this borrower.  But for

25     the 9011 portion, Miss Salinas looked at it.

                                                145


1      Chase got the payment for May, the May 25

2      payment.  Chase processed that payment.

3      That payment was made by the Scheusslers in

4      the amount of the past due amount. It was

5      for the prior month's payment, April.  So

6      whether you like the policy or not, the

                        Page 126

020108 Schuessler

7    policy is that when they are two months in
8    arrears, they will move for relief from the
9    automatic stay.  That was triggered by the
10   analyst.  Miss Salinas looked at it.  At the
11   time she signed her affidavit they were in
12   fact two months behind according to Chase's
13   records.  So in my view there is substantial
14   evidentiary support for that affidavit, and
15   as a result there is no basis to award
16   sanctions under 9011.  We were in arrears;
17   the motion was in part based on 362(d)(1)
18   for cause, and so there is a basis to move
19   forward on that motion.  I would reiterate
20   that Chase backed off once additional
21   payments came in and got into Mr. Jose'
22   hands.
23           Someone can argue that, you know,
24   they should have been credited a little
25   sooner.  Perhaps, but he was trying to

                                        146


1    apparently work it out with the borrower's
2    counsel and had those checks, and then
3    reached a point where he said okay, we need
4    to process these checks and then withdraw
5    the motion, and he did do so.
6           THE COURT:  Can you explain Pillar
7    Processing?
8           MR. LESNIAK:  No, Judge, I do not
9    know who that is.  Perhaps I should have had
10   Mr. Jose here.  I don't really know. I just

                    Page 127


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

11    know that the motion was withdrawn.  I don't
12    have any idea.  I've never met him before.
13    We have only talked on the phone.
14            THE COURT:  By an unknown entity.
15            MR. LESNIAK:  I don't know his
16    situation there.
17            Your Honor, you cite a couple of
18    cases that I want to refer to, and I think
19    you did those in the context of the Rule
20    9011 situation.  The first is Noseck --
21    excuse me, not Noseck, let me go to Fagen.
22    Fagen was a situation in which the lender's
23    own records showed that the borrowers were
24    not in default.  That is very different from
25    the current situation.  Miss Salinas

                                        147


1    described the procedures she went through.
2    She described the information she looked at.
3    We've showed the Court the detailed
4    information she looked at.  And when she
5    looked at it on June 29, 2007, the account
6    was two months in arrears according to those
7    records.  So this is not a Fagen situation
8    where you can look at it and say according
9    to your records you're not in default.  They
10   were in default for two months at that point
11   in time.  So this distinguishes Fagen.
12           The other case was the Gwynn case
13   that Your Honor cited.  In that case a
14   credit union essentially withdrew an

                        Page 128

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

15    individual's membership.  And the individual

16    had just taken out a mortgage loan, and the

17    credit union refused to accept any payment.

18    That is not the case here.  Chase did not

19    refuse.  Chase Home Finance did not refuse

20    to accept payment.  Chase Home Finance

21    refused to take a payment at one place, at

22    the local branch.  Not all borrowers have

23    local branches.  These borrowers had that

24    convenience, but at that particular branch

25    the payment was refused.  But when the

148

1    payments came in by mail, in accordance with

2    the manner in which Chase had directed the

3    borrowers to make payments, those payments

4    were ultimately received, sent to Mr. Jose,

5    worked out in the motion for relief and then

6    ultimately credited to their account. So

7    this is not the Gwynn case where the lender

8    said I'm not taking any payments.  We refuse

9    to take payments in a certain way.  And

10    there's a reason for that way, Your Honor.

11         We've identified that what Chase

12    has done has set up a separate department.

13    Miss Baker said there's a separate

14    accounting system in Chapter 13s.  We have

15    done what the Noseck Court -- we have

16    already done what the Noseck Court said

17    needs to be done.  We recognize the

18    distinction that in bankruptcy there are

Page 129

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

19    certain considerations that have to be made.
20    And frankly, I find it somewhat disingenuous
21    that Chase would be expected to create the
22    separate system but then not be allowed to
23    administer it in a special way.  Chase does
24    not want those tellers talking to that
25    borrower.  I guaranty you, Judge, if that

