UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

|   |   |   |
|---|---|---|
| In re: | : | Chapter 7 |
|  | : |  |
|  | : | Case No. 07-35608 (cgm) |
| CHRISTOPHER W. SCHUESSLER and | : |  |
| BOBBI ANN SCHUESSLER, | : |  |
|  | : |  |
| Debtors. | : |  |
|  | : |  |

-------------------------------------------------------------X

**MEMORANDUM DECISION FOLLOWING EVIDENTIARY HEARING
ON ORDER DIRECTING CHASE HOME FINANCE, LLC TO SHOW CAUSE
WHY IT SHOULD NOT BE SANCTIONED PURSUANT TO RULE 9011 OF THE
FEDERAL RULES OF BANKRUPTCY PROCEDURE AND 11 U.S.C. § 105(a)**

## A P P E A R A N C E S :

John Fallon, Esq.
McAdam & Fallon, P.C.
90 Scofield Street
Walden, New York
*Attorney for the Debtors*

Edward J. Lesniak, Esq.
Burke, Warren, MacKay & Serritella,
P.C.
330 N. Wabash Avenue
Chicago, Illinois
*Counsel for Chase Home Finance LLC
on the Court's Order to Show Cause*

Lillian Weigert, Esq.
Gellert & Klein, P.C.
75 W. Washington Street
Poughkeepsie, New York
*Local Co-Counsel for Chase Home
Finance LLC on the Court's Order to
Show Cause*

Dennis Jose, Esq.
Steven J. Baum, P.C.
220 Northpointe Parkway
Amherst, New York
*Counsel for Chase Home Finance LLC
on the Lift-Stay Motion*

Lori J. Gilmore-Morris, Esq.
6 Daisy Lane
Wappinger Falls, New York
*Local Counsel for Chase Home Finance
LLC on the Lift-Stay Motion*

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Title 11 U.S.C. § 105(a) authorizes bankruptcy courts to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code. Section 105(a) permits this Court, *sua sponte*, to take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or "to prevent an abuse of process." Section 105(a) is not a "roving writ," or an authorization to make substantive law or reorder contracts. To echo another bankruptcy court, "I do not employ § 105 lightly, but only to 'prevent an abuse of process,' that is impermissibly severe." *In re Whitaker*, 341 B.R. 336, 338 (Bankr. S.D. Ga. 2006).

In this case, the Court issued an order to show cause and conducted an evidentiary hearing after a Mortgage Servicer[1] filed a motion that suggested abuse of process. The motion, requesting relief from the automatic stay provided by 11 U.S.C. § 362, was troubling on its face because the alleged defaults were minimal and, although the Mortgage Servicer erroneously indicated otherwise, the property in question had equity in excess of $120,000. Each layer of this Mortgage Servicer's procedures revealed more questionable practices. For example, one of the two missing payments that the Mortgage Servicer relied upon to make its lift-stay motion was "missing" only because the payment was refused when the Debtors tendered it at the Bank Branch. The staff at the Bank Branch, as the Mortgage Servicer was quick to point out, does not work for the Mortgage Servicer; rather, the Bank Branches work for the original Mortgagee (which may or may not own or hold the mortgage – it was unclear from the testimony), and the Bank Branch

---

[1]    For purposes of explanation in this introduction, the parties are identified by their respective roles in this case. Each of these entities are identified and discussed by name in the Background and Discussion sections, *infra*.

refused to accept payments *on the instructions of the Mortgage Servicer*, solely because the Debtors filed for bankruptcy.  Though the Mortgage Servicer's officers and employees testified that paying at a Bank Branch offers advantages to Debtors, they maintained that the Mortgage Servicer was exercising its contractual rights in barring the Debtors from making payments at Bank Branches, and that they essentially exercised this right for the protection of the Debtors.  Though an assistant vice president of the Mortgage Servicer testified that the Bank Branches are not "set up" to handle bankruptcy filings, she conceded that one payment was accepted by the Bank Branches from these Debtors post-petition, correctly forwarded to the Mortgage Servicer, and posted to the account more quickly than would otherwise be possible.  The Mortgage Servicer was never able to explain why mortgage payments could not at least be accepted at the Bank Branches of the Mortgagor and then forwarded to the Mortgage Servicer.

The testimony before this Court was clear that at all relevant times, the Debtors were at worst one payment behind, that they had paid faithfully and routinely made their monthly mortgage payments for years, in a pattern acceptable to this Mortgage Servicer. Whenever the Debtors made a late payment, they paid the late charge assessed by the Mortgage Servicer.  Although the Debtors occasionally paid late, they were not "in default."  Notwithstanding the fact that the Debtors continued the same payment pattern after the bankruptcy filing, the Mortgage Servicer sought relief from stay.

Perhaps the most troubling testimony revealed the manner in which the Mortgage Servicer came to file this lift-stay motion, which is a prelude to commencing a state court action to foreclose on the Debtors' property.  The lift-stay motion was filed after the Chapter 7 Trustee filed a no-asset report in the case and requested entry of a discharge –

an action that would have resulted in a statutory termination of the stay under 11 U.S.C. §

362(c)(2)(C) without any need for the Mortgage Servicer to act. The process by which

the Mortgage Servicer filed this lift-stay motion is described below and illustrated

graphically in a chart annexed as Exhibit "A" to this decision:

1. Upon the Debtors' bankruptcy filing, the loan was transferred to the
   Mortgage Servicer's Bankruptcy Department.

2. Approximately one month after the bankruptcy filing, the Mortgage
   Servicer instructed the Bank Branches to refuse payments from the
   Debtors, though the Debtors were not informed of this fact until after
   they had attempted to make their second post-petition payment at one
   of the Bank Branches.

3. The Bankruptcy Department, following a more rigorous set of
   standards than the Mortgage Servicer otherwise observes, generated a
   report and identified a small amount of arrears on the account.

4. Based the arrears that appeared in the report, an Analyst in the
   Bankruptcy Department referred the loan to a third-party Vendor.
   Before doing so, the Analyst did not consider whether or not there was
   sufficient equity in the property to offset the small amount of arrears,
   nor did the analyst examine the payment history of the account to
   determine whether the Mortgage Servicer had been required to make
   any advances on the account to cover real estate taxes or property
   insurance. The first and only question considered by the Analyst was
   whether arrears existed, according to the Bankruptcy Department's
   records.

5. The third-party Vendor received the information from the analyst and
   makes a "referral" to a regional law firm. The Vendor receives a
   payment for each referral.

6. The Regional Law Firm prepared the necessary lift-stay motion
   papers, including the affidavit to be signed by a Supervisor in the
   Bankruptcy Department.

7. The lift-stay motion process, which began by identifying the existence
   of arrears on a computer spreadsheet, ended with a review by a
   Supervisor in Bankruptcy Department. The Supervisor's review
   consisted only of verifying that arrears existed according to the
   Mortgage Servicer's computer records. Though the Supervisor signed
   an affidavit in support of the lift-stay motion that included a boiler-
   plate statement that the secured creditor "may be required to make
   further advances for property taxes, insurance and related matters," the
   Supervisor made no more of an attempt to verify whether such
   advances have ever been made or were likely to be made in the future

than did the Analyst.  Like all of the personnel and entities up to this point, the Supervisor made no attempt to verify whether there was equity in the property.

8. The Supervisor generally executes between 15 and 20 of these affidavits in a day, which may be signed in a batch and forwarded to an employee of the Vendor to be notarized.

9. The Regional Law Firm that drafted the lift-stay motion files the documents with the Court.  The Regional Law Firm then sends Local Counsel to appear at a hearing on the lift-stay motion and even attempted to utilize a separate, Non-Legal Entity to communicate with the Court.  After the Court scheduled an evidentiary hearing and ordered the Mortgage Servicer to submit an affidavit in response to the Debtors' allegations, this Non-Legal Entity attempted to withdraw the lift-stay motion.

The Court ordered this Mortgage Servicer to show cause why it should not be sanctioned pursuant to Fed. R. Bankr. P. 9011(b)(3) for submitting pleadings with allegations that had no factual support.  As discussed below, the statements submitted by the Mortgage Servicer were true, but entirely misleading because of the many facts that were omitted.  The Court also directed the Mortgage Servicer to show cause why it should not be sanctioned pursuant to 11 U.S.C. § 105(a).  Upon review of all of the evidence below, the facts reveal that the system utilized by this Mortgage Servicer constitutes an abuse of the bankruptcy process in this case because it would effectively deny the Debtors the right to a fresh start.  The bankruptcy filing in this case was not precipitated by any default in the loan and will have no negative effect on the Debtors' repayment of the loan.  Though unnecessary to protect the secured claim, the Mortgage Servicer took advantage of the Debtors' bankruptcy filing to subject the loan to its Draconian "Bankruptcy Department" that utilizes third party vendors and law firms with obvious volume and profit motives, an analyst that analyzed nothing, and a supervisor with no discretion other than to verify default information as it appears on a computer screen and sign the affidavit drafted by the outside law firm and notarized by the vendor.

Due solely to the Debtors' bankruptcy filing, the Mortgage Servicer caused the Bank
Branches to refuse the Debtors' payments.  This generated enough confusion and delay in
payment to allow the Bankruptcy Department, with its heightened scrutiny of the loan, to
move for relief from stay based upon the arrears appearing in its records.  An order
granting relief from stay would presumably be the first step in the Mortgage Servicer's
efforts to foreclose on the Debtors' property in state court, a result that would not have
occurred but for the Debtors' bankruptcy filing.

A creditor's inattentiveness can be just as abusive of process as an intentional act
of misconduct.  Under the facts in this case, the actions of the Mortgage Servicer
constitute an abuse of process that this Court has a duty to rectify pursuant to 11 U.S.C. §
105(a), regardless of whether or not the abuse is the result of intentional conduct.  This
lengthy introduction, and the Court's findings of fact set forth below, are intended to
serve as a warning to all creditors that, in this Court's view, the conduct of the Mortgage
Servicer in this case (including acts that were taken and not taken by its employees,
agents and attorneys) constitute an abuse of process.  Even where creditors, such as the
Mortgage Servicer in this case, devise a system designed to insulate them from any
accountability or evidence of an intentional act or misrepresentation, this does not mean
that the system itself will not constitute an abuse of process; nor does it render this Court
powerless to identify and correct such abuses.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate), (G) (motions to terminate, annul, or modify the automatic stay), and (O) (proceedings affecting the adjustment of the debtor-creditor relationship).

## I.    BACKGROUND

### 1.    Note and Mortgage

On March 12, 2003, Debtors executed a note and mortgage in favor of JPMorgan Chase Bank, designated in the note and mortgage as the "Lender," securing a 20-year note in the principal amount of $178,000.  The mortgage gave the Lender rights in the Debtors' real property located on Palerino Lane in Burlingham, New York in Sullivan County (the "Residence").[2]

### 2.    Chapter 7 Petition

Debtors filed this joint chapter 7 petition on April 30, 2007. Electronic Case Filing ("ECF") Docket No. 1.  In Schedule A to the bankruptcy petition, the Debtors value the Residence at $299,900, encumbered by liens totaling $178,937.09; of this total amount, $164,058.33 was owed to "Chase" on account of a first mortgage on the Residence, and the remainder was owed to "Fleet Bank" on account of a second mortgage.  The Debtors' petition and Statement of Financial Affairs do not indicate that

---

[2]    Various documents in the case refer to the Residence as being located on "Palarino Road" in the town of Mamakating, New York.

the Debtors were in arrears on either the first or second mortgage prior to filing their

bankruptcy petition.  The Debtors' statement of intention expressed a desire to reaffirm

both the first and second mortgages on their Residence.

Though the Debtors never explicitly indicate the reason why they filed for

Bankruptcy, from a review of their petition, it appears to the Court that the purpose was

to discharge $53,025.12 in general unsecured claims, largely credit card debt.  It is clear

to the Court that the Debtors' bankruptcy filing had nothing whatever to do with any pre-

petition dispute with or arrears due to either of its secured creditors.  In view of the

Debtors' expressed intention to reaffirm the secured debt and an equity cushion of

$120,000, the Debtors' bankruptcy filing and subsequent discharge had virtually no effect

on the interests of the Debtors' secured creditors.  Moreover, on June 5, 2007 the Chapter

7 Trustee filed a "no-asset" report and requested that a discharge be issued in the case.

The Debtors received a Chapter 7 discharge by order dated August 8, 2007. ECF Docket

No. 20.