149

1    teller said to the Scheusslers, oh, I see
2    you're behind a month in your payment, are
3    you going to make a payment?  We'd have a
4    stay violation or a discharge injunction
5    violation hearing on our hands.  Those are
6    not Chase employees.  They do not have
7    access to the Chase Home Finance records.
8    They are not trained by Chase Home Finance.
9    And Chase recognizes that the Noseck Court
10   requires that you have to view bankruptcies
11   as special circumstances; they are
12   different.
13            We are not discriminating against
14   bankrupt borrowers.  Miss Baker testified
15   that there are foreclosure cases get special
16   treatment; military get special treatment,
17   because you may not be able to move against
18   military personnel.  People in the home
19   assistance program get special treatment.
20   People who have a loan modification pending
21   get special treatment. People who have a
22   short sale pending, they have special

Page 130

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

23    treatment, because those tellers are not

24    equipped to deal with those payments.  They

25    have to get handled by a special department,

150

1    so we're doing it in accordance with our

2    obligations.  That's why it's like that.

3    And I think that's appropriate to have it

4    that way.

5          Now, I would like to move into the

6    105 situation, if I can.  And what I would

7    like to point out here, Your Honor, is that

8    lenders have rights too.  The Bankruptcy

9    Code does very little to take away the

10    rights of home mortgage lenders, and I'll

11    get into that a little bit more in a second.

12    Specifically, the contract between the

13    borrowers and the lender was that the

14    borrowers will make their payment at P.O.

15    box or where Chase Home Finance directs.

16    Chase Home Finance exercised that right.

17    When the borrowers went into bankruptcy,

18    they told them where to make the payment,

19    okay.  They then changed the statements.

20          And again, I find it disingenuous

21    that Mr. Fallon was questioning Miss Baker

22    about the fact that the informational

23    statements don't have the past due amount.

24    As soon as that past due amount goes on

25    there, with a borrower who has been

151

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1    discharged and has not reaffirmed, we are
2    going to have a discharge injunction
3    violation on our hands.  That's what
4    happens.  That's why it is done.  Your Honor
5    has said repeatedly, this is to protect
6    Chase.  And I don't think that motivation is
7    appropriate.  It is conduct we are talking
8    about.  It is conduct we talking about,
9    Your Honor.
10              If I have too much to drink and I
11   decide not to get into my car but to call a
12   cab after a dinner out, does it really
13   matter if I'm concerned about hurting myself
14   or if I'm concerned about hurting my car or
15   if I'm concerned about hurting a pedestrian
16   or if I just don't want to get arrested and
17   get a ticket.  What's important is that I
18   made the right decision.  My conduct was I
19   didn't get in that car.  And Chase's conduct
20   here, as evidenced by those statements, is
21   to comply with the Bankruptcy Code.  Does it
22   protect Chase?  It protects Chase from
23   motions arguing that Chase has violated the
24   statute or violated the discharge
25   injunction, certainly.  But the Bankruptcy

                                        152


1    Code provides that protection to the
2    borrowers.  The Bankruptcy Code says thou
3    shalt not contact the borrowers about
                    Page 132

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

4     amounts for which they have been discharged.

5     These debtors have been discharged; they

6     have no personal obligation to pay this

7     loan.  They have not reaffirmed and at this

8     point it is purely voluntary.  So those

9     procedures are set up to comply with the

10    Code.  If the Code said we could contact the

11    borrowers, I probably would.  But the Code

12    says thou shalt not.  That's why those

13    statements say we are not trying to collect

14    a debt.  We are not going to show you the

15    past due amount.  This is for informational

16    purposes.  But you know what, if you want to

17    find out the status of your account, nothing

18    prohibits you from contacting us.  We can't

19    contact you, but you can contact us.  So

20    they provide a customer service number.  In

21    fact Miss Baker showed they provided several

22    numbers where that borrower can call in and

23    find out the status of the account.  But we

24    can not talk to that borrower about past due

25    amounts.  We are prohibited.  And that's

                 153

1     what that policy is designed to do.  Does it

2     have the effect of taking away what is

3     perhaps a convenient method of payment for

4     this borrower?  Of course.  If the borrower

5     finds that to be the most convenient method

6     to drive by and get a receipt, yes.  But

7     this is a balancing test.  It's that way for

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

8          a reason.  It is that way so we can make
9          sure their payments are properly processed;
10         we can make sure that the tellers don't
11         provide or don't make an inappropriate
12         contact.
13                  So is there a little disadvantage?
14         To the extent that's a disadvantage, yes.
15         It is a disadvantage to this borrower.  But
16         it's justified based upon Chase's efforts to
17         comply with the Bankruptcy Code.
18                  Now, I do have some points on
19         authorities, Your Honor.  And if it's
20         helpful, while I refer to them, for your
21         clerk I did write them out.
22                  THE COURT:  Thank you.
23                  MR. LESNIAK:  Because I think as we
24         look at Section 105 there is some real
25         question that I need to place on record as