### 3.      The Lift-Stay Motion

On July 6, 2007, Chase Home Finance, LLC ("Chase Home Finance") filed a

motion in this Court "for an Order pursuant to 11 U.S.C. §362(d)(1) terminating the

automatic stay as to movant's interest in real property" ECF Docket No. 14; hereafter, the

"Lift-Stay Motion").  The Lift-Stay Motion was accompanied by an affidavit from

Sophia Salinas, identified as a "Bankruptcy Representative of CITIBANK, N.A. AS

TRUSTEE C/O CHASE HOME FINANCE, LLC, secured creditor" (the "Salinas

Affidavit").  According to the Lift-Stay Motion and Salinas Affidavit:

> The Note and Mortgage provide that the Debtors will be in default if they
> do not make full monthly payments on each due date. As of the 29th day

of June, 2007, the Debtors have failed to make 2 payments in the amount
of $2,079.12 which represents the payments due the 20th day of May,
2007 through June, 2007 and have not cured said default.

Lift-Stay Motion, ¶3; Salinas Affidavit, ¶5.  In the Lift-Stay Motion, Chase Home

Finance did not allege that the Debtors had failed to make mortgage payments prior to the

bankruptcy filing.  Chase Home Finance also did not dispute the statement in the

Debtors' petition that the Residence had equity in excess of $120,000.  Notwithstanding,

Chase Home Finance argued that it:

> is suffering immediate and irreparable injury and loss in that insufficient
> income is being received by it on the Note secured by the Mortgage to pay
> real estate taxes and hazard insurance and as each installment period
> passes and as advances are made, Secured Creditor is further exposed and
> the equity securing its interest in the Mortgaged Premises is further
> diminished to the point where it does not now nor will it have adequate
> protection for that security interest.

Lift-Stay Motion, ¶6.  In the Memorandum of Law accompanying the Lift-Stay Motion,

Chase Home Finance made the following, obviously erroneous statement: "As

aforementioned, the value of the mortgaged premises is $299,900.00 and as such, no

equity exists. Therefore, the stay must be lifted pursuant to §362(d)(1) and (2)." ECF

Docket No. 15, p. 2.

The Debtors opposed the Lift-Stay Motion on July 12, 2007. ECF Docket No. 17.

Debtor Christopher Schuessler submitted an affidavit, sworn to on July 11, 2007 and

attaching a receipt from the Goshen, New York branch of JPMorgan Chase Bank, N.A.

dated May 25, 2007 representing the May 2007 mortgage payment, which he made in

person at the bank branch.  As for the other payment that Chase Home Finance alleged

had not been paid, Mr. Schuessler stated:

> I tried to pay June's mortgage payment at the branch again, but the
> payment would not go through.

> Mr. Doyle at the branch could not find the reason, so I called and spoke
> with Jennifer at the Bankruptcy Department who advised me that I am not
> allowed to pay by phone or at the branch, that I must mail payments to
> them.
>
> On June 29, 2007 I mailed a check in the sum of $2,100.00 Check #124
> which check has not cleared the bank as of today.

ECF Docket No. 17, p. 1.

A hearing on the Lift-Stay Motion was held August 14, 2007.  Chase Home
Finance appeared by local counsel, who stated her understanding that the Debtors were
"only behind one month" for a payment due prior to the bankruptcy filing.  The Court
immediately expressed concern about the allegations in the Debtors' opposition and
stated, "If that's the case, I want a hearing on this."  The Court further stated: "I want
Chase in here," and instructed Chase Home Finance's local counsel to "get me somebody
at Chase that is a bankruptcy executive" because "if Chase has messed [the Debtors] up
since they filed, they've got to be in this court room."  The Court advised the parties of
the recent ruling by Judge Joel B. Rosenthal in *In re Nosek*, 363 B.R. 643 (Bankr. D.
Mass. 2007) and directed the movant to submit an affidavit, within ten days, from "a
high-ranking officer" to address whether it has a policy of refusing debtors' payments
when made at a local banking branch (the "Policy Affidavit").

The Court adjourned the Lift-Stay Motion and scheduled an evidentiary hearing
for October 4, 2007.  Chase Home Finance later requested, and was granted, an
adjournment of the evidentiary hearing to November 1, 2007 and thereafter to December
7, 2007.

4.      **Attempt to Withdraw the Lift-Stay Motion**

On November 28, 2007, several months after this Court scheduled an evidentiary

hearing and directed Chase Home Finance to submit the Policy Affidavit, a letter was

filed on the Court docket in this case addressed to the Clerk of the Court from a legal

assistant acting on behalf of "Pillar Processing, LLC," an entity unknown to the Court

that appeared to have no connection with this case or these Debtors.  The letter stated:

> Dear Sir or Madam:
>
> Respecting captioned bankruptcy matter, please be advised that the
> 362 motion scheduled for December 7, 2007, at 10:30am [sic] has been
> withdrawn.
>
> > Very Truly Yours,
> >
> > PILLAR PROCESSING, LLC.
> >
> > By: Robin L. Brown
> > Legal Assistant

ECF Docket No. 23.  Though no relationship was identified or explained in the body or

letterhead, Pillar Processing and Chase Home Finance's bankruptcy counsel, Steven J.

Baum, P.C., share the same address and telephone number, and ECF reflects that the

letter was filed using a password issued to "Dennis Jose [a Steven J. Baum, P.C. attorney]

on behalf of CHASE HOME FINANCE, LLC."  Chase Home Finance's bankruptcy

counsel, Steven J. Baum, P.C., has made no effort to address or explain this act, or the

propriety of this action on the record.

By the November 28, 2007 letter that purported to withdraw the Lift-Stay Motion,

Chase Home Finance and its counsel apparently considered all of the matters resolved.

Chase Home Finance did not contact the Court with regard to the evidentiary hearing that

had been scheduled by the Court and did not submit the Policy Affidavit that the Court

directed Chase to file within ten days of the August 14, 2007 hearing.  Notwithstanding,

the Court directed Chase Home Finance to appear at the evidentiary hearing that had been

scheduled on December 7, 2007.  After multiple requests to withdraw the Lift-Stay

motion or adjourn that evidentiary hearing were denied, the Court instructed Chase Home

Finance to file the Policy Affidavit, after which time Chase Home Finance would be

permitted to renew its request to either withdraw the Lift-Stay Motion or adjourn the

evidentiary hearing.

### 5.        The Policy Affidavit and Attorney Affirmation

Chase Home Finance filed the Policy Affidavit on December 6, 2007. ECF

Docket No. 24.  The Policy Affidavit was executed by Deborah K. Baker, an Assistant

Vice President at Chase, with a business address in Columbus, Ohio.  Ms. Baker explains

that Chase "is acting as a servicer to Citibank, N.A. as Trustee (the 'Secured Creditor'),

which in turn is the holder of a note and mortgage . . . dated March 12, 2003," and

"acting in its capacity as servicer of the Loan has internal procedures in place regarding

the application of payments received from mortgagors under the protection of Chapter 7

of the Bankruptcy Code." ECF Docket No. 24, ¶2.  Ms. Baker then set forth "an

explanation of Chase's procedures as they relate to payment receipts from mortgagors

under Chapter 7 of the Bankruptcy Code." *Id.*, ¶4.  Ms. Baker stated: "It is Chase's policy

to extend the courtesy to mortgagors **who are current with their mortgage obligations**

to make payments at the local banking branches of Chase and by telephone." *Id.*, ¶8

(emphasis added).  Ms. Baker annexed as Exhibit B to the Policy Affidavit, a letter

"setting forth the policies in place regarding" the mortgage payments of mortgagors who

file Chapter 7 bankruptcies.  Exhibit B to the Policy Affidavit is a letter addressed to the

Debtors, which states: "Chase's policy is to monitor your loan in our Bankruptcy

Department, **even if your loan is current**.  We will monitor your loan in this department

to protect you from improper contacts." (emphasis added).  The letter required payments

to be made to Chase at a post office box in Phoenix, Arizona and also noted: "We do

accept payments by phone using your checking account ($20.00 processing fee), and

Western Union (code city address is Rancho, CA)."  The letter does not specifically state

that the Debtors would not be permitted to make their mortgage payments at a JPMorgan

Chase banking branch.

> Ms. Baker also stated in the Policy Affidavit:
>
> It is Chase's policy not to accept payments on loans under Chapter 7
> Bankruptcy Protection ("Protected Loans") at local banking branches.
> Said policy of not accepting payments on Protected Loans at the local
> banking branches is to ensure that payments received on Protected Loans
> are processed accurately within the context of the requirements of the
> Bankruptcy Code, established procedures, and well within the
> infrastructure for processing such payments.

ECF Docket No. 24, ¶8.  Chase Home Finance did not offer a copy of its actual written

policy, and it not clear to whom this policy is stated, or whether this is an internal policy,

or something else.

The Policy Affidavit also included, for the first time, a copy of the payment

history, which Ms. Baker submitted as proof that: "As per the records of Chase, as of the

29th day of June 2007, the Debtors were due for the monthly mortgage payments for May

2007 and June 2007 in the amount of $2,110.99 each." *Id*., ¶10.  The Debtors' payment

history is examined in a separate section, below.

On the same day that the Policy Affidavit was filed, the law firm that filed the

Lift-Stay Motion for Chase Home Finance submitted an "Attorney Affirmation

Regarding the Status of Motion for Relief from the Automatic Stay and Request that

Motion for Relief Be Marked off the Court's Calendar." ECF Docket No. 25; hereafter,

the "Attorney Affirmation".  The Attorney Affirmation attempts to explain some of the

circumstances that lead to the attempt to withdraw the Lift-Stay Motion:

> As settlement negotiations continued, on consent of the parties, counsel to the Secured Creditor approached the Court and sought adjournments of the Evidentiary Hearing.  The Court was kind, and provided said requested adjournments . . . .
>
> In the intervening time period, the litigants continued with their settlement negotiations.  As part of said negotiations, the fact that the Debtors have secured a Chapter 7 discharge was taken into account.  In spite of the best efforts by counsel, agreement could not be reached as to the dues owed by the Debtors on account of their mortgage.
>
> In the above context, Debtors' counsel suggested that the Secured Creditor withdraw its Motion for Relief from stay and all parties maintain their respective rights.  Counsel to the Secured Creditor advised the Secured Creditor of its options in the context of the settlement negotiations.  The Secured Creditor made the decision that, in its business judgment, the cost of litigation outweighs a potential favorable result and choose [sic] to withdraw the motion despite the fact that the Secured Creditor's records still indicated that the Debtors were delinquent in their mortgage obligations.

ECF Docket No. 25, ¶¶5-7 (emphasis in original).  The Attorney Affirmation did not

explain why an attempt was made to withdraw the Lift-Stay Motion without receiving

permission from the Court, since the Court had scheduled an evidentiary hearing.  The

Attorney Affirmation also failed to explain why Chase Home Finance attempted to

withdraw the motion prior to filing the Policy Affidavit and without making any attempt

to address the concerns raised by the Court at the August 14, 2007 hearing.  Finally, the

Attorney Affirmation made no effort to explain the relationship between the Steven J.

Baum, P.C. law firm and Pillar Processing, LLC, the non-legal entity that attempted to

withdraw the Lift-Stay Motion.

Upon review of the Policy Affidavit and Attorney Affirmation, the Court

adjourned the December 7, 2007 evidentiary hearing and issued on December 10, 2007

an "Order Directing Chase Home Finance, LLC to Appear and Show Cause Why It

Should Not Be Sanctioned Pursuant to Rule 9011 of the Federal Rules of Bankruptcy

Procedure and 11 U.S.C. § 105(a)." ECF Docket No. 27; hereafter, the "<u>Order to Show</u>

<u>Cause</u>."  The Order to Show Cause directed Chase Home Finance to appear by Ms.

Salinas and Ms. Baker at a hearing on February 1, 2007 (the "<u>Evidentiary Hearing</u>").

 The Court was troubled by the suggestion in the Policy Affidavit and its exhibit

that Chase Home Finance granted mortgagors "the courtesy" to make payments at

JPMorgan Chase Bank branches so long as they are current with their mortgage

obligations, but that all mortgagors in bankruptcy are barred from making payments at

banking branches, regardless of whether or not they are current in their loan payments.

In the Policy Affidavit Chase Home Finance described bankruptcy debtors' loans as

"Protected Loans" that it must protect from improper contacts and process correctly.  It

appeared to the Court that the Debtors' loans in this case were "protected" by denying

them access to the same payment options available to other customers who are current on

their loans.  Chase Home Finance appeared to draw no distinction between the separate

acts of (1) accepting payments from debtors and (2) proper processing thereafter by

Chase Home Finance.  Chase Home Finance did not offer a satisfactory explanation as to

why payments could not be accepted at a branch and then forwarded to the appropriate

Chase Home Finance P.O. Box or even the appropriate department within Chase Home

Finance for processing.  Thus, it appeared to the Court that the party "protected" by

Chase Home Finance's policies is Chase Home Finance and JPMorgan Chase Bank, at

the expense of the Debtors.  The Court viewed this scheme as potentially prejudicial to

the Debtors in this case, who appear to have been current with their mortgage payments

(or very nearly so) until their mortgage payments were refused at a local branch.  Chase

Home Finance then moved in this Court for relief from stay based upon the failure to make the payment.  As a result of the "protection" they received from Chase Home Finance, the Debtors risked loss not only of their home, but also home equity in excess of $120,000.  In the Policy Affidavit and the Attorney Affirmation, Chase Home Finance continued to maintain that the Debtors failed to make two payments, and it appeared from the Attorney Affirmation that Chase Home Finance would continue to assert that the Debtors were in arrears.  Thus, when the bankruptcy case closed, it appeared that Chase Home Finance intended to commence an unwarranted foreclosure action, due to "arrears" resulting from Chase Home Finance's handling of the case in its Bankruptcy Department, rather than any default of the Debtors.