                                        154


1          to what is the Court's authority, what is
2          the extent to which the Court can act.
3          First thing, Your Honor, I wanted to point
4          out is a case in the Third Circuit.  It is a
5          nonprecedental case.  I've noted that.  It
6          is the case of In re: Deleone, but it really
7          says what I would like to say very
8          succinctly.
9                  Your Honor, can I skip the
10         citations in as much as I've provided them.
11                  THE COURT:  Yes, you can.  When I
                            Page 134

020108 Schuessler

12    find them, I'll let you know.  And I found
13    that one.
14              MR. LESNIAK:  Thank you.  This one,
15    Your Honor, I'm looking at page -- excuse me
16    at page two of the opinion.  It refers to
17    Chapter 13 proceedings, but the issue comes
18    up more in 13 because there are some basis
19    to modify mortgages in Chapter 13
20    proceedings.  So I'm going to refer to two
21    Chapter 13 cases by analogy.
22              The Deleone case said:  However,
23    section 1322(b)(2) precludes debtors from
24    modifying the rights of home lenders.  If
25    the appellant intended to keep his home and

                                        155

1    continue making mortgage payments, he was
2    required to do so according to the original
3    terms of the mortgage.  The Bankruptcy Code
4    does not direct Chase to provide branches
5    for which payments -- where at payments can
6    be made.  The terms of the mortgage allow
7    Chase to decide where those payments should
8    be made.  And Chase has done that in this
9    case.  Now, I think it has done so in
10   compliance with the Code.
11              And there's a reason, Your Honor,
12   why it's like this.  The Court in -- excuse
13   me, I'll take a moment.  The Court in the
14   Nobleman case, Your Honor, the Supreme
15   Court --
                    Page 135

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

16            THE COURT:  That's the one right

17      after that, okay.

18            MR. LESNIAK:  Yes, it is.  And I'm

19      quoting from page 329, which would be 508

20      U.S. 329.  The Court referred to certain

21      rights of lenders, and the Supreme Court

22      says these are rights that were bargained

23      for by the mortgagor and the mortgagee and

24      they are rights protected from modification

25      by 1322(b)(2).  Again, my point is that

                                        156


1       Chase bargained for these rights to

2       determine how payments should be made, and

3       it's appropriate that they exercise that

4       right.  And they did exercise their right in

5       a way that let the borrowers know.  They

6       sent a letter out promptly after the

7       bankruptcy proceeding was filed and they

8       learned about it.  They sent a letter out

9       saying here's how we need to have you make

10      your payments, and we are monitoring your

11      account, yes, we are, because you have

12      special considerations being in bankruptcy.

13            Justice Stevens in his concurring

14      opinion explained that the legislative

15      history indicated that favorable treatment

16      of residential mortgages was intended to

17      encourage the flow of capital into the home

18      lending market.  And what I'm saying here is

19      that I believe Chase had the right to

                       Page 136

020108 Schuessler

20    determine where payments should be made.  I
21    believe that right is not modified in
22    bankruptcy.  And I believe Chase is entitled
23    to exercise that right when it sent those
24    borrowers a letter saying please make your
25    payments here and did not include local

157

1    branches.
2            Moving into a little bit more
3    specifically on Section 105, Your Honor.  I
4    would ask the Court to proceed with caution.
5    United States Court of Appeals in the Second
6    Circuit In re: Barbieri said the equitable
7    powers emanating from Section 105(a) are not
8    a license for a Court to disregard the clear
9    language and meaning of the bankruptcy
10   codes, bankruptcy statutes and rules.  We
11   are mindful that the purpose of the
12   Bankruptcy Code is to afford the honest and
13   unfortunate debtor a fresh start, not to
14   shield those who abuse the bankruptcy
15   process in order to avoid paying their
16   debts.  Nevertheless, our concerns about
17   abuse of the bankruptcy system do not
18   license us to redraft the statute.  Courts
19   are not authorized to rewrite a statute
20   because they might deem its effects
21   susceptible of improvement.
22            In the Aquatic Development Group,
23   the United States Court of Appeals for the