### 6.      Evidentiary Hearing

The Evidentiary Hearing featured the testimony of Sophia C. Salinas, a bankruptcy supervisor in Chase Home Finance's San Diego, California office; and Debora Karen Baker, an assistant vice president in Chase Home Finance's Litigation Support Unit in the Columbus, Ohio, office.  Ms. Salinas executed the client Affidavit in support of the Lift-Stay Motion, and Ms. Baker executed the Policy Affidavit.

#### a. Testimony of Sophia Salinas – the Lift-Stay Motion Process

Ms. Salinas supervises subprime bankruptcy loans.  She is one of 17 people in the Bankruptcy Department at Chase Home Finance, each monitoring between 450 and 500 loans. Transcript of Evidentiary Hearing (ECF Docket No. 39; hereafter, "Tr."), p. 23. The Court was particularly interested in how Ms. Salinas came to sign the Salinas Affidavit.  She signs between 15 and 20 of those affidavits in a typical day. *Id.*  Ms.

Salinas explained that she does not monitor the Debtors' loan; rather, she supervises the

person who does, called an analyst. Tr. at 23-24.

> THE COURT: Practically speaking, how are these affidavits executed?
>
> MS. SALINAS: [T]he analyst gets them from our attorney, and what they do is they put the loan number on it, and they put it in a folder and they put the folder on my desk. And then what I do is I go into that loan or the case – I can search by either the case or the loan number, and I verify whatever is on that affidavit as far as what the debtor is due for and the payment amounts. If there's any late charges on there I verify that amount as well.
>
> THE COURT: And you verified the information on this one?
>
> MS. SALINAS: That's correct.
>
> THE COURT: What information did you consult in compiling this affidavit?
>
> MS. SALINAS: I didn't – I didn't make the affidavit myself.

Tr. at 24. Eight different analysts report to Ms. Salinas. Tr. at 32. Ms. Salinas testified

that the analyst – not the supervisor – makes the decision to move for relief from stay. Tr.

at 27. It appears that the analysts also make the decision whether or not to foreclose on a

particular loan, without consulting a supervisor such as Ms. Salinas. Tr. at 33-34.

According to Ms. Salinas, When the analyst identifies arrears, he or she "requests

for the motion for relief from stay via a code in the system," and that code goes to a

"vendor." Tr. at 28. Ms. Salinas explained:

> A vendor is – they are called First American. They work in-house, and they handle our referrals to the attorney, and they handle mail. They have different duties that they do on behalf [of ]Chase. So they refer out the motion for relief in a system called VendorScape. VendorScape is the communication system we have with our attorney. In that referral they indicate the arrears. So they'll put, you know, post-petition payments due.

Tr. at 28. Ms. Salinas testified that First American is paid "every time they send a

referral in VendorScape." Tr. at 32. Ms. Baker later confirmed that First American

receives between $75 and $150 for every referral, and the law firm retained to file a

motion for relief from stay might receive $650. Tr. at 90.

From the vendor, the information is outsourced to a law firm that compiles the

legal documents necessary to move for relief from the automatic stay, including an

affidavit in support of the motion, to be signed by Ms. Salinas. Tr. at 29.  Ms. Salinas

simply verifies whether the information is correct on the affidavit, and then she signs it.

*Id*.  The Court asked Ms. Salinas how she verified the information in the affidavit.  Ms.

Salinas replied: "I check our systems." Tr. at 25.  When asked what process she

undertook to ascertain if the Debtors were really in arrears, she said: "I checked the

payment history." *Id*.  Once she signs the affidavit, Ms. Salinas forwards it to an

employee of First American, the vendor, who notarizes it. Tr. at 30-31.  Ms. Salinas may

execute five or six affidavits at a time, and the notary at First American does not witness

the signature because according to Ms. Salinas, "they have a way of verifying

signatures." Tr. at 30.

It appears from Ms. Salinas's testimony that neither the analyst, vendor, outside

law firm nor supervisor routinely verify whether there is equity in the property securing

the mortgage:

> THE COURT: Were you aware at the time you executed the affidavit that
> the debtors asserted in their petition equity of $120,000?
>
> MS. SALINAS: I was unaware of that, no.
>
> THE COURT: Did you take any steps to ascertain the value of this
> collateral?
>
> MS. SALINAS: I did not myself, no.
>
> THE COURT: Would it matter to you?
>
> MS. SALINAS: Umm, not really.  Only because the analyst will provide
> that to the attorney.
>
> THE COURT: So it could have easily been ascertained?

- 18 -

MS. SALINAS: Correct.

Tr. at 35.  It appears that no appraisal was conducted as to the Debtors' property in this case.  Ms. Salinas later explained that the attorney drafting the motion for relief from stay can "ask the analyst to order [an appraisal of the property], and the analyst is authorized to get it requested, and they would forward it to the attorney." Tr. at 57.  Ms. Salinas was unaware whether any appraisal had been requested or conducted in this case. Tr. at 36.[3]

Ms. Salinas also could not recall whether Chase Home Finance had ever been required to make advances (such as for property taxes and insurance), or whether any advances were anticipated at the time of the Lift-Stay Motion. Tr. at 36.  Ms. Salinas was also uncertain why her affidavit omitted any reference to the fact that the Debtors had made a recent post-petition payment; she responded: "Our attorney drafts that." Tr. at 37.

The evidence revealed that whenever the Debtors paid late, they paid the late charge due according to the note and mortgage.  Ms. Salinas confirmed that, other than the late charge, there is no penalty assessed against the Debtors for making a late payment. Tr. at 44.  From Ms. Salinas's review of the payment history, the Debtors had continued to make their mortgage payments post-petition in the same pattern as they had since 2003. Tr. at 45.  Ms. Baker also confirmed that in the first six full months since the

---

[3]      Ms. Baker answered that Chase Home Finance does not have a specific code in its computer system to indicate whether or not a mortgaged property has substantial equity. Tr. at 85. Ms. Baker could only offer the following explanation:

> Normally what I've seen in Chapter 7 bankruptcy is that the trustee will decide if the, you know, if the mortgagor has reaffirmed or not, and if they want to keep the house.  If they don't want to keep the house, then normally the trustee will decide if house is to be sold or what.  So I don't know what happened exactly on the Schuesslers' loan.

*Id.*

Debtors filed their bankruptcy petition, the Debtors had made seven post-petition payments. Tr. at 99.

### b. Testimony of Deborah Baker – Branch Payment Policies

Ms. Baker has been an assistant vice president with Chase Home Finance since January 2005. Tr. p. 76.  She professed familiarity with the bankruptcy process and the Bankruptcy Code. Tr. at 77.  According to Ms. Baker, Chase Home Finance services approximately 3 million residential mortgages, including the loans of other investors. Tr. at 78-79.  In her opinion, Chase Home Finance is well equipped to service these mortgages. Tr. at 80.

Most of the Court's questions to Ms. Baker concerned Chase Home Finance's policy of not permitting bankruptcy debtors to make payments at JPMorgan Chase Bank branches.  Ms. Baker confirmed that the Debtors' June 2007 payment was refused at the JPMorgan Chase Bank on the instructions of Chase Home Finance. Tr. at 81.  Ms. Baker could not explain why the Debtors were able to make one of their post-petition payments at the bank branch, but she stated that they should not have been permitted to do so once they filed for bankruptcy. Tr. at 84.  She testified: "Once a bankruptcy is filed, there are codes that are either a bankruptcy foreclosure, it can be a homeowner's assistance, which is our loss mitigation department, it can be a loan that the mortgagors are in the military. There are various reasons why we put codes in the system to stop payments [being] accepted in the branch." Tr. at 84-85.  "So when we instruct, when we put a code on our system for the branch not to accept the payment, the only thing that they say is inactive." Tr. at 87.  Thus, the tellers at the branch "have no idea" why the payment cannot be accepted. Tr. at 113.

Testimony from Ms. Baker and Ms. Salinas revealed that the assessment of late charges is based on the effective date of the payment, not the date the payment is posted, and when made at a branch, the payment is posted on the same day and forwarded directly, overnight, to the appropriate processing center. Tr. at 60, 91-92, 132, 134. When payments are sent by mail, it could take five to seven days for the payment to be posted. Tr. at 110.  Moreover, when payment is made at a bank branch, the debtor receives an immediate receipt that a payment was tendered. Tr. 93.  Notwithstanding these facts, Ms. Baker disagreed that the ability to make payments at a banking branch would provide a benefit to the Debtors.  First, Ms. Baker disagreed that the receipt would constitute "proof of payment" because "[t]hat does not ensure that we will accept that payment." *Id*.

> THE COURT: Can you tell from the spreadsheet whether or not a certain payment has been made at a local branch?
>
> MS. BAKER: No ma'am.
>
> THE COURT: Do you know from that spreadsheet if the May 29th payment was made at a branch?
>
> MS. BAKER: No, ma'am, not from a spreadsheet.
>
> THE COURT: Can you tell or do you know if many of the debtors' other payments over the years were made at that branch?
>
> MS. BAKER: You cannot tell by looking at the spreadsheet, no, ma'am.
>
> THE COURT: Does the May 29th payment that the Debtors made at the Chase branch appear to be correctly processed?
>
> MS. BAKER: Yes, ma'am.
>
> THE COURT: So if payments at a Chase branch is a privilege for those mortgagors who are current, and if bankruptcy debtors are automatically not allowed to pay at the branch, whether or not they are current . . . isn't it fair to say that Chase's policy has the effect of denying privileges to debtors in bankruptcy just because they filed for bankruptcy?
>
> MS. BAKER: I look at it differently.
>
> THE COURT: Okay.
>
> MS. BAKER: I look at it as if we are trying to protect the mortgagors.

THE COURT: You're protecting Chase, not the mortgagors.

MS. BAKER: And that's where I see it differently.  I think that if the
mortgagors were allowed to go in and make any payments at any time, no
matter what stage it's in, we could be basically violating the Bankruptcy
Code.  Because one of our tellers could say something inappropriate.
There could be payments that should have been accepted if they were on
an agreed order.  They may be making payments that are less than what
they should have been.  And quite honestly, I don't see it like we're
protecting Chase.  I see it like we're trying to protect both of us.

Tr. at 96-98.

There were four basic reasons offered for refusing to permit bankruptcy debtors

from paying at JPMorgan Chase Bank branches:

### i.  The branches are a separate entity

Ms. Baker emphasized: "[T]he branches are not Chase Home Finance employees.

They are separate.  It's under a separate entity." Tr. at 79, 81.  "The local branch does not

know that a mortgagor has filed bankruptcy or not.  And we don't want them to know.

They are not our employees at all.  They are an affiliate." Tr. at 86.

### ii. The tellers might violate the automatic stay

As noted above, Ms. Baker and Ms. Salinas were of the belief that branch tellers

"could say something inappropriate," "could ask something about the payments," or

"there could be a violation of the automatic stay." Tr. at 48, 97.  These arguments were

echoed by Chase Home Finance's counsel at the Evidentiary Hearing, as discussed

below. Tr. at 148-49.

### iii. Need to process payments correctly

Ms. Baker argued that the policy is necessary "to ensure that the payments are

posted correctly." Tr. at 87.  Yet, both Ms. Baker and Ms. Salinas agreed that the post-

petition payment the Debtors' made at the bank branch was correctly processed and

posted. Tr. 48, 96-97.  Ms. Baker never provided a satisfactory reason as to why a

payment could not be accepted at a branch and then forwarded to the appropriate

department for processing:

> THE COURT: For mortgage and bankruptcy, why is it not possible for those payments to be accepted at the branch and forwarded, just like you said, to the appropriate person and location, P.O. Box, for processing?

> MS. BAKER: Well, there's many different reasons. In this case, the Schuesslers, it was a Chapter 7 bankruptcy. In Chapter 7s, there is no pre and post. They are due for whatever they are due for. They were due for the April 20th payment when they made the payment on May 25th. So that's what the payment was applied to was April 20th. So when Miss Salinas filed the – or signed the affidavit, she was signing it correctly. Now, if it had been in Chapter 13, we would have had a totally different situation.