Page 137

020108 Schuessler

24      Second Circuit, in a concurring opinion of
25      Justice Straub stated:  Nonetheless, this

                                                    158


1       Court has repeatedly cautioned that Section
2       105(a) does not authorize the bankruptcy
3       courts to create substantive rights that are
4       otherwise unavailable under applicable law
5       or constitute a roving commission to do
6       equity.  while perhaps expansive, the
7       equitable power conferred on the bankruptcy
8       courts by Section 105(a) is the power to
9       exercise equity in carrying out the
10      provisions of the Bankruptcy Code, not the
11      broader power to invoke equity to further
12      the purposes of the Code generally or
13      otherwise to do the right thing.  Citing In
14      re: Barbieri.
15              The same sentiment has been
16      expressed in West Point Stevens Inc., which
17      is a case in United States District Court
18      for the Southern District of Illinois, I've
19      cited that case as well.
20              THE COURT:  Illinois or New York?
21              MR. LESNIAK:  Excuse me, New York,
22      Your Honor.  Force of habit.  Sorry about
23      that.  In that case the District Court said:
24      Section 105 does not provide bankruptcy
25      courts with a roving writ, much less a free

                                                    159


                        Page 138

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

1   hand.  The authority bestowed thereunder may
2   be invoked only if and to the extent that
3   the equitable remedy dispensed by the Court
4   is necessary to preserve an identifiable
5   right conferred elsewhere in the Bankruptcy
6   Code.  Similar sentiment was stated by the
7   United States Bankruptcy Court.
8         THE COURT:  So you're trying to
9   tell me that I cannot address conduct by
10   creditors that has a prejudicial effect on
11   debtors and interferes with their rights
12   under the Bankruptcy Code?
13         MR. LESNIAK:  No, I'm not, Your
14   Honor.  What I'm saying -- I'm not at all
15   saying that.
16         THE COURT:  Okay.
17         MR. LESNIAK:  But what I'm saying
18   is you can't create rights that don't exist.
19   There is no right in the Code for a borrower
20   to pay at a local branch bank.  It's not
21   there.  The right of the lender to determine
22   where the payments should have been made are
23   set out in the contract.  That contract is
24   not changed by the Bankruptcy Code.  It
25   still remains in full force and effect, and

160

1   Chase is entitled to rely on that contract.
2   That's what I'm saying.  I'm saying let's
3   slow down just a bit and recognize, please,

Page 139

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

4    that lenders have rights too.  Those rights
5    are set out in their documentation, and
6    those rights are enforceable under the
7    Bankruptcy Code.  The Bankruptcy Code
8    doesn't change those rights.
9                In here I believe Chase has
10   exercised those rights with regard for the
11   Bankruptcy Code requirements, with concern
12   about improper contacts with the debtor,
13   without discrimination, they apply special
14   treatment in a number of different
15   circumstances.  And other borrowers who are
16   not located near Chase banks would not have
17   the ability to make those payments either.
18   So while their conduct in refusing that
19   particular payment, while it may be
20   troublesome in the individual instance in
21   the context of this case, where you have the
22   moving target, the borrowers are making a
23   payment at the same time you're moving for
24   relief from stay, I think that lawyers get
25   caught up in that advice all the time.  And

                                      161

1    it's a juggling act.  The way Chase has
2    chosen to deal with it is when they get
3    those checks, to send them on so their
4    counsel can deal with it with the borrower's
5    attorney, rather than being in a situation
6    where their counsel walks in to move for
7    relief from the stay, finds out the payment

                    Page 140

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

8      was made that he didn't know about, and then

9      the Court says, well, why are you here if

10     they have made the payment.  The payments

11     were sent to Mr. Jose.  He apparently tried

12     to deal with them.  Decided to withdraw the

13     motion for relief from stay when he had

14     those payments in hand.

15            THE COURT:  Which you still haven't

16     addressed on Pillar.

17            MR. LESNIAK:  I --

18            THE COURT:  And you can't?

19            MR. LESNIAK:  I can't, Judge.  I'm

20     sorry.  If I tried to address that I would

21     undermine any credibility I've been able to

22     establish because I know nothing about it.

23            Does Your Honor have any questions.

24            THE COURT:  Well, it is the

25     credibility to the Court that we are

                                                162


1      interested in.

2             No, I have no other questions.

3             MR. LESNIAK:  Thank you, Judge.

4             THE COURT:  Mr. Fallon, do you have

5      anything you wish to add?

6             MR. FALLON:  Yes, just briefly,

7      Your Honor.  I believe in listening to the

8      testimony as to what was or wasn't done

9      prior to bringing this motion, it was

10     woefully negligent.  Apparently there is no

11     record of any appraisal having been done of

                    Page 141

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

12      the property.  There is a record that they

13      do have that showed that there were two

14      payments made post-petition.  They do not

15      mention it in their papers.