> THE COURT: Let's go back a bit, to giving it to a local branch. You compare with at least going in and getting a receipt and putting it in the mail to a Post Office box –

> MS. BAKER: No ma'am, to a processing center.

> THE COURT: Yeah, but it's got a Post Office box, doesn't it?

> MS. BAKER: For them to mail their payments in?

> THE COURT: Right.

> MS. BAKER: Yes, ma'am, that's correct.

> THE COURT: Right. So you send it off in the mail, you don't have a clue, then the money doesn't get cashed, you don't know why. How many days later will you even find out? Whereas at least you've got your receipt. I don't understand why this couldn't be sorted out?

> MS. BAKER: We tried to withdraw the motion. I don't know if you're aware of –

> THE COURT: I'm totally aware of it. Pillar Processing had no connection to Chase at all, but to withdraw the motion after I had said I wanted a hearing on it based on what I had heard.

> MS. BAKER: Right.

> THE COURT: So yes. And that's why Chase's behavior in this has been unconscionable to me.

> What is it about Chase's infrastructure that would prevent them from just going to the local branch . . . why could that not be done?

> MS. BAKER: Basically because we want to take every precaution that that branch – the branch doesn't see our system at all. Again, they only will receive an inactive status when they try to process that. The branch people

do not work for Chase Home Finance.  They work for JPMorgan Chase
Bank.  We do not want any inappropriate actions taken against the
mortgagor at all.  And that's why it's sent directly to the appropriate
department for decisioning.

Tr. 94-96.  The Court asked Ms. Salinas the same question:

> THE COURT: Can you explain why Chase does not permit bankruptcy
> debtors to make payments at the local branch, even if they are current?
>
> MS. SALINAS: Well, the only thing that I can think of is we need to
> ensure that they get processed appropriately.
>
> * * *
>
> THE COURT: Why is it not possible for the payments to be accepted at
> the branch and forwarded to the appropriate person; is there any reason?
> You've said [whether the payment is made in person or mailed to a post
> office box is] not reflected in your looking at the computer screen.  So do
> you see any reason why that couldn't be done?
>
> MS. SALINAS: Well, my thought is if the debtor were to go into the
> branch, [the] branch doesn't necessarily know what's going on with the
> account, and there could be a violation of the stay.  Maybe the branch
> person could ask something about the payments in violation of the stay.
>
> THE COURT: So it protects Chase and not the debtor is what you've just
> said.  Was the May 29, 2007 payment that the debtors made at the Chase
> branch correctly processed?
>
> MS. SALINAS: Yes, it was.

Tr. at 47-48.  Debtors' counsel later asked Ms. Baker if Chase Home Finance could use a

code that instructed the branch teller to simply accept the check and to forward it to the

appropriate department.  Ms. Baker answered: "The only code that would change on the

banking side is one that would go from an inactive loan to an active or active status to

inactive." Tr. at 128.  Ms. Baker agreed that bankruptcy debtors' payments are not

permitted to be made at JPMorgan Chase Bank branches because "the branch is not set

up to handle it." Tr. at 133.

### *iv.  No contractual right to pay at the branch*

Ms. Baker also directed the Court's attention to a provision in the promissory note

in which the Debtors agree to make their monthly payments to a post office box in

Phoenix, Arizona "or at a different place if required by the Note Holder."[4]  Tr. at 117;

ECF Docket No. 14, Exh. A, p. 20.  Testimony was also offered regarding the May 3,

2007 letter from Chase Home Finance to the Debtors. ECF Docket No. 24, Exh. B.  The

May 3, 2007 letter informed the Debtors that Chase Home Finance would be monitoring

their loan in the bankruptcy department and asked that payments be made to the same

post office box listed in the note, "[i]f you mail payments." ECF Docket No. 24, Exh. B.

The May 3, 2007 letter told the Debtors where they should mail payments, if they mailed

them, but did not inform them that they could no longer make payments in person at

JPMorgan Chase branches. *Id.*; Tr. at 121; ECF Docket No. 24, Exh. B.  At the

Evidentiary Hearing, Chase Home Finance introduced copies of mortgage loan

statements that had been sent to the Schuesslers between November 2005 and December

2007. ECF Docket No. 41.  Each of these mortgage loan statements, both pre- and post-

petition, directed that payments be addressed to a different post office box in Phoenix.[5]  It

appears that even Ms. Baker was not aware of this fact until Debtors' counsel drew her

attention to the fact:

> MR. FALLON: So the [May 3, 2007] letter confuses a person, gives them
> an address that's completely different from the monthly statement?
>
> MS. BAKER: It does, it does have a different address.

---

[4]      As discussed below, the identity of the "Note Holder" is not entirely clear, except that it
does not appear to be Chase Home Finance.

[5]      The Note and May 3, 2007 letter directed payments to P.O. Box 78828; the mortgage
loan statements listed P.O. Box 78116.

Tr. at 124.  Ms. Baker later testified that it did not really matter which of the two post office boxes the Debtors sent their post-petition payments to because "it's going to end up at the same place." Tr. at 134.

### 7.    <u>Debtors' Payment History</u>

The payment history attached as Exhibit B to the Policy Affidavit reveals the following:

- **April to November 2003:** The Debtors made one $2,000 payment each month on a monthly amount due of $1,990.50. Each payment was made between the 21st and 28th of each month.  If a payment was late, the Debtors paid the late charges.

- **January to April 2004:** The Debtors made two $2,000 payments in January 2004, one $2,000 payment in February 2004, and two $2,000 payments in April 2004.  If a payment was late, the Debtors paid the late charges.

- **May 2004 through February 2006:** The Debtors made a payment of the exact amount due, or slightly more, for each month in this period (the amount due increased to $2,075.66 in May 2004 and fluctuated to as much as $2,100). If a payment was late, the Debtors paid the late charges.

- **March 2006 through July 2006:**  The Debtors made five payments during this five-month period: one in April 2006, two in May 2006 (May 23 and May 31), and two in July 2006 (July 3 and July 28).  Each payment was for the amount due, except the $2,500 payment on May 23, which was in excess of the amount due of $2,015.27.  The Debtors paid the late charges incurred.

- **August 2006 through November 2006:**  The Debtors paid the exact amount due, or slightly more, for each month in this period.  When late charges were incurred, the Debtors paid them.

- **December 2006 through June 2007:** The Debtors made one payment on January 5, 2007, representing the payment due for December 2006.  As usual, the Debtors paid the late charge incurred.  The Debtors made a second payment of $1,593.48 on January 2007; the amount due for that month was $2,074.  This is the only instance the Court could find where the Debtors made a payment that was significantly[6] less than the amount due.  The Debtors made the February 2007 payment on March 2, 2007.  The March 2007 payment was made on April 2, 2007, and the Debtors paid the late charges.  The April 2007 payment was made on May 1, 2007, and the Debtors paid the late charges.  The May 2007 payment was posted on May 25, 2007.

---

[6]    The Debtors made two payments in August 2007 for $2,100 on amounts due of $2,110.99.

ECF Docket No. 24, Exh. C.  The payment posted on May 25, 2007 is the post-petition

payment the Debtors made in person at a JPMorgan Chase Bank branch.  When the

Debtors attempted to make the June 2007 payment at the same branch, it was refused.

Ms. Salinas confirmed that at the time the Lift-Stay Motion was filed, the Debtors were,

at worst, due for May and June 2007; however, at the time the Lift-Stay motion was filed,

the 15-day grace period for the June 2007 payment had not yet passed. Tr. at 59.  Ms.

Salinas testified that as of February 1, 2008, the date of the Evidentiary Hearing, the

Debtors had made all of their post-petition payments and were due, according to Chase

Home Finance's records, for the January 20, 2008 payment, which with the 15-day grace

period, was not yet past-due.  Tr. at 72, 74-75.

### 8.     <u>Who Owns or Holds the Note and Mortgage?</u>

One of the questions that remains unanswered is the identity of the current owner

of the note and mortgage.  Section 20 of the mortgage is captioned "Note Holder's Right

to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan

Servicer; Lender's and Borrower's Right to Notice of Grievance." ECF Docket No. 14,

Exh. A, p. 14-15.  Under Section 20 of the mortgage, the Debtors and JPMorgan Chase

Bank agreed to the following:

> The Note, or an interest in the Note, together with this Security
> Instrument, may be sold one or more times.  I [meaning the Debtors]
> might not receive any prior notice of these sales.

> The entity that collects the Periodic Payments and performs other
> mortgage loan servicing obligations under the Note, this Security
> Instrument, and Applicable Law is called the "Loan Servicer."  There may
> be a change of the Loan Servicer as a result of the sale of the Note.  There
> also may be one or more changes of the Loan Servicer unrelated to a sale
> of the Note.  Applicable Law requires that I be given written notice of any
> change of the Loan Servicer.  The notice will state the name and address
> of the new Loan Servicer, and also tell me the address to which I should
> make my payments.  The notice also will contain any other information

required by RESPA or Applicable Law.  If the Note is sold and thereafter
the Loan is serviced by a Loan Servicer other than the purchaser of the
Note, the mortgage loan servicing obligations to me will remain with the
Loan Servicer or be transferred to a successor Loan Servicer and are not
assumed by the Note purchaser unless otherwise provided by the Note
purchaser.

Neither I nor Lender may commence, join or be joined to any court
action (as either an individual party or the member of a class) that arises
from the other party's actions pursuant to this Security Instrument or that
alleges that the other has not fulfilled any of its obligations under this
Security Instrument, unless the other is notified (in the manner required
under Section 15 of this Security Instrument) of the unfulfilled obligation
and given a reasonable time period to take corrective action . . . .

*Id*.  It is not possible to tell from any of the documents submitted, or from testimony,

whether or not JPMorgan Chase Bank is still the owner of the Note, whether the Note

was sold to Chase Home Finance, or someone else, or whether Chase Home Finance is

the Loan Servicer, the purchaser of the Note, or something else.  The Lift-Stay Motion

identifies "Chase Home Finance, LLC" as "a secured creditor of the Debtors."  The

Salinas Affidavit indicates that the "secured creditor" is "CITIBANK, N.A. AS

TRUSTEE C/O CHASE HOME FINANCE, LLC."  The Lift-Stay Motion states that

Chase Home Finance "is the holder of a mortgage" on the Debtors' Residence.  In the

Policy Affidavit, Ms. Baker stated that Chase Home Finance "is acting as a servicer to

Citibank, N.A. as Trustee (the 'Secured Creditor'), which in turn is the holder of a note

and mortgage . . . dated March 12, 2003 . . . ."

The testimony at the Evidentiary Hearing was equally unclear.  Ms. Salinas's

testimony, which was inconclusive, suggested that Chase Home Finance owned this

mortgage:

QUESTION BY MR. FALLON: Are you representative of Citibank or of
Chase?
ANSWER: I work for Chase, but we represent and we service on behalf of
Citibank.

Q: So who is your employer?

A: Chase Home Finance.

Q: And they contract out to Citibank to do this?

A: We service for Citibank.

THE COURT: Would you answer the question first, and then you can explain.  But answer his question.  You contract out to Citibank?

THE WITNESS: I don't know if it would be referred to as contract.  I just know it's referred to as we service for them.

THE COURT: Okay, that doesn't make sense to our world.  You've got to make it make sense to our world.  What does Chase and Citibank actually do?

THE WITNESS: It would be a contract between Chase and Citibank.

MR. FALLON: So Chase owns the mortgage, is that correct?

A: Yes.

Q: They contract with Citibank to service it, is that correct?

A: Maybe I'm just not understanding how to explain it.  Cause the only way I know it is we see Citibank as our investor and we service for them.

THE COURT: Who owns this mortgage?  Who owns the mortgage we're talking about?

THE WITNESS: Well, Chase has the mortgage.

THE COURT: Chase owns the mortgage?

THE WITNESS: Chase Home Finance.

THE COURT: Chase Home Finance owns the mortgage and you work for Chase Home Finance?

THE WITNESS: Yes, ma'am.

THE COURT: So why do you have Citibank on your affidavit?

THE WITNESS: Because we service for them.

THE COURT: But what have they to do with this mortgage?

THE WITNESS: With this affidavit nothing.

MR. FALLON: Now, do you know whether or not there was any assignment of the original mortgage by JP Morgan Chase to any other entity on the records of the county clerk's office?

A: I don't know if the assignments are there.  I wouldn't know.

Q: Do you know whether they were actually assigned as opposed to just a servicing?

A: I'm not sure.