16              The other thing, Your Honor, and I

17      don't know how serious the Court wants to

18      consider the affidavit itself, that it says

19      it's signed in Columbus, Ohio, by a notary

20      in San Diego, not before a notary.  I

21      suppose one could argue there really isn't

22      any affidavit there, so what was submitted

23      to the Court was an unsworn statement.

24              THE COURT:  I admit that troubling.

25              MR. FALLON:  And so therefore, that

                                            163


1       was not a proper thing to have done.  And so

2       I think basically the Court is well within

3       its rights to say that with regard to just

4       bringing this petition, at the time -- or

5       not the petition -- the motion, June 29th at

6       best there was one month past due.  All the

7       time that they showed through their own

8       evidence for approximately a year and a half

9       when my clients were past due pre-petition,

10      they just simply added it to the next

11      payment.  There was no reason at this

12      particular point in time for them to go

13      forward and seek to lift the stay.  There

14      were in no immediate danger of in any way

15      being jeopardized.  Accordingly, I believe

                        Page 142

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

16    that sanctions should be imposed.

17          I would also add that while the

18    payments were received by Chase and I guess

19    Chase's attorney before August 22nd, it was

20    not until I believe November of 2007 that

21    Chase at that point, knowing that they had

22    the money and actually had not applied even

23    one month's payment then said we want to

24    withdraw this motion.  In the meantime my

25    the client has had to come to my office on

164

1    several occasions in preparing for this

2    matter.  She's had to take time off from

3    work for a total of three days, which was

4    charged to her vacation time, and she's

5    going to have to incur additional attorneys'

6    fees.  And I think they should all be

7    covered by Chase.  There is no reason for

8    this to have been brought.

9          As far as punitive damages, I leave

10   that up to the Court to make a

11   determination.  Thank you very much, Your

12   Honor.

13          THE COURT:  You're welcome.

14          MR. LESNIAK:  Your Honor, would you

15   like an explanation of that affidavit issue?

16          THE COURT:  I've tried to get it

17   out of the witness.  You can't explain it

18   here.  You had a witness testify to it.

19          MR. LESNIAK:  Okay.

Page 143

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

20            THE COURT:  I don't think that
21    works.
22            MR. LESNIAK:  Okay.
23            THE COURT:  And it was not
24    satisfactory actually.  So in fact, it
25    became more troubling.  And this is sort of

                                          165


1    an aside and not to this case in particular,
2    but it is troubling that someone who is
3    charge in the affidavit isn't in charge of
4    the affidavit.  And that that someone is not
5    doing it in front of the notary.  And it's
6    done in batches.  That, for every judge in
7    the country, is troubling.  And in fact, I
8    will probably have to address it in this
9    case, but that's again...
10           Mr. Lesniak, I'm going to allow you
11    to submit a comprehensive or post-trial
12    submission, if you would prefer that.  I'm
13    going to -- would you or would you be
14    comfortable with what you've just argued?
15           MR. LESNIAK:  I would welcome, Your
16    Honor, the opportunity to submit one.  I do
17    have a little bit of a timing issue.  It
18    would probably take me about 21 to 28 days
19    to get it in.  But you said comprehensive, I
20    would like to be able to prepare --
21           THE COURT:  Well, you said earlier
22    that you didn't make a comprehensive
23    affidavit, and then you said the arguments

                        Page 144


PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler
24      and the testimony -- and so I would like to
25      give you the opportunity.  Because I am

                                                    166


1       looking at a Noseck value.  So you need to
2       understand that's my thinking.
3               MR. LESNIAK:  Yes.
4               THE COURT:  I'm not joking about
5       this.  This was not a -- when I started this
6       at the very beginning, and I told you that
7       this was one of those difficult things for a
8       Judge to do, this was a difficult thing for
9       a Judge to do.  I do not do it lightly.  So
10      when I'm talking about it, I'm talking about
11      serious --
12              MR. LESNIAK:  Your Honor, I assure
13      you, I've taken nothing you've said today
14      lightly.  And if that's where you're
15      thinking about going, I would definitely
16      like to make a submission once we have a
17      copy of the transcript so I can make
18      appropriate references to the testimony.
19              THE COURT:  Okay, I'm going to
20      allow you to do so, because I am thinking in
21      that direction.
22              And I will give you part of my
23      thoughts on it.  What I heard in testimony
24      and what I heard you say that Chase has a
25      policy in place that it claims is designed

                                                    167


                        Page 145

020108 Schuessler

1    to accurately process payments from a

2    mortgagor in bankruptcy, but the process

3    places the administrative burden on the

4    debtors.  And I see what you say was said in

5    the letters, but that wasn't the policy they

6    had in place for these people, and they did

7    accept these payments, and they can't tell

8    when they came in.  So that's just

9    disingenuous to me.