Tr. 62-64.   Ms. Baker's testimony indicated that Chase Home Finance does not own the mortgage:

> QUESTION BY THE COURT:  What is Chase's Role in the mortgage banking industry?
>
> ANSWER: Are you asking about Chase Home Finance LLC?
>
> Q: If that's who owned this mortgage, that's who I'm talking about?
>
> A: **Chase Home Finance LLC does not own this mortgage.**
>
> Q: Who owns this mortgage?
>
> A: JP Morgan Chase Bank originated the mortgage, and then their mortgage was **either assigned or sold to Citibank**, and then Citibank transferred the mortgage to Chase for servicing.
>
> Q: And the records of the county will reflect that?
>
> A: They should reflect that, Your Honor.

Tr. at 77 (emphasis added).  If any record of an assignment or sale by JPMorgan Chase exists, recorded or otherwise, it has never been filed or submitted to this Court.

## II.    DISCUSSION

Motions for relief from the automatic stay in consumer bankruptcy cases present a peculiar challenge to bankruptcy judges.  They are by far the most frequent motion that this Court must decide.[7]  Lift-stay motions usually go to the heart of what a consumer debtor is trying to save in his or her bankruptcy case.  Many times, the collateral at stake in a lift-stay motion is a family residence.  Where a foreclosure judgment was issued before the bankruptcy filing, the automatic stay may be the only thing preventing a debtor and his or her family from losing the home in a foreclosure sale.  Due to the large number of lift-stay motions the Court must resolve each week, there is always a tension between the importance of the automatic stay to each debtor, and the need to promptly and

---

[7]    For example, by the Court's count, 60 motions for relief from stay appeared on the April 8, 2008 calendar; 33 have already been scheduled for next week.

efficiently adjudicate a creditor's request for stay relief. *See* 11 U.S.C. § 362(e). Many times, for a variety of reasons, the lift-stay motions are not opposed. Accordingly, the Court relies upon the accuracy of the statements made by a creditor requesting relief from stay. When a secured creditor requests relief from the automatic stay, the Court must be able to trust that the motion is based upon a realistic and conscious assessment by the creditor, before the motion is filed, that the creditor really does lack adequate protection under the facts in that particular case.

The Order to Show Cause raised the issue of whether Chase Home Finance should be sanctioned pursuant to Fed. R. Bankr. P. 9011(b)(3) for allegations in its pleadings that appeared to have no factual support. As discussed below – with one exception[8] – no fact asserted in the Lift-Stay Motion was false. What Chase Home Finance chose to include in, or omit from, the Lift-Stay Motion created an extremely misleading and one-sided view of the facts. The facts not disclosed by Chase Home Finance comprise the difference between a meritorious and unmeritorious motion for relief from the automatic stay.

### 1.    <u>Cause Never Existed to Lift the Stay</u>

Pursuant to 11 U.S.C. § 362(d), after notice and a hearing, a party in interest may request relief from automatic stay by terminating, annulling, modifying or conditioning the stay. Under Section 362(d)(1), the Court may grant relief from stay "for cause,

---

[8]      In the Memo of Law in support of the Lift-Stay Motion, Chase Home Finance's counsel argued that no equity existed, a statement so clearly erroneous that it could not possibly have been an intentional misrepresentation. However, the apathy implied by this gross misstatement is another example of systematic abuse of process in this case. Chase Home Finance later shrugged off the statement as "meaningless surplusage." Post-Hearing Submission (ECF Docket No. 40), p. 6.

including the lack of adequate protection of an interest in property of such party in

interest."[9] 11 U.S.C. § 361 states in relevant part:

> When adequate protection is required under section 362 . . . of this title of
> an interest of an entity in property, such adequate protection may be
> provided by –
>
>> (1) requiring the trustee to make a cash payment or periodic cash
>> payments to such entity, to the extent that the stay under section 362 of
>> this title, use, sale, or lease under section 363 of this title, or any grant
>> of a lien under section 364 of this title results in a decrease in the value
>> of such entity's interest in such property;
>>
>> (2) providing to such entity an additional or replacement lien to the
>> extent that such stay, use, sale, lease, or grant results in a decrease in
>> the value of such entity's interest in such property; or
>>
>> (3) granting such other relief, other than entitling such entity to
>> compensation allowable under section 503(b)(1) of this title as an
>> administrative expense, as will result in the realization by such entity
>> of the indubitable equivalent of such entity's interest in such property.

When alleging grounds other than a lack of equity, a creditor is only required to

make a *prima facie* showing that it is entitled to relief from stay. 11 U.S.C. § 362(g).  In

other words, once the creditor alleges facts demonstrating a legal entitlement to the relief

sought, the burden shifts to the debtor (or party opposing relief) to prove that cause does

not exist to lift the automatic stay.  "While section 362(g) allocates the burden of ultimate

persuasion, under either ground, the movant must still make a *prima facie* showing that it

is entitled to the relief that it seeks." *In re Eatman*, 182 B.R. 386, 390 (Bankr. S.D.N.Y.

1995).

---

[9]    Chase Home Finance has never introduced any documentary evidence that it is in fact the
servicer of this note and mortgage.  Moreover, as discussed above, it is unclear who currently
holds or owns the underlying note and mortgage.  Thus, it is not clear whose "interest in
property" Chase Home Finance is servicing, and it is equally unclear for the purposes of Section
362(d)(1) that Chase Home Finance even has an "interest in property" for which it *could* lack
adequate protection.  For the purposes of this decision, the Court assumes that Chase Home
Finance would have standing to move for relief from stay pursuant to Section 362(d)(1).

To be sure, the failure to make mortgage payments constitutes "cause" for relief from the automatic stay and is one of the best examples of a "lack of adequate protection" under Section 362(d)(1) of the Bankruptcy Code. *See In re Taylor*, 151 B.R. 646, 648 (E.D.N.Y. 1993) ("debtor's failure to make regular mortgage payments as they become due constitutes sufficient 'cause' to lift the automatic stay").   This is particularly true where a debtor lacks the willingness; the current means; or a realistic, near-present ability to make contractual payments to the secured creditor.   In the short run, where there is a substantial equity cushion, the single fact that a debtor has missed one or more payments is not cause *per se* for relief from the automatic stay.   Where, as in this case, the contractual default resulted from a record-keeping glitch or miscommunication rooted in the past and does not reflect a current or ongoing failure or inability to make payments, cause does not exist for granting relief from stay.   Furthermore, "where the value of the collateral substantially exceeds the secured creditor's claim, a debtor's breach of his financial obligation alone may not constitute 'cause' because the equity cushion in the collateral may provide the secured creditor with adequate protection." *In re Zeoli*, 249 B.R. 61 (Bankr. S.D.N.Y. 2000); *see also In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection.").

*In re Taylor*, 151 B.R. 646 (E.D.N.Y. 1993), a case cited by Chase Home Finance in support of the Lift-Stay Motion, cites *In re Heath*, 79 B.R. 616 (Bankr. E.D. Pa. 1987) as authority.   The court in *In re Heath* denied a motion for relief from stay in spite of that debtor's failure to make any post-petition mortgage payments, because the current equity cushion adequately protected the creditor's interest.   *Heath* defined "equity cushion" as

"the value in the property, above the amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during the time the automatic stay remains in effect." 79 B.R. at 618 (quoting *In re Roane*, 8 B.R. 997, 1000 (Bankr. E.D. Pa. 1981)); *see also In re Zinke*, 1989 WL 113154, *3 (E.D.N.Y. June 9, 1989). *Heath* applied the following formula to express the equity cushion as a percentage: (1) appraised fair market value, (2) minus the secured creditor's lien, (3) divided by total encumbrances. *Id.* n. 3. In *Heath*, the equity cushion was 39%; in this case, the Court calculates the equity cushion at 75%.[10] *Taylor* and *Heath* do not support Chase Home Finance's position on the Lift-Stay Motion.

The only factor that Chase Home Finance appears to have considered before filing the Lift-Stay motion was whether or not any default appeared according to its internal records. This was confirmed repeatedly at the Evidentiary Hearing.

> THE COURT: So the decision to file for relief from stay is basically whether or not arrears show up on a report, plain and simple?
> MS. SALINAS: Yes, ma'am.

Tr. at 53. Chase Home Finance argues that it was following "its own established policies – to move for relief from the stay when the debtors fall two months behind in payments that are equally applicable to other debtors." Post-Hearing Submission (ECF Docket No. 41), p. 11. Chase Home Finance's established policies ignore the definition of adequate protection in Section 361 and reads "cause" in Section 362(d)(1) to mean "two months behind in payments," with no regard to any other factors that may be present in a particular case. This assertion finds no support in the case law or the plain meaning of

---

[10]     Calculated as follows: (1) $299,900 (the value of the Residence in Schedule A to Debtors' petition); (2) minus $165,349.14 (the principal amount due according to ¶6 of the Salinas Affidavit); (3) divided by $178,937.09 (the Debtors' estimate of all encumbrances on their Residence).

Section 361 and 362*; see, e.g., In re Heath, supra,* 79 B.R. at 619 (rejecting creditor's

"bold assertion" that even where creditor is not faced with actual or possible diminution

in value of its security, the debtor must afford adequate protection in the form of interest

payments).  Chase Home Finance's "established policies" are not a substitute for the duty

to make a *prima facie* showing of  "cause" for relief from stay and "lack of adequate

protection" as those terms are used in the Bankruptcy Code.

> The burden of proof on a motion to lift or modify the automatic stay is a shifting
> one. Section 362(d)(1) requires an initial showing of cause by the movant, while
> Section 362(g) places the burden of proof on the debtor for all issues other than
> "the debtor's equity in property," 11 U.S.C. § 362(g)(1). *See* 2 *Collier on
> Bankruptcy* ¶ 362.10, at 362-76. If the movant fails to make an initial showing of
> cause, however, the court should deny relief without requiring any showing from
> the debtor that it is entitled to continued protection.

*In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).  The Debtors in this case

were never more than one payment in default, and there is a substantial equity cushion.

At all times, Chase Home Finance was adequately protected, and the Court finds no

grounds in this case that would constitute "cause" to lift the stay.[11] Accordingly, the Lift-

Stay Motion must be denied. *See In re Guinn*, 102 B.R. 838, 843 (Bankr. N.D. Ala. 1989)

("Even the least sensitive notion of good faith dealings would condemn an effort of a

creditor to put a debtor in default on a debt by refusing the debtor's payment; and this

Court is under no duty to grant any relief to the movant in such circumstances.")

The Court also notes the absence of any evidence, prior to filing the Lift-Stay

Motion, of an attempt by Chase Home Finance to communicate with the Debtors

---

[11]     In defending the Order to Show Cause, Chase Home Finance made additional arguments
that (1) this is a Chapter 7 case in which there is no mechanism for curing contractual defaults
and (2) the Debtors did not enter into a reaffirmation agreement as to their personal liability under
the note.  The Court agrees, but this does not change the Court's ruling that, under all of the facts
in this case, no cause existed for relief from stay.  These arguments fail as a defense to the Order
to Show Cause because this reasoning was not provided at the time the Lift-Stay Motion was
made.

(through their counsel) about payment of the amounts that Chase Home Finance believed to be in default.  In *In re Cox*, 251 B.R. 446, 448 (Bankr. N.D.N.Y. 2000), Judge Ninfo explained that it is the policy in his court that when (1) there is a substantial equity cushion, and (2) the post-petition arrears are relatively small, the secured creditor should not make an immediate motion for relief from stay until the debtors and their attorneys have been provided with written notice and a brief opportunity to become current. Chase Home Finance has never explained why it could not have taken this preliminary step, particularly in this Chapter 7 case where the trustee had already requested that a discharge be issued, an event that would obviate the necessity to move for relief from the automatic stay. 11 U.S.C. § 362(c)(2)(C).

It should be noted that the Lift-Stay Motion was never properly withdrawn.  As noted above, a letter purporting to withdraw the Lift-Stay Motion was filed only after the Court directed Chase Home Finance to respond to certain allegations in the Debtors' objection to the Lift-Stay Motion, and after the Court had scheduled an evidentiary hearing on the matter. *See In re Parsley*, 2008 WL 622859 (Bankr. S.D. Tex. March 5, 2008) (order to show cause issued after attempt to withdraw lift-stay motion without first addressing court's concerns).  Moreover, the letter was not filed by either Chase Home Finance's attorney of record or its local counsel, and Pillar Processing, LLC is not a law firm.  Instead, Pillar Processing appears to be a separate affiliate of Steven J. Baum, P.C., the law firm that filed the Lift-Stay Motion on behalf of Chase Home Finance.[12]  It

---

[12]      This same practice was utilized by one of the law firms scrutinized by Bankruptcy Judge Jeff Bohm in the recent case of *In re Parsley*, 2008 WL 622859, *20 (Bankr. S.D. Tex. March 5, 2008).  Judge Bohm recounts testimony that the national law firm for a mortgage servicer, Countrywide Home Loans, Inc., "made a business decision to create a separate entity known as MR Default Services, which provided non-legal support services to the law firm."  This new entity employed 300 to 350 legal assistants formerly employed by the law firm who perform the

appears that the Steven J. Baum firm, emulating its client, has created its own "servicer"

in order to distance itself from dealing directly with this Court and other attorneys and

parties when it suits the Steven J. Baum firm to do so.  The Court has questioned the legal

and ethical propriety of this practice.[13]  All that is decided for the purposes of this case is

that the Pillar Processing letter was not effective to withdraw the Lift-Stay Motion or to

avoid liability for sanctions under Fed. R. Bankr. P. 9011.