10          And what I hear was Chase has a

11    conduct and policies that in effect create

12    an obstacle course for debtors who desire to

13    make their contractual mortgage payments,

14    albeit late.

15          Mr. Fallon and Mr. Lesniak, Mr.

16    Fallon has laid the groundwork for

17    attorneys' fees and actual damages for this

18    debtor in time off from work and travel.  So

19    the groundwork has been laid.  I would like

20    to hear -- I do not want to cut Chase short,

21    and I am concerned about how these

22    affidavits are done, and I think the

23    testimony has basically shown that they are

24    done in a rote basis.  So I'm concerned

25    about that.

168

1          I'm going to allow you -- and

2    you're right, 20 days is a good period of

3    time.

4          MR. LESNIAK:  Your Honor, once I

Page 146

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

5   see the transcript, if it's possible, I
6   don't know how long it would take to procure
7   that transcript.
8          THE COURT:  We'll put a rush on it.
9   You need to order it ASAP.  You need to go
10   into the clerk's office before you leave and
11   order it, and we'll ask them to put a rush
12   on it.
13          MR. LESNIAK:  Does Your Honor know
14   how long a rush takes, or would you like to
15   set a date now?
16          THE COURT:  I can tell you this
17   goes to Manhattan, and they are used to
18   rushes.  Sometimes they'll do them
19   overnight.  I don't know what they'll do.
20   So yeah, let's set a date.  Today is
21   February 1st.  I am going to tentatively set
22   March 6th, but that will be subject to
23   change if it's not at least 20 -- I don't
24   like 20 -- 21 days, because I'm now trying
25   to get into the new civil procedure, 7, 14,

169

1   21.  21 days from when you receive the
2   transcript, so keep us informed.
3          MR. LESNIAK:  Your Honor, I'm
4   actually out of town the 5th and 6th of
5   March, so I expect I'll be filing that
6   early.
7          THE COURT:  Okay, sounds good.
8          MR. LESNIAK:  Unless the transcript

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

9      is a problem, and I trust we can communicate

10     with your office.

11          THE COURT:  You can communicate to

12     Mr. Fallon and then to chambers.

13          MR. FALLON:  Your Honor, will I be

14     given the opportunity to respond at all?

15          THE COURT:  Absolutely.

16          Did we get anything from the

17     highway patrol by any chance?  Okay, we

18     haven't heard.

19          MR. LESNIAK:  Thank you, Judge.

20          THE COURT:  We did look on the

21     Internet, and there are myriad accidents

22     everywhere, and fatalities in East Fishkill.

23          MR. LESNIAK:  I hear a siren going,

24     Your Honor.

25          THE COURT:  I do too.  Court is in

                                  170

1      recess.

2          MS. WEIGERT:  Thank you, Your

3     Honor.

4          MR. LESNIAK:  Thank you, Your

5     Honor.

6          MR. FALLON:  Thank you, Your Honor.

7          THE COURT:  Mr. Fallon, let's make

8     your response 14 days after you receive Mr.

9     Lesniak's.

10

11          (Whereupon, the above-captioned

12     proceedings concluded.)

Page 148

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

13

14                         oOo

15

16

17

18

19

20

21

22

23

24

25

                                                        171

1                 I N D E X

2

3

| 4  | WITNESS                       | COURT | D   | X   | RD  | RC  |
|----|------------------------------|-------|-----|-----|-----|-----|
| 5  | Sophia Salinas               | 22    | 49  | 53  | 67  | 70  |
| 6  |                              |       |     |     | 72  |     |
| 7  | Deborah Baker                | 76    | 104 | 122 | 134 |     |
| 8  |                              | 121   |     |     |     |     |
| 9  |                              | 133   |     |     |     |     |

| 10 | Exhibits                     |       |     |     | ID  | EVD |
| 11 | 2, Monthly mortgage statements |     |     |     |     | 104 |

12

13

14

15

16

                         Page 149

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com

020108 Schuessler

17

18

19

20

21

22

23

24

25

PDF Created with deskPDF PDF Writer - Trial :: http://www.docudesk.com