Although the witnesses for Chase Home Finance and Mr. Lesniak, Chase Home

Finance's counsel at the Evidentiary Hearing, disavowed any knowledge of the Pillar

Processing entity, Ms. Baker and Mr. Lesniak both reminded the Court that Chase Home

Finance "tried to withdraw the motion," Tr. at 96, 142-143, apparently in reliance on the

letter to the Court from an entity that was unknown to them.  Chase Home Finance

continues to rely on the Pillar Processing letter. *See* Response to the Order to Show

Cause, ECF Docket No. 38 (arguing that "**Chase filed** a letter on November 28, 2007

withdrawing the [Lift-Stay Motion]") (emphasis added); Post-Hearing Submission, p. 21

(asserting that "**Chase's bankruptcy counsel, Dennis Jose, filed a letter** withdrawing

the [Lift-Stay Motion] on November 28, 2007" in support of argument that Court is

powerless to consider sanctions under Fed. R. Bankr. P. 9011(c)(2)(B)) (emphasis

added).

Sanctions under one subsection of Rule 9011 cannot be avoided by violating

another subsection of Rule 9011.  Fed. R. Bankr. P. 9011(a) requires that:

---

same functions as when they were direct employees of the law firm and remain under the
supervision and control of the firm's attorneys. *Id.*

[13]     By order dated February 7, 2008 this Court denied lift-stay motions, *sua sponte*, barring
the assessment of any costs against the debtors or the mortgage, where the motions were initially
filed by Steven J. Baum, P.C. and then "serviced" by Pillar Processing. *See In re McCourt*, Case
No. 05-38803; *In re Daniel*, Case No. 06-35505; *In re Sagman*, Case No. 07-35282; *In re
Lawson-Campbell*, Case No. 07-36217; *In re Delaney*, Case No. 07-35421.

> **Every** petition, pleading, written motion, and other **paper**, except a list, schedule, or statement, or amendments thereto, **shall be signed by at least one attorney of record in the attorney's individual name.** A party who is not represented by an attorney shall sign all papers. Each paper shall state the signer's address and telephone number, if any. **An unsigned paper shall be stricken** unless omission of the signature is corrected promptly after being called to the attention of the attorney or party.

(emphasis added). *See also* Local Rule 9011-1(a) of the United States Bankruptcy Court for the Southern District of New York ("All pleadings, motions, and other papers that are submitted for filing shall be signed by an attorney of record in the attorney's own name or, if there is no attorney, by the party.").

## 2.      **Fed. Rule Bankr. P. 9011**

Rule 9011(b) of the Federal Rules of Bankruptcy Procedure (which is modeled after Fed. R. Civ. P. 11) provides:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances –
>
> > (1) **it is not being presented for any improper purpose**, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> >
> > (3) **the allegations and other factual contentions have evidentiary support** or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(emphasis added).  "Factual omissions may also be the basis for a violation of Rules 11 or 9011." *In re Kouterick*, 167 B.R. 353, 364 (Bankr. D. N.J. 1994) (citing cases).  Where

a pleading or submission from a party violates one or more of the provisions of

Bankruptcy Rule 9011(b), Bankruptcy Rule 9011(c) permits the Court, "after notice and a

reasonable opportunity to respond," to "impose an appropriate sanction upon the

attorneys, law firms, or parties that have violated [Bankruptcy Rule 9011(b)] or are

responsible for the violation."  Such sanction "may consist of, or include, directives of a

nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and

warranted for effective deterrence, an order directing payment to the movant of some or

all of the reasonable attorneys' fees and other expenses incurred as a direct result of the

violation." Bankruptcy Rule 9011(c)(2).

On January 25, 2008, Chase Home Finance filed a response to the Order to Show

Cause (ECF Docket No. 38; hereafter, the "Response").  In the Response, Chase seized

upon the word "delinquent," used in the Order to Show Cause, to fashion a new argument

that the Lift-Stay Motion was accurate because the Debtors "were delinquent prior to and

at the time they filed their petition" (Response, p. 1) and that the payment history "Shows

That They Were Continually One or Two Months Delinquent Up To And Including The

Filing Date." Response, p.3.  In the Response, Chase acknowledges that the Debtors

made a payment on May 25, 2007 which "was promptly processed and applied by Chase

to the then next due payment, which was for April 20, 2007, not May 20, 2007." *Id*. at 1.

This fact was not advertised by Chase in the Lift-Stay Application, Salinas Affidavit, or

Memorandum of Law.  As Chase notes in its Response, that fact could only be

discovered by reviewing a spreadsheet annexed to the Policy Affidavit. *Id*. at 3.

### a. *Bankruptcy Rule 9011(b)(1) – improper purpose*

Chase Home Finance's main defense in the Response is that the Debtors "were consistently one or two months behind" for "more than a year prior to the Filing Date." Response, p. 4. A question arises as to why Chase Home Finance would move for relief from stay when the Debtors appear to have done what they had been doing (and Chase Home Finance had been permitting) since February 2005, according to Chase Home Finance's own records. Chase Home Finance filed the Lift-Stay Motion notwithstanding the fact that the Debtors attempted to make regular monthly post-petition payments. The Court is concerned that Chase Home Finance views the bankruptcy filing as an opportunity to take steps to foreclose on the Debtors' property that it would not have taken otherwise.

The circumstances in this case might suggest that Chase Home Finance submitted the Lift-Stay Motion for an improper purpose, which would be a violation of Bankruptcy Rule 9011(b)(1). One view of the evidence is that Chase Home Finance attempted to take advantage of the Debtors' bankruptcy filing by denying Debtors' payment privileges, thereby creating a default, and then acting on that default (first in this Court, and later by commencing state foreclosure proceedings). Chase Home Finance could be motivated by the possibility of "bidding in" the balance of the mortgage at a foreclosure sale and acquiring a property with substantial equity, or it could simply be motivated by the desire to increase fees. The Court does not find that Chase Home Finance filed the Lift-Stay Motion in this case "for an improper purpose," as that term is used in Rule 9011(b)(1). The main impediment to such a conclusion is that a certain amount of intent would be necessary and would require an attention to detail that the Court has found

lacking in Chase Home Finance's entire lift-stay process. The Court takes Chase Home Finance at its word when it asserts that it never "deviated from its established criterion in order to harass these particular Debtors, or that the established criterion is intended to harass debtors generally." Post-Hearing Submission, p. 11. As discussed below, the Court's view is that the system utilized by Chase Home Finance to deal with bankruptcy debtors is an abuse of process. The Lift-Stay Motion is not abusive because there may be a nefarious purpose behind it. It is abusive because there was **no purpose** behind it.

### b. *Bankruptcy Rule 9011(b)(3) – evidentiary support*

The Lift-Stay Motion alleged: "As of the 29th day of June, 2007, the Debtors have failed to make 2 payments in the amount of $2,079.12 which represents the payments due the 20th day of May, 2007 through June, 2007 and have not cured said default." Lift-Stay Motion, ¶3; Salinas Affidavit, ¶5. Because the Debtors filed their bankruptcy petition on April 30, 2007, the Application appears to allege that they had not made either of the two post-petition payments that had come due as of the date of the Lift-Stay Motion. The Debtors responded with proof that they made a post-petition payment in May 2007 and had attempted to make another payment in June 2007 that was refused at a JPMorgan Chase branch. Thus, the Debtors claimed, and there appeared to be no dispute, that the Debtors in fact made, or attempted to make, both post-petition payments. This lead the Court to observe in the Order to Show Cause that Chase Home Finance "never alleged in a written submission that the Debtors were delinquent in their mortgage payments prior to the bankruptcy filing." ECF Docket No. 27, p. 4. The Court believed that the two post-petition payments made by the Debtors represented the payments due for May and June 2007. The impression was created, in part, by the fact that this is a Chapter 7 case, where

it is less important to distinguish between pre- and post-petition payments because

debtors cannot not utilize a plan of reorganization to cure defaults.  The Court's

impression was also due to the incomplete picture presented by the Lift-Stay Motion.

   The problem with the Response is that Chase Home Finance did not move on the

grounds that the Debtors were "delinquent"; Chase Home Finance moved for relief based

upon the claim that the Debtors "have failed to make 2 payments . . . ."  It appears that

this statement was true, in a highly technical and ephemeral nature.  One of the two

payments the Debtors allegedly "failed to make" was the post-petition payment that

Chase Home Finance caused to be refused at a JPMorgan branch, a fact that Chase Home

Finance did not disclose in the Lift-Stay Motion.  For Chase Home Finance to focus on

the fact that one or two payments had not been made, even if technically correct, is

misleading for the many facts Chase leaves out.[14]  In reality, the Debtors made regular

payments (including, if applicable, any late charges), made (or attempted to make) all

post-petition payments, and have substantial equity.  The Seventh Circuit has upheld

sanctions for omitting such "highly relevant" facts:

> While the appellant did not misstate an empirical fact, it did omit facts that
> were highly relevant to an accurate characterization of the facts that were
> stated. Such an obvious omission placed a heavy burden on a court. The
> presentation amounts, in its totality, to a half-truth that can be just as
> misleading, sometimes more misleading, than an absolutely false
> representation.

*In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988).  At no point did Chase Home

Finance disclose that it was moving for relief from stay for the simple reason that it is

---

[14]   Using the same method of accurately telling a fraction of the story, Babe Ruth struck out
1,330 times and failed to get a hit 65% of the time that he came to bat.  The statement is accurate,
but it is not a fair view of all of the facts.  At the very least, it must be added that Babe Ruth also
hit 714 runs, a Major League Baseball record that stood for nearly 40 years; his lifetime batting
average of .342 is tied for 7th best all time.

Chase Home Finance's policy to move for relief from stay in every case where debtors

fall two payments behind, whether or not the fact constitutes grounds for relief from stay.

Instead, Chase Home Finance alleged that the Debtors failed to make two payments, then

asserted that Chase Home Finance "may be required to make further advances for

property taxes, insurance and related matters," that it "is suffering immediate and

irreparable injury and loss" and then advocated the legal conclusion that "cause" existed

to lift the automatic stay without examining, disclosing or evaluating any other facts in

the case.

    In the Lift-Stay Motion, Chase Home Finance represented that it might have to

make "further advances."  In the Post-Hearing Submission, Chase Home Finance argues

that because the mortgage "expressly authorizes Chase to advance taxes and insurance

premiums to protects its lien in the property if the Debtors fail to either pay taxes or keep

their property insured," there was "clear evidentiary support for Ms. Salinas' statement

that Chase may be required to advance additional funds to protect its lien interest."

Chase Home Finance appears to believe it has "evidentiary support" to make this

assertion in every lift-stay motion every time such a provision appears in the mortgage,

without regard to whether it has ever made advances or would ever be likely to do so in

the future.  Chase Home Finance hedged just enough in stating that it "may" have to

make "further" advances, though at the Evidentiary Hearing, Chase Home Finance

offered no evidence of past advances and could not anticipate any "further advances" that

it might have to make.  After incorrectly asserting in the Lift-Stay Motion that "no equity

exists," Chase Home Finance argued that statement was "meaningless surplusage." Post-

Hearing Submission, p. 5-6.  Chase Home Finance's excessively dramatic statements about what it might have to do are equally meaningless.

In opposing sanctions under Rule 9011, Chase Home Finance argues that the Court must consider the Lift-Stay Motion as a whole and must find that there was "no factual or legal basis whatsoever." Post-Hearing Submission, p. 5.  The Court agrees with Chase Home Finance that the Lift-Stay Motion must be considered as a whole.  When the Lift-Stay Motion is considered in the context of the process that spawned it, this Court believes the real issue is not whether the Lift-Stay Motion contained the minimum amount of evidentiary support required by Rule 9011.  Chase Home Finance argues that "[n]othing in the record suggests that Chase deviated from its established criterion in order to harass these particular Debtors . . . ." Post-Hearing Submission, p. 11. The larger issue is the structure utilized by Chase Home Finance to service bankruptcy debtors' mortgages, which culminated in the Lift-Stay Motion.

### 3.    **Abuse of Process**

The Court has described at length why the Lift-Stay Motion was ill-founded and misleading.  Everyone involved in the Lift-Stay Motion process disclaims responsibility for bringing the Lift-Stay Motion.  No one made any effort to determine whether or not Chase Home Finance lacked adequate protection.  The analyst makes "the decision" to lift the stay only to the extent of forwarding information to a vendor, who refers the information to an attorney.  The supervisor at Chase Home Finance only verifies that whatever information is contained in the affidavit (the information that the vendor received from the law firm and forwarded to the analyst) is correct:

> THE COURT: Were you at any point involved with or familiar with the decision-making concerning this loan?

- 44 -

> MS. SALINAS: No, other than signing the affidavit, no.
>
> * * *
>
> THE COURT: And the only point you're testifying before this Court today, even though you're [a] supervisor, is that you look on a computer screen and verify one thing and sign an affidavit?
>
> MS. SALINAS: That's correct.
>
> THE COURT: And you didn't research it in any other way and didn't feel it necessary to let anyone know about that [May 2007, post-petition] payment that had been made?
>
> MS. SALINAS: The attorneys were aware. They are aware. They are provided a payment history at the time of motion for relief referral.

Tr. at 46-47. No appraisal is conducted unless the attorney asks the analyst to request the information. Ms. Baker claims that Chase Home Finance relies on their attorneys to tell them whether a motion for relief from stay is warranted. Presumably Chase Home Finance's attorneys were only relying on the information Chase Home Finance and the vendor sent to them, and which Chase Home Finance later verified was correct. Even Chase Home Finance's policy of not allowing debtors to make payments at a bank branch is the product of "a committee of senior vice presidents" at Chase Home Finance, which is then "blessed" by the legal department. (Tr. 81-83). *Cf. In re Parsley*, 2008 WL 622859 at *19 ("Tracing the steps leading up to the filing of the Motion shows that this is an assembly line process.").

Notwithstanding Chase Home Finance's disingenuous claim that its system is designed to protect debtors, it primarily exists to protect Chase Home Finance and JPMorgan Chase Bank. As illustrated by the chart annexed to this decision as Exhibit B, at the inception of the mortgage, the Debtors dealt with JPMorgan Chase Bank and were free to interact with JPMorgan Chase through its banking branches. The chart annexed as Exhibit C shows that when JPMorgan Chase Bank assigned the note and mortgage to

Chase Home Finance for servicing, the Debtors were obligated to deal with Chase Home

Finance and its separate set of policies.  As shown by the chart annexed as Exhibit D,

when the Debtors filed for bankruptcy, the note and mortgage were handled by a different

department within Chase Home Finance, with yet another set of policies and standards.

Chase Home Finance claims that its Bankruptcy Department policies are designed

to accurately process payments from mortgagors in bankruptcy, though it appears that

payments are processed just as easily when paid at a JPMorgan Chase Bank branch.  The

policies and guidelines used in the Bankruptcy Department are more aggressive than

those otherwise applied by Chase Home Finance, and this difference – not the conduct of

the Debtors – created the default that put the Debtors on path to a foreclosure proceeding

that never would have occurred except for the bankruptcy filing.  As discussed above, the

Chase Home Finance Bankruptcy Department guidelines have no relationship whatsoever

to whether or not there is adequate protection in a particular piece of collateral.

Chase Home Finance's policy of instructing JPMorgan Bank branches not to

accept payments from bankruptcy debtors is just one component of the system, but an

important one for several reasons.  Chase Home Finance argues it: "did not refuse to

accept any payment.  Rather, it redirected the Debtors to make the payment in accordance

with Chase's prior written direction . . . .  When the Debtors mailed that payment to

Chase it was processed and accepted." Post-Hearing Submission, p. 13.  Chase Home

Finance's point seems to be that it never refused any payment.  Instead, Chase Home

Finance "redirected" the payment by making it impossible for the bank branch to accept

it.  Neither the tellers at the bank branch nor the Debtors were told what was happening.

>THE COURT: Does anywhere in that [May 3, 2007] letter that you sent
>have a policy that says don't do this anymore; don't file at your branch
>bank anymore?
>
>MS. BAKER: No, ma'am, it does not.

Tr. at 121.  The Debtors were only "redirected" after their payment was refused at the

branch by a teller that did not know why the payment would not "go through"; the

Debtors had to call Chase Home Finance to find out why.  The delay in accepting the

payment furnished Chase Home Finance with a brief opportunity to accurately state in

the Lift-Stay motion that the Debtors had failed to make two payments.  And it is this

delay that Chase Home Finance cites in defense of the lift-stay motion by arguing that it

is "unrefuted from Ms. Salinas' testimony that the payment mailed by the Debtors on or

about June 29, 2007 had not [been] posted to the loan account when Ms. Salinas

reviewed the payment history and executed her affidavit." Post-Hearing Submission, p. 8.

Among the many reasons that Chase Home Finance offered for not permitting

this, the Court notes a pre-occupation with protecting JPMorgan Chase.  Ms. Salinas

testified: "[I]f the debtor were to go into the branch, [the] branch doesn't necessarily

know what's going on with the account, and there could be a violation of the stay.

Maybe the branch person could ask something about the payments in violation of the

stay." Tr. at 48.  Ms. Baker emphasized that Chase Home Finance "want[s] to take every

precaution that that branch – the branch doesn't see our system at all . . . .  We do not

want any inappropriate actions taken against the mortgagor at all.  And that's why it's

sent directly to the appropriate department for decisioning." Tr. at 97.  "I think that if the

mortgagors were allowed to go in and make any payments at any time, no matter what

stage it's in, we could be basically violating the Bankruptcy Code.  Because one of our

tellers could say something inappropriate. *Id*.  Mr. Lesniak argued to the Court:

> Chase does not want those tellers talking to that borrower.  I guarantee
> you, Judge, if that teller said to the Schuesslers, "oh, I see you're behind a
> month in your payment, are you going to make a payment?" we'd have a
> stay violation or a discharge injunction violation hearing on our hands.
> Those are not Chase employees.  They do not have access to the Chase
> Home Finance records.  They are not trained by Chase Home Finance.

Tr. 148-149.[15]  It is intriguing that Chase Home Finance appears to be chiefly concerned

with protecting a separate entity from improper contacts with the Debtors.  JPMorgan

Chase did not file the Lift-Stay Motion, did not appear in this case or at the Evidentiary

Hearing, and was not a party to the Order to Show Case.  This may be the purpose of the

structure that the Court has attempted to graphically illustrate in Exhibits B, C and D.

Only Chase Home Finance is before the Court, and it emphasizes that "in the bankruptcy

context, Chase must take care not to make statements or incur contact that could violate

the automatic stay or the discharge injunction, which could occur with a teller at a branch

bank." Post-Hearing Submission, p. 12.  Chase Home Finance seems to be saying that *it*

must take care that *JPMorgan Chase* does not violate the automatic stay.  Ms. Baker

testified that she did not believe JPMorgan Chase Bank branches were "set up to handle"

payments from mortgagors in bankruptcy. Tr. at 133.

Chase Home Finance admonishes the Court that "lenders, like debtors, have

rights," Post-Hearing Submission, p. 14, that "the right to determine where payments are

to be made is [Chase Home Finance's] contractual right, and there is no Code provision

that alters or modifies that right or, conversely, creates a right in a debtor to pay in

person." *Id.*, p. 18.  The Court does not disagree with Chase Home Finance.  The Court

does not rule that Debtors have the right to pay at a bank branch when the mortgage or

---

[15]     This reasoning does not appear to take into account the embarrassment and confusion that
a debtor might experience when his or her payment is not accepted at a local branch.  The
testimony at the Evidentiary Hearing was that a debtor would only be aware of the reason why
the payment was refused if he or she later called Chase Home Finance.

contract says otherwise.  However, a creditor can exercise a contractual right in a way
that violates a debtor's automatic stay, the discharge injunction, or other rights under the
Bankruptcy Code. *See, e.g.,* 11 U.S.C. §§ 362(a)(1)-(8); 365(e)(1) (executory contract or
unexpired lease cannot be terminated or modified solely because of a provision
conditioned on commencing a bankruptcy case); 366(a) (utility services); 525(b)
(discrimination by private employers); 553 (limitations on right to setoff).  The exercise
of contractual rights under certain circumstances can also contribute to an abuse of
process that can be remedied under Section 105(a).  Where a creditor, under the guise of
"excercising a contractual right," revokes a privilege granted to a debtor solely because of
the bankruptcy filing, and without notice, an abuse results if the creditor's action disrupts
the bankruptcy process and unnecessarily prejudices the debtor.  In this case, Chase
Home Finance admits that the ability to make payments at JPMorgan Chase branches is a
"privilege." [16]  When Chase Home Finance terminated that privilege, without notice to
the Debtors, it was directly responsible for creating a default that Chase Home Finance
attempted to take advantage of, even though that action was not necessarily to protect its
collateral.

In *In re Nosek*, 363 B.R. 643 (Bankr. D. Mass. 2007), a Massachusetts bankruptcy
court sanctioned a mortgage servicer, Ameriquest Mortgage Company, for failure to
adjust its accounting procedures to reflect payments on pre-petition arrears made through
a debtor's Chapter 13 plan.  Ameriquest argued that if it was required to apply payments

---

[16]     Chase Home Finance claims that the "privilege" of making payments at a local branch is
provided to mortgagors "who are current with their mortgage obligations," but not "on loans
under Chapter 7 Bankruptcy Protection." When the Court expressed concern in the Order to
Show Cause that current debtors would be denied this "privilege" just because they filed for
bankruptcy, Chase Home Finance responded that these Debtors were "delinquent" but did not
explain why "delinquent" mortgagors are granted the privilege of paying at the local branch, but
the same delinquent mortgagors may not pay at a branch if they have also filed for bankruptcy.

in a manner different from the underlying contracts, it "would be forced to constantly

monitor each debtor's bankruptcy case, readjust their accounting methodologies, and

continually recalculate how payments should be applied." *Id*. at 649.  The court

responded:

> That is exactly the point; Ameriquest must adjust its accounting practices
> because of Nosek's bankruptcy. The Bankruptcy Code is not a cafeteria;
> lenders do not decide which of its provisions apply to them. Once a debtor
> files for Chapter 13, the Bankruptcy Code, and only the Bankruptcy Code,
> dictates the protections (such as the preemption of state law remedies)
> afforded to the lender and the obligations (such as the separate accounting
> for pre-and-post petition payments) required of them.

*Id*. at 649-650 (emphasis added).  Ameriquest also argued that it could not use its

computer system to track bankruptcy payments because the necessary software did not

exist.  The Judge in *Nosek* rejected this argument as "an apparent excuse as to why

Nosek's payment history was inaccurate" and responded that Ameriquest "is not excused

from doing it right, even if it is an administrative burden." *Id.* at 650.  The *Nosek* court

awarded emotional distress damages of $250,000 and punitive damages of $500,000

against Ameriquest pursuant to 11 U.S.C. § 105(a) because Ameriquest's accounting

practices were "wholly unacceptable for a national mortgage lender." *Id.* at 649.

> Counsel for Chase Home Finance argued at the Evidentiary Hearing:

> [W]hat Chase has done has set up a separate department.  Miss Baker said
> there's a separate accounting system in Chapter 13s.  We have done what
> the *Nosek* Court – we have already done what the Nosek Court said needs
> to be done.  We recognize the distinction that in bankruptcy there are
> certain considerations that have to be made.  And frankly, I find it
> somewhat disingenuous that Chase would be expected to create the
> separate system but then not be allowed to administer it in a special way.

Tr. at 148-149. Whereas the mortgage servicer in *Nosek* resisted any separate treatment at all for bankruptcy debtors, Chase Home Finance attempts to sequester them in a way that disrupts debtors' payment practices. Without informing debtors, Chase Home Finance makes it impossible for JPMorgan Chase Bank branches to accept any payments. Chase Home Finance's Bankruptcy Department then moves for relief from stay at the first possible moment that the loan appears to be two payments behind – in this case it did not even wait for the 15-day grace period to pass and moved for relief from stay notwithstanding the fact that the Chapter 7 Trustee had already requested a discharge in the case. Like the mortgage servicer in *Nosek* that complained that it should not have to "constantly monitor" each debtor's bankruptcy case, Chase Home Finance's Bankruptcy Department appears to refer, draft and file lift-stay motions completely by "autopilot," disregarding the individuals' rights. In *Nosek*, Ameriquest ran afoul of the Bankruptcy Code because its accounting system was not set up to separately account for pre- and post-petition payments. Chase Home Finance testified that it has a policy of barring payments at JPMorgan Chase Bank branches because those branches are not "set up to handle" payments, though the evidence suggests otherwise. Though Chase Home Finance stubbornly maintains that this policy "protects" debtors, it had the opposite effect in this case.[17] While Chase Home Finance's conduct in this case is not the same type of

---

[17]      At the Evidentiary Hearing, counsel for Chase Home Finance argued that the motivation behind Chase Home Finance's decision to refuse payments at JPMorgan Chase branches was not the most important consideration, offering the following analogy:

> If I have too much to drink and I decide not to get into my car but to call a cab after a dinner out, does it really matter if I'm concerned about hurting myself or if I'm concerned about hurting my car or if I'm concerned about hurting a pedestrian or if I just don't want to get arrested and get a ticket. What's important is that I made the right decision. My conduct was I didn't get in that car. And Chase's conduct here, as evidenced by those statements, is to comply with the Bankruptcy Code. Does it protect Chase? It protects Chase from

abuse addressed in *Nosek*, it is just as surely an abuse of process.  Like Ameriquest's

accounting system in *Nosek*, the system utilized by Chase Home Finance to monitor loans

in bankruptcy and to move for relief from the automatic stay is "wholly unacceptable for

a national mortgage lender." 363 B.R. at 649.

Chase Home Finance made no effort to obtain an independent appraisal of the

Debtor's property and does not dispute that the Debtors have substantial equity.  In

support of the Lift-Stay Motion Chase Home Finance incorrectly asserted in the Memo of

Law that: "no equity exists. Therefore, the stay must be lifted pursuant to §362(d)(1) and

(2)." ECF Docket No. 15, p. 2.  Later, when the Court discovered the error, Chase Home

Finance argued that "whether a debtor lacks equity is immaterial to the secured creditor's

prima facie case under Section 362(d)(1)" and that "the assertions regarding lack of

equity are meaningless surplusage." Post-Hearing Submission, p. 5-6.  The Court

wonders: meaningless to whom?  Certainly not to the Debtors or to the Court.

Whether deliberately or inadvertently, the process utilized by Chase Home

Finance in this case stands in the way of important rights afforded to debtors under the

Bankruptcy Code, including the right to the protection of the automatic stay pursuant to

11 U.S.C. § 362(a), and the essential concept of a "fresh start." *See also In re Parsley*,

2008 WL 622859 at *1 (in view of "long-standing policy protecting homesteads in

---

motions arguing that Chase has violated the statute or violated the discharge
injunction, certainly.  But the Bankruptcy Code provides that protection to the
borrowers.  The Bankruptcy Code says thou shalt not contact the borrowers about
amounts for which they have been discharged.  These debtors have been
discharged; they have no personal obligation to pay this loan.  They have not
reaffirmed and at this point it is purely voluntary.  So those procedures are set up
to comply with the Code.  If the Code said we could contact the borrowers, I
probably would.

Tr. at 151-152.  A closer analogy would be: Chase Home Finance, knowing it was going to dinner
and might have too much to drink, decided to keep the Debtors from going out to dinner so that
they would not be in the way if Chase Home Finance decided to drive home drunk.

Texas," bankruptcy court "makes every effort to ensure that motions to lift stay seeking to foreclose on homesteads contain accurate information regarding payments made by the debtor").  As noted at the beginning of this Discussion section, the automatic stay is of critical importance to consumer debtors.  Before moving for relief from stay, a secured creditor's analysts and supervisors should do more than simply forward data to the next station or entity involved in the process.  Someone must consider the specific facts in each individual case and conclude that relief from stay is actually necessary and warranted. Where affidavits are submitted under penalty of perjury, this Court expects that the facts asserted have been carefully researched and, to the best of the party's knowledge, are not only true but complete enough to be an accurate characterization. This is particularly true for lift-stay motions, where the burden of proof shifts to the debtor to prove that cause does not exist to grant relief.  In short, the Court must be certain that the party requesting relief from stay is taking the matter seriously.  The Court is aware of its own duty to carefully scrutinize the merits of each lift-stay motion, no matter how many there may be.  The same is expected of the secured creditors that bring the motion.  Whether Chase Home Finance services three loans or three million, it "is not excused from doing it right, even if it is an administrative burden." *In re Nosek*, *supra*, 363 B.R. at 650

This Court must ensure that if these Debtors, and all debtors that come before the Court, do what is required of them, they will have a chance at a fresh start, including all of the rights and benefits to which they are entitled under the Bankruptcy Code.  Where a creditor's policies or practices interfere with those rights, this Court has a duty to investigate and prevent such conduct. *In re Lyon & Reboli, Inc.*, 24 B.R. 152, 154 (Bankr.

E.D.N.Y. 1982) (court has obligation under Section 105 to pass upon the propriety of the

salaries of insiders where there is the potential for, and the prima facie appearance of,

abuse); *In re Panem*, 352 B.R. 269, 278 (Bankr. D. Colo. 2006) (reasoning that if court

failed to review terms and conditions of submitted stipulation, it would abdicate its

duties); *In re Earl*, 140 B.R. 728, 741 (Bankr. N.D. Ind. 1992) (using Section 105(a)

where "Court must preserve the integrity of the Bankruptcy system and prevent the

abusive use of the Bankruptcy system invoked only to thwart the legitimate rights of

creditors, and preclude an unwarranted congestion of its docket by enjoining the Debtor

from again filing another chapter 13 case in the near future."); *In re Fasano*, 85 B.R. 639

(Bankr. S.D. Fla. 1988) (holding debtors in contempt, citing "Court's duty under Section

105 to protect the bankruptcy system from abuse").

> 11 U.S.C. § 105 is an omnibus provision phrased in such general terms as
> to be the basis for a broad exercise of power in the administration of a
> bankruptcy case.  The basic purpose of section 105 is to assure the
> bankruptcy courts power to take whatever action is appropriate or
> necessary in aid of the exercise of their jurisdiction . . . . Bankruptcy
> courts, both through their inherent powers as courts, and through the
> general grant of power in section 105, are able to police their dockets and
> afford appropriate relief.

*In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999) (quoting 2 *Collier on Bankruptcy* (15th

ed.1999) at 105-5 to -7 (footnote omitted)).  The Court agrees with Chase Home

Finance's statement of the law regarding the outer limits of a bankruptcy court's

authority under Section 105(a). Section 105(a) cannot be used to disregard the clear

meaning of the Bankruptcy Code and Bankruptcy Rules. *In re Barbieri*, 199 F.3d 616 (2d

Cir. 1999).  "[T]he general grant of equitable power contained in section 105(a) cannot

trump specific provisions of the Bankruptcy Code, but must instead be exercised within

the parameters of the Code itself." *In re Aquatic Dev. Group*, 352 F.3d 671, 680 (2d Cir.

2003).  The findings of fact in this case do support use of Section 105(a) as "necessary to

preserve an identifiable right conferred elsewhere in the Bankruptcy Code." *In re Jamo*,

283 F.3d 392, 403 (1st Cir. 2002).

"Because of their very potency, inherent powers must be exercised with restraint

and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate

sanction for conduct which abuses the judicial process. *Chambers v. NASCO, Inc.*, 501

U.S. 32, 44-45, 111 S.Ct. 2123, 2132-2133 (1991) (citation omitted). "As with all

judicially imposed sanctions, the court must impose the least onerous sanction that

addresses the situation." *In re Hughes*, 2007 WL 1087784, *3 (Bankr. N.D. Tex. April 4,

2007).

> Counsel for Chase Home Finance argued at the Evidentiary Hearing:
>
> I want to point out, Your Honor, that Chase in this case, when payment
> did come in after the motion for relief was filed did attempt to withdraw
> this motion. . . .  I think there was an attempt here to do that, particularly
> when it was clear that Mr. Jose had enough payments that at worst the
> account was only one month in arrears.  So the trigger for the motion for
> relief was no longer present and he attempted to remove that.

Tr. at 142-143.[18]  Had Chase Home Finance begun by considering all of the facts

surrounding the Debtors' loan and payment history, it would have never filed the Lift-

Stay Motion.  Chase Home Finance's lift-stay process is not calibrated to any real sense

of whether or not it is adequately protected within the meaning of the Bankruptcy Code.

Where, as here, Chase Home Finance filed an unwarranted motion, Chase Home Finance

---

[18]    It should be noted that this explanation for withdrawal is not supported by the Attorney
Affirmation executed by Dennis Jose, who filed the Lift-Stay Motion for Chase Home Finance.
The Attorney Affirmation indicates that "the Secured Creditor's records still indicated that the
Debtors were delinquent in their mortgage obligations," and that all parties intended to "maintain
their respective rights." ECF Docket No. 25.  The impression given in the Attorney Affirmation is
that Chase Home Finance decided to bide its time until this bankruptcy case was closed and then
pursue the Debtors in another forum.

should bear all of the costs of its overly simplistic and myopic system, and this includes

compensating the Debtors for the time and expense required to defend the Lift-Stay

Motion. *Cf. In re Ronco*, 838 F.2d at 218 (later correction of factual omissions "does not

permit a recoupment of the time, energy, or in some cases, money that has already been

expended" by the opposing party).

### III.    CONCLUSION

The remedy for the abuse identified in this case is to make the Debtors whole by

(1) requiring Chase Home Finance to pay all of the costs and attorney fees the Debtors

incurred in defending the Lift Stay Motion or in participating in the subsequent pleadings

and hearings necessitated by the Lift-Stay Motion, and (2) barring Chase Home Finance

from recouping the costs it incurred to bring the Lift-Stay Motion from the Debtors or the

collateral.  "The plain meaning of [Section 105(a)] endorses monetary sanctions at least

insofar as they deter future misconduct – especially when that language is construed

broadly, as the Second Circuit has emphasized that it should be." *Grand Street Realty,

LLC v. McCord*, 2005 WL 2436214, *7 (E.D.N.Y. Sept. 30, 2005); *see also In re

Ambotiene*, 316 B.R. 25, 36 (Bankr. E.D.N.Y. 2004) (noting that several courts have

concluded that Section 105 provides a sound and appropriate basis for a bankruptcy court

to make an award of attorneys' fees and costs).

Counsel for the Debtor is hereby directed settle an order on Chase Home Finance

awarding attorney fees and costs to the Debtors on 14 days' notice.  As part of the settled

order, counsel for the Debtors should annex (1) attorney time records and receipts for all

costs incurred in connection with the Lift-Stay Motion, Order to Show Cause and

Evidentiary Hearing, including the Post-Hearing Submission, and (2) an affidavit from

the Debtors as to any expenses or costs incurred in defending the Lift-Stay Motion and appearing at the Evidentiary Hearing, including any time lost from work and travel expenses in connection with the Lift-Stay Motion, the Evidentiary Hearing, or the conduct of Chase Home Finance that gave rise to them.

The Court will issue a separate order denying the Lift-Stay motion and directing that neither Chase Home Finance, the current holder or owner of the note and mortgage, nor any of their successors-in-interest shall in any way seek or charge any attorneys' fees or other charges against Debtors, their property, or the mortgage, whether now or at the end of the mortgage, if such fees or charges are in any manner connected with the Lift-Stay Motion, the Order to Show Cause, or the Evidentiary Hearing.

This decision is published as a warning, not just to Chase Home Finance and other mortgage servicers, but to all individuals and entities involved in the process, along the line – analysts, supervisors and other personnel employed by mortgage servicers; third-party vendors; regional law firms; and local counsel – that the conduct identified here, in this Court's view, constitutes an abuse of process.  Although the Court's focus in this case was on the mortgage servicer's conduct and did not order all of the participants to appear and respond to this Order to Show Cause, they will be included in future orders if such abusive conduct continues, and the Court will assume familiarity with this decision.

The Lift-Stay motion, which originated with a notation on an analyst's computer screen, has generated a 60-page decision and stress on the Debtors for the nine-month period that the Lift-Stay Motion was pending.  The Court is not compensated according to time spent on a particular case, but this Order to Show Cause has drawn time and

resources away from other, meritorious cases.  Judicial resources do not permit such a

thorough examination of every case.  This decision sanctions Chase Home Finance only

for the actual costs incurred by the Debtors.  In the Court's view, the sanction is an

extremely mild one, because the Supreme Court instructs that a bankruptcy court should

exercise its Section 105 powers with restraint and discretion.  The Court does not regard

the exercise of restraint in this case to be a limitation on the sanctions that might be

imposed in the future against Chase Home Finance or another mortgage servicer if this

abuse occurs again.  If Chase Home Finance, other mortgage servicers and any

employees, third-party vendors, or any attorneys involved in the process at any level

exhibit the same type of abusive conduct in the future, this Court believes that Section

105(a) authorizes sanctions of increasing severity.

Dated: Poughkeepsie, New York
     April 10, 2008                   __ /s/ Cecelia Morris_____
                                   CECELIA G. MORRIS
                                   UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A: <u>Lift-Stay Motion Process</u>**



**EXHIBIT B: <u>Mortgage Inception</u>**



**EXHIBIT C:** <u>Assignment to Servicer</u>



**EXHIBIT D: <u>Mortgagors File Bankruptcy</u>**